# EXHIBIT B

2/9/2021 4:57 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-20-006861**
**Nancy Rodriguez**

CAUSE NO. D-1-GN-20-006861

| | | |
|---|---|---|
| JAMES BLAKE BRICKMAN, | § | IN THE DISTRICT COURT OF |
| DAVID MAXWELL, | § | |
| J. MARK PENLEY, and | § | |
| RYAN M. VASSAR | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| OFFICE OF THE ATTORNEY GENERAL | § | |
| OF THE STATE OF TEXAS | § | |
| | § | |
| | § | |
| Defendant. | § | 250th  JUDICIAL DISTRICT |

## PLAINTIFFS' SECOND AMENDED ORIGINAL PETITION AND VERIFIED MOTION FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

"The Texas Whistleblower Act protects public employees who make good faith reports of violations of law by their employer to an appropriate law enforcement authority. An employer may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who makes a report under the Act." [1]

This correct statement of Texas law is taken directly from the Texas Attorney General's website and can be found there as of the date of this pleading. It is sadly ironic, then, that Attorney General Warren Kenneth Paxton -- the Chief Law Enforcement Officer for the State of Texas -- has flagrantly violated and apparently believes he is above the very law he promotes on his own website. Plaintiffs are dedicated, respected, public servants, officers of the court, and—until the events that are the basis of this Whistleblower Suit transpired—honorably served in the most senior levels of the Office of the Texas Attorney General ("OAG").

---

[1] https://www.texasattorneygeneral.gov/sites/default/files/files/divisions/general-oag/WhistleblowerPoster.pdf

1

The Texas Legislature passed the Texas Whistleblower Act in 1983 to prevent the very conduct by Attorney General Ken Paxton and OAG that forms the basis of this case. The most senior members of the OAG believed in good faith that Paxton was breaking the law and abusing his office to benefit himself as well as his close friend and campaign donor, Austin businessman Nate Paul, and likely the woman with whom, according to media reports, Paxton has carried on a lengthy extramarital affair. On September 30, 2020, the Plaintiffs, along with three other Executive Deputies and the First Assistant Attorney General, reported the facts underlying Paxton's and OAG's illegal conduct to the Federal Bureau of Investigation ("FBI") and other law enforcement authorities, as was their duty. The three Plaintiffs who attended that meeting made very clear that they believed Paxton's and OAG's conduct were acts of criminal bribery, tampering with government records, harassment, obstruction of justice, and abuse of office. Thus, they became "whistleblowers" (collectively "Whistleblowers"). On October 1, they reported the fact of their whistleblower report of the previous day to the OAG Human Resources Division and to Paxton.

Paxton responded to the report immediately and with ferocity, as though he was trying consciously to show Texans exactly what retaliation against whistleblowers looks like. Paxton falsely smeared the whistleblowers publicly in the manner calculated to harm them most, threatened them, tried to intimidate them, and engaged in all manner of retaliation ranging from serious to petty to pathetic. Then, within about a month of learning of their whistleblowing, Paxton and the OAG fired the Plaintiffs. Less than two months after they reported Paxton's and OAG's wrongdoing, none of the Whistleblowers remains employed at the OAG. It is hard to imagine more flagrant violations of the Texas Whistleblower Act.

At the crux of this case are Texas' core and necessary government policies of transparency, honesty, and integrity—as opposed to corruption and favoritism—within the State's highest law

enforcement office and instruments. Plaintiffs hope that this lawsuit following upon their direct, good-faith complaints to the FBI and other law enforcement authorities will help to restore integrity to this exceedingly important office.

Plaintiffs James Blake Brickman, David Maxwell, J. Mark Penley, and Ryan M. Vassar file this Second Amended Original Petition against the OAG. Plaintiffs respectfully show the Court the following:

## I. Parties

1.     Until they were fired and otherwise retaliated against by the OAG at the instruction of Ken Paxton shortly after reporting to law enforcement their concerns about Paxton's and OAG's criminal conduct, the four Plaintiffs were among Paxton's most senior staff, each of them hand-picked by Paxton himself, and each of whom directly interacted with Paxton on a frequent basis.

2.     Plaintiff James Blake Brickman ("Brickman") was the Deputy Attorney General for Policy & Strategy Initiatives from February 2020 until he was wrongfully terminated October 20, 2020. Brickman is a lawyer and veteran public servant. Prior to being recruited to the OAG by Paxton, Brickman served as the Chief of Staff for the Governor of Kentucky, a Republican, for four years. Earlier in his career, he also served as Chief of Staff to a United States Senator, a Republican, in Washington, D.C., attorney in private practice, and as a federal law clerk to the Honorable Amul R. Thapar (now a sitting judge on the Court of Appeals for the Sixth Circuit). Before Brickman made a good faith report to an appropriate law enforcement authority of criminal wrongdoing by Paxton, Paxton regularly and publicly lauded Brickman's work. Just by way of example, in May, Paxton publicly praised Mr. Brickman's work in the monthly meeting of senior OAG staff. Paxton presented Brickman with a book on which Paxton inscribed a note saying he was "so grateful [Brickman] joined our team." Paxton praised Brickman as an "amazing addition"

to the AG's office. Brickman relocated to Austin, with his wife and three young children, to take his job at OAG at Paxton's request and is a resident of Travis County, Texas.

3.      Plaintiff David Maxwell ("Maxwell") is and has been a law enforcement professional. Until he was wrongfully terminated on November 2, 2020, Maxwell served as the Deputy Director, and then the Director, of Law Enforcement Division for the OAG for approximately 10 years, collectively, where he oversaw 350 employees. Maxwell's storied 48-year career in law enforcement in the State of Texas includes over 38 years with the Texas Department of Public Safety – 24 years as a Texas Ranger. Maxwell has been involved in investigating some of the most serious criminal matters and conduct in this State for decades and has a well-earned reputation as an honest, thorough, and tough law enforcement investigator. Maxwell is a resident of Burnet County, Texas.

4.      Plaintiff J. Mark Penley ("Penley") was the Deputy Attorney General for Criminal Justice at the OAG from October 8, 2019 until November 2, 2020, when he was wrongfully terminated. He supervised the Criminal Prosecutions, Special Prosecutions, Criminal Appeals, and Crime Victims Services Divisions which were comprised of approximately 220 employees. Penley has 36 years of legal experience and is a retired federal prosecutor. Penley is a resident of Dallas County, Texas.

5.      Plaintiff Ryan M. Vassar ("Vassar") was the Deputy Attorney General for Legal Counsel at the OAG. In that role, until he was retaliated against and wrongfully terminated, Vassar served as the chief legal officer for the OAG. He represented the OAG before other state and federal governmental bodies and oversaw 60 attorneys and 30 professional staff across 5 different divisions, which are responsible for rendering approximately 50,000 legal decisions each year. Vassar served in different roles at the OAG for over 5 years. Before joining the OAG, Vassar

served as a law clerk for three years at the Supreme Court of Texas. Vassar is a resident of Travis County, Texas.

6.        As described in the paragraphs immediately above, all four Plaintiffs were, at all relevant times, employees of the OAG.

7.        Defendant Office of the Attorney General of the State of Texas ("OAG") is an agency of the State of Texas in the executive branch of state government created by statute. *See* Tex. Const. art. IV, §22 and Tex. Govt. Code §402.001, *et. seq.* OAG is a proper defendant in a claim under the Texas Whistleblower Act. OAG was served with process on or about November 20, 2020 and has filed an answer in this case.

8.        At all times relevant to this action, Ken Paxton has been an employee of OAG. The OAG's own employment records identify Ken Paxton as an employee of OAG. For example, **Exhibit 1** to this pleading is a true and correct copy of public records and business records from Ken Paxton's employee file at OAG. OAG's employment records show that Ken Paxton's "Date of Employment" with OAG was January 5, 2015. Ken Paxton has been an employee of OAG since January 5, 2015 and remains so to this day. The OAG employee records identify the "Employee Being Replaced" by Ken Paxton in 2015 as Greg Abbott, who was the Attorney General prior to Ken Paxton. The OAG employee records catalog Ken Paxton's "Employee Information." OAG employee records list Ken Paxton's Position Number. OAG employment records designate Ken Paxton as an exempt employee under the Fair Labor Standards Act, a law that only applies to employees and exempts certain employees. Thus, OAG's own HR department deems Paxton an employee, but an employee who is exempt from the overtime and minimum wage provisions of the FLSA.

9.     From at least September 1, 2015 to the present Ken Paxton's full-time job has been as Attorney General of the State of Texas. At all times from at least September 1, 2015 to the present Ken Paxton has been paid a salary of at least $153,750 per year by OAG for his full-time, 40-hour per week employment at OAG. Throughout that same time period, Ken Paxton has been listed in the employment records of OAG as an employee, has an OAG-designated "pay group" and "Job Class Title" in the employment records of OAG, and has been eligible for and has received employment benefits including health care benefits offered only to employees of OAG. When Ken Paxton receives a salary increase for his job at OAG, his salary increase is recorded, like it is for other employees, in a "Personnel Action Form."

10.    Since January 5, 2015 and up to the present day, Ken Paxton has been contributing to and accruing employment-based service credit under an employee pension plan administered by the Employees Retirement System of Texas. The Employees Retirement System of Texas states that its purpose is to "manage[] a defined benefit retirement plan *for State of Texas employees*."

11.    At all times relevant to this action, Ken Paxton has been the leading executive employee of the OAG and has been responsible for directing and conducting the affairs of OAG. Ken Paxton's actions, when taken in his official capacity as Attorney General, are the actions of the agency itself.

12.    That Ken Paxton is an OAG employee is further borne out by how OAG treats individuals who work at OAG in a non-employee capacity. When OAG compensates a person or a company on a non-employee basis, it expressly identifies them as a non-employee in OAG records.  For example, **Exhibit 2** to this pleading is a contract OAG claims it entered into with a lawyer named Brandon Cammack with the Cammack Law Firm PLLC. In that contract, OAG took care to specify that Cammack and the Cammack Law Firm were "independent contractors of

[OAG] and are not employees of Agency or the State of Texas." OAG has never entered into any agreement with Ken Paxton specifying that he is not an employee of the State of Texas.

**II. Jurisdiction, Venue, Rule 47 Disclosure, and Discovery Control Plan**

13.     This Court has jurisdiction because the amount in controversy exceeds the minimum jurisdictional limit of this Court. In addition, the Texas Whistleblower Act waives any immunity that might otherwise deprive this Court of jurisdiction. TEX. GOV'T CODE §554.0035 ("A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter."). Furthermore, each of the Plaintiffs exhausted any administrative remedies having participated in formal complaint procedures within the OAG with such procedures concluding without resolution.

14.     Venue is proper in Travis County because the Texas Whistleblower Act provides that a public employee of a state governmental entity may sue in a district court of the county in which the cause of action arises or in a district court of Travis County. TEX. GOV'T CODE §554.007(a). This cause of action arises in Travis County, Texas as all Plaintiffs were employed in Travis County, and worked at OAG offices near the Capitol Building in Austin, Texas in Travis County, were fired or constructively terminated in Travis County, and were subject to acts of retaliation in Travis County. Venue is also proper under §15.002 TEX. CIV. PRAC. & REM. CODE because all or a substantial part of the events or omissions giving rise to this claim occurred in Travis County, Texas.

15.     Pursuant to TEX. R. CIV. P. 47(c)(4), Plaintiffs seek monetary relief of over $1,000,000.

16.    Plaintiffs intend for discovery to be conducted in accordance with a discovery control plan under TEX. R. CIV. P. 190.4 (Level 3).

### III. Facts

### Ken Paxton's Donor and Friend, Nate Paul

17.    On August 14, 2019, FBI agents executed a search warrant at the home of Austin real-estate investor Nate Paul. That same day, agents executed search warrants at two separate office locations of Nate Paul's real estate business, World Class Holdings. A long-serving and highly respected United States Magistrate Judge issued those warrants on August 12. A fourth search warrant was executed a few days later at a records storage unit rented by Paul's company.

18.    Paul has had many well-documented troubles in 2019, 2020, and 2021 in addition to the execution of search warrants at his home and offices by federal law enforcement. Paul is an Austin businessman who invests in real estate through his company, World Class Holdings, and through single-purpose limited liability companies controlled by Paul and/or World Class Holdings. In 2019 and 2020, according to media reports, at least 16 Paul-controlled entities have filed for bankruptcy protection, and lenders have initiated foreclosure proceedings on over $250 million in delinquent debt held by over two dozen of Paul's companies.

19.    Also in 2020, Paul created a company for the purpose of suing a local charity, the charity's lawyer, and a court-appointed receiver. The district judge presiding over the case dismissed the case shortly after the suit was filed, ruled that the suit was groundless and filed in bad faith for the purpose of harassment, and sanctioned Paul's company and his lawyer over $225,000 for the frivolous and malicious use of the justice system.

20.    Mr. Paul also spent time in 2020 making requests—both formally and informally— that the Travis County District Attorney and the Office of the Attorney General of the State of

Texas launch criminal investigations of Mr. Paul's perceived adversaries. By way of example, Mr. Paul made formal written requests for criminal investigations of:

    a.  The federal magistrate judge who issued the search warrants authorizing the search of Paul's offices and home;

    b.  The FBI agents and state law enforcement agents who carried out the searches;

    c.  The Assistant United States Attorney who had obtained the search warrants from the federal magistrate judge;

    d.  A federal bankruptcy judge;

    e.  A local charity that was a co-investor with Paul-controlled entities in two properties;

    f.  The local charity's lawyer;

    g.  A credit union that held a lien on one of Paul's entities' properties; and

    h.  The receiver appointed by the Travis County Court to take control of certain properties pending resolution of the lawsuit between the charity and Paul-controlled entities.

21.    Despite a very busy 2019 and 2020, Mr. Paul, age 33, also found time to enjoy his personal friendship with the Attorney General of the State of Texas, Ken Paxton, age 57.

22.    The origins and full dimensions of the relationship between Mr. Paul and Mr. Paxton are net yet known. But what is known paints a picture of personal, reputational, and financial ties to Mr. Paul that almost certainly explain why Paxton, acting in the scope of his official duties, abused his office and brought the power, resources, and personnel of OAG to bear in outlandish ways to personally benefit Mr. Paul and to benefit Paxton himself.

23.    It is known, for example, that in 2020, Paxton and Paul met regularly in Austin, Texas, in meetings usually without Paxton's staff or security detail present, and in meetings that were not included on Paxton's official schedule. It is also known that Nate Paul repeatedly refuses to answer questions in civil litigation he is involved in about the nature of his relationship with the Attorney General.

24.     Nate Paul is also a major donor to Paxton's campaign.

25.     On or about October 29, 2018, Paul made a $25,000 contribution to Paxton's political campaign committee. It has also been publicly reported that the political action committee of a law firm representing Nate Paul's interests in litigation between Nate Paul-related entities and the Mitte Foundation made a $25,000 contribution to Paxton's campaign on or about June 30, 2020, which was 22 days after the OAG intervened in the litigation to advantage Paul personally.

26.     Ken Paxton also has personal and financial ties to Nate Paul through an individual with whom Ken Paxton carried on an extramarital affair and who now works for Nate Paul on Ken Paxton's recommendation.  In late 2019 or 2020, Paxton admitted to several OAG staffers that he had been involved in an extramarital affair with an individual whose name Plaintiffs do not include in this pleading.  This individual is a former staffer of a Texas state senator – a different state senator than Mr. Paxton's wife who serves in the Texas Senate. At the time Plaintiffs went to law enforcement to report a wide array of criminal conduct by Ken Paxton and OAG, Plaintiffs suspected a connection between Ken Paxton's affair with this individual and Nate Paul. Nate Paul has subsequently admitted that the individual with whom Paxton carried on the affair was recommended to Nate Paul for a job, and that she was then hired to work for a Nate Paul entity. Nate Paul did not know the individual prior to her being recommended to Nate Paul for a job with one of Nate Paul's companies. Notably, the individual's LinkedIn profile conceals her work for a Nate Paul-controlled company, further evidence of its illicit nature.

27.     On information and belief, that individual still works for one of Nate Paul's companies as a construction project manager even though that individual has no prior experience in the construction industry, much less managing construction projects.

28.     Also on information and belief, Nate Paul and Ken Paxton have a relationship related to the renovation construction of a home Paxton was renovating in Austin. In 2018, Ken Paxton bought a home valued at approximately $1 million in the Tarrytown neighborhood of central Austin, although permitting records in Travis County could not be located. In 2020, Ken Paxton was undergoing a major remodeling project on the home. In mid-2020, some of the Plaintiffs received information suggesting that Nate Paul, either personally or through a construction company he owns and controls, was involved in the project.

### Paxton Abused the Office of the Texas Attorney General to Personally Benefit Paul and Himself

29.     Over the course of 2019 and 2020, Ken Paxton used and abused his office by causing the full weight of the office that he commands, deploying employees and resources of OAG spanning multiple functions and departments, to improperly interfere in the civil disputes and criminal matters of his donor, friend and personal benefactor Nate Paul. Plaintiffs reasonably believed that Paxton and OAG engaged in these acts not only to benefit Paul, but to benefit Paxton personally because of the financial, reputational and personal relationships between Paul and Paxton, relationships Paul and Paxton work hard to conceal.

30.     As described in greater detail below, the criminal actions about which Plaintiffs complained to law enforcement were the actions of the OAG, Paxton as the top employee of OAG, and the actions of other OAG employees whom Paxton enlisted to participate, in most cases apparently unwittingly. Some of Paxton's actions directing the OAG to benefit Paul were criminal without regard to motive. Others were so egregious and so contrary to appropriate use of his office, that they could only have been prompted by illicit motives such as a desire to repay debts, pay hush money, or reciprocate favors extended by Paul.

31.     During the Spring and Summer of 2020, Paxton began taking more interest in legal matters involving Nate Paul and applying more pressure on the Plaintiffs and the other Whistleblowers to use the personnel, legal authority and other resources of the OAG to advance the legal and personal interests of Nate Paul and his business activities. Paxton showed a pattern of not listening to the Whistleblowers, including Plaintiffs, when they raised valid objections to his instructions regarding Nate Paul's legal matters that were brought before the OAG. Plaintiffs, along with the other Whistleblowers, became increasingly concerned over time as the Attorney General became less rational in his decision making and more unwilling to listen to reasonable objections to his instructions, and placed increasing, unusual priority on matters involving Paul.

32.     Paxton's abuse of the OAG to benefit Paul began in or around November 2019. But as 2020 progressed, Paxton's efforts on Paul's behalf became increasingly reckless, bold, and apparent to Plaintiffs.

**Paxton Intervened to Benefit Nate Paul in Nate Paul's Open Record Requests**

33.     A state agency that receives a request for records under the Texas Public Information Act and wishes to withhold documents responsive to that request based on statutory exceptions must request a ruling from the OAG as to whether the asserted exceptions are applicable. The OAG issues approximately 30,000 to 40,000 open records decisions each year, but Plaintiffs are only aware of Paxton taking a personal interest in decisions that related to Paul.

34.     In the Fall of 2019, lawyers for Paul issued an open records request to the Texas State Securities Board for records related to the August 2019 search of Paul's properties by the FBI and other federal and state law enforcement officials. In effect, Paul was seeking to gain information about the federal investigation into his own conduct. The State Securities Board requested an open records decision from the OAG as to whether it was required to produce records

relating to this ongoing investigation. Paxton put pressure on Whistleblower Ryan Bangert to issue an opinion that would have allowed for the records Paul sought to be released to Paul – a highly unusual move that was contrary to well-established precedent related to protecting the integrity of criminal investigations. Despite this pressure from Paxton to issue a highly irregular ruling to benefit Nate Paul, OAG issued a ruling that all records related to this request were **not** subject to disclosure due to a pending criminal investigation of Paul.

35.     On or about March 13, 2020, lawyers for Paul tried again, this time issuing an open records request to the Texas Department of Public Safety ("DPS") for records related to the FBI's search of Paul's properties in August 2019. DPS had cooperated with and assisted the FBI in conducting the search of Paul's office and properties. Because the search of Paul's properties in August 2019 was conducted by the Federal Bureau of Investigation, the FBI filed a brief with the OAG urging OAG to follow its longstanding practice of not providing documents related to an ongoing investigation. The FBI also sent a redacted version of the brief to Paul's lawyers. A law enforcement agency, when submitting a brief like this one, will typically redact a copy of the brief to conceal information a law enforcement agency would not want the subject of an ongoing negotiation to know during the investigation itself. The FBI sent the redacted version of the brief to Paul's lawyers. But Paul wanted the unredacted brief. Paxton tried to help Paul get the unredacted brief.

36.     Paxton contacted Ryan Vassar, then the Deputy Attorney General for Legal Counsel, several times related to Paul's request and pressured him to issue an opinion favorable to Nate Paul's efforts to get information about the FBI's ongoing investigation of Paul. In meetings between Paxton and Vassar, Paxton revealed that he had spoken personally with Paul about the

activities that occurred on the day the search warrants of Paul's properties were executed. Paxton stated that he did not want to use the OAG to help the FBI or DPS in any way.

37.     Longstanding OAG precedent and sound principles indicated that disclosure of the documents should be prevented, yet Paxton directed Vassar to find a way to release the information. Vassar struggled with this directive because allowing disclosure of the information requested by Paul would overturn decades of settled expectations among sister law enforcement agencies, compromise the OAG's own law enforcement information, and likely spark innumerable lawsuits challenging the newly announced application of the law.

38.     Paxton then personally took the file, including all the responsive documents, which included documents sealed by a federal court, and did not return it for approximately seven to ten days. Paxton also directed that the final opinion, issued on June 2, 2020, take no position on whether the documents should be released.

39.     On or about May 20, 2020, lawyers for Paul issued an open records request to the OAG for the un-redacted FBI brief referenced above. Paxton asked Vassar for a copy of the un-redacted FBI brief, and directed Vassar to find a way to release the un-redacted FBI brief. Paxton then directed Vassar, an OAG employee at the time, to release the opinion dated July 24, 2020, which ultimately concluded that the unredacted FBI brief must be released.

40.     These actions of OAG, Paxton, and Vassar at Paxton's direction are inexplicable in the absence of an illicit motive by Paxton to personally assist his friend, donor and financial associate, Nate Paul and to thereby benefit Paxton himself.

41.     The work and powers of the Open Records division of OAG is only one of the functions and powers Paxton and OAG brought to bear at the expense of Texans and in favor of

Nate Paul and Ken Paxton personally. *See, e.g.*, Tᴇx. Gᴏᴠ'ᴛ Cᴏᴅᴇ §552.306 (requiring the attorney general to render a decision regarding release of public information).

### Paxton Caused OAG to Intervene in Civil Litigation To Pressure a Charity to Settle a Dispute with Nate Paul

42.     OAG and Paxton also caused the powers, employees and other resources of the Financial Litigation and Charitable Trust Division of OAG to be brought to bear illegally to help Nate Paul by pressuring a local charity with whom Paul was involved in a business dispute.

43.     The OAG has approximately 35,000 open civil litigation cases each year, but Paxton has only taken a personal interest in one case. That case involves Paul.

44.     The Roy F. and Joann Cole Mitte Foundation ("Mitte Foundation") is a non-profit corporation and charitable foundation located in Austin, Texas. The Mitte Foundation invested in and was a limited partner of several entities associated with World Class Holdings, Nate Paul's company. In 2018, the Mitte Foundation filed suit against several of those entities controlled by Paul's World Class Holdings claiming, among other things, that the Mitte Foundation was being denied access to the books and records of the companies. That litigation grew and ultimately resulted in the court appointment of a receiver over the World Class entities.

45.     The Financial Litigation and Charitable Trust Division of the OAG has the power to intervene in any litigation involving charities if doing so will protect the assets of the charity.[2] On January 31, 2020, lawyers in the Charitable Trust division of the OAG filed a notice with the court declining to intervene in the case. (*See* **Exhibit 3**). The decision not to intervene reflected the obvious and prudent conclusion by OAG staff that OAG's intervention in a suit of this nature – a dispute among owners (including the charity) of a valuable piece of Austin real estate in which

---

[2] *See* Tex. Prop. Code § 123.001, *et seq*

the charity was the plaintiff and represented by capable legal counsel at one of Texas's most established and reputable law firms – was not warranted.

46.     However, months later, in May or June of 2020, Paxton began to take a deep personal interest in this case. Paxton had several discussions with OAG staff about intervening in the case. OAG staff advised Paxton that OAG had no interest in intervening in the case, as the Mitte Foundation was the plaintiff in the case and instituted the suit to protect the charity's interest, making OAG's intervention unnecessary.

47.     Against the advice of OAG staff, including some of the Whistleblowers, and contrary to OAG's prior decision not to intervene, Paxton directed the Charitable Trusts Division to intervene in the lawsuit, which OAG did on or about June 8, 2020. (*See* **Exhibit 4**). The OAG, with Paxton acting in his official capacity and with other employees of OAG (as reflected in Exhibit 4) carrying out the direction of Paxton, intervened for the purpose of exerting pressure on the Mitte Foundation to settle on terms favorable to Nate Paul.

48.     On or about July 6, 2020, Paxton asked Brickman to review the pleadings in the case. On or about July 6, 2020, Brickman informed Paxton that OAG had no interest in the case and should not waste resources of the OAG participating in a dispute in which the charity – which the OAG should have wanted to protect – was the plaintiff and represented by capable counsel in a legitimate dispute. Additionally, Brickman informed Paxton that the parties reached a settlement agreement in August 2019, which Paul subsequently breached. Paxton did not waver in his desire to bring the power and resources of OAG to bear in this civil litigation to help Nate Paul at the expense of the charity that the OAG should have been protecting.

49.     So intense and bizarre was Paxton's desire to help Nate Paul that, on or about July 22, 2020, then-First Assistant Jeff Mateer and Brickman had to talk Paxton out of personally

attending and appearing before the Travis County District Court in this matter, which would have been an unprecedented event as Paxton has not appeared in any court on behalf of the OAG in the memory of any of the Plaintiffs, if he ever has.

50.     Plaintiffs saw that Paxton was seeking to exert influence in the case not to assist the charity, but to pressure the charity to reach a settlement favorable to the World Class entities controlled by Nate Paul.

51.     On or about October 1, 2020, then-Deputy Attorney General for Civil Litigation and Whistleblower Darren McCarty directed the Financial Litigation and Charitable Trusts Division to withdraw from the case. (*See* **Exhibit 5**).

52.     Plaintiffs knew when they went to the FBI in September 30, 2020 that no legitimate, lawful exercise of the powers of the OAG could explain OAG's and Paxton's intervention and actions to help Nate Paul on the Mitte Foundation case. Plaintiffs would later learn that the political action committee of a law firm that at that time represented Nate Paul's interests on the Mitte Foundation case made a $25,000 contribution to Paxton's campaign on or about June 30, 2020,  a mere 22 days after the OAG intervened in the litigation at Ken Paxton's insistence and over the objections of OAG staff.

**Paxton Directed a Legal Opinion to Benefit Nate Paul**

53.     On or about July 31, 2020, Paxton contacted Whistleblower Bangert and asked him to look into whether restrictions on in-person gatherings due to COVID prevented the foreclosure sales of properties. Bangert consulted Vassar.  After hearing their researched views on this subject, Paxton made clear that he wanted OAG to express a specific conclusion: that foreclosure sales should ***not*** be permitted to continue. That Paxton would become personally involved in a question

such as whether foreclosures should be suspended was surprising enough. That he would come down so personally and adamantly that COVID should *stop* foreclosure sales seemed bizarre.

54.     Even more bizarre was the speed and timing of the release of the opinion Paxton sought, and the connection to Nate Paul that soon became apparent. On Sunday, August 2, 2020 at approximately 1:00 a.m., OAG issued an informal legal opinion Paxton sought, concluding that foreclosure sales should not be permitted to continue in light of the then-existing restrictions on in-person gatherings to prevent the spread of COVID-19. Unbeknownst to Plaintiffs at the time, this opinion favored persons such as Paul who hoped to stave off foreclosure sales. According to media reporting, on the very next day, Monday, August 3, 2020, lawyers for Paul showed Paul's creditors a copy of Paxton's opinion to prevent the foreclosure sales of Paul's properties that were scheduled for August 4, 2020. Here again, Plaintiffs reasonably concluded that OAG and Paxton abused the office's powers and personnel to personally benefit Nate Paul and Ken Paxton.

**Paxton Used OAG to Investigate Nate Paul's Adversaries**

55.     The OAG has approximately 400 open criminal cases and 2,000 open criminal investigations each year. Paxton rarely showed an interest in any pending criminal investigations, but he showed an extraordinary interest in investigations sought by Nate Paul.

56.     In May of 2020, Paxton contacted the Travis County District Attorney and requested a meeting to help Nate Paul present a criminal complaint. A meeting was held with the DA's staff. Paxton attended the meeting along with Paul and his attorney. Paul also submitted a written complaint accusing federal law enforcement, a federal magistrate judge, Texas state law enforcement, and a prosecutor with the U.S. Attorney's office of violating his rights. Specifically, Paul was alleging that federal law enforcement officials – either FBI agents or a federal prosecutor – had made substantive alterations to a warrant for the search of his property after it had been

signed by the federal magistrate judge. With OAG's and Paxton's help, Paul was asking the Travis County DA to investigate the FBI and a federal prosecutor.

57.     Paxton knew that the Travis County DA would have nothing to do with such an outlandish and baseless accusation. But Paxton also knew he could request the Travis County DA to refer the complaint to the OAG where, yet again, Ken Paxton could cause the OAG to bring its resources and employees to bear to help Paxton's friend and donor, Nate Paul.

58.     By letter dated June 10, 2020, The Travis County DA's Office referred Paul's criminal complaint to the OAG. Paxton assigned the matter to Plaintiffs Maxwell and Penley, both employees of OAG, for investigation.

59.     Maxwell, an employee of OAG at the time, scheduled an initial meeting with Paul and his attorney, Michael Wynne, at which they stated their contentions that the substance of a federal search warrant executed in August 2019 had been altered by a federal law enforcement officer or federal prosecutor after they were signed by the federal magistrate judge.

60.     Penley and Maxwell held a second meeting, at which they believed Paul and Wynne would produce evidence supporting their claim. Paul and Wynne gave a further explanation of their complaints and produced a thumb drive containing documents which they contended would support their claims. After the second meeting, Penley and Maxwell examined the contents of the thumb drive.

61.     Shortly thereafter, Maxwell and Penley consulted with forensic experts in the OAG Criminal Investigation Division ("CID") and determined that no credible evidence existed to support any state law charges. Paul's allegation of misconduct by federal law enforcement consisted entirely of a claim that the *copy* he had of the warrant contained metadata showing that at some point the *copy* had been altered in some way. Paul and his lawyer had no evidence

indicating how the copy had been altered. As Penley and Maxwell had learned from the forensic experts in the CID and then explained to Nate Paul and his lawyer, metadata would show that a copy of a document had been altered for a variety of common reasons having nothing to do with changing the content of the warrant itself.  For example, metadata showing the copy had been altered would be present when a document was merely (a) saved as a .pdf; (b) redacted pursuant to a court-prescribed redaction process to conceal sensitive information; or (c) emailed in an encrypted format. All three of those things had been done to the copy of the warrant in Paul's possession.

62.     Maxwell and Penley conveyed to Paul that they found no evidence of a crime under Texas law. They suggested that, if Paul had concerns about the conduct of the federal prosecutor and the FBI agents – concerns Maxwell and Penley did not share – they could present their concerns to the federal court and/or to the Department of Justice Office of Inspector General (DOJ/OIG).

63.     Paul's lawyer said that he had presented his concerns about the alleged alterations of the search warrants, which were under seal at the federal District Clerk's office, to the magistrate judge at a hearing in February 2020, and that the judge had released some documents to him.

64.     In or around this time, Paul leaked the fact that the OAG was investigating his complaint against federal officials to the media.

65.     Soon thereafter, Paxton, Paxton's assistant, Penley, Maxwell, Paul, Wynne, and two CID forensic experts attended a third meeting regarding Paul's complaints.  When Penley announced his recommendation that the investigation be closed, Paul, Paul's attorney and Paxton pushed back. As a result of Paxton's surprising response, Penley thereafter requested additional documents from Paul's counsel, but the attorney never provided those documents despite repeated

requests. After the third meeting, it was obvious that Paxton was dissatisfied with Maxwell's and Penley's opinions and recommendation.

66.     On August 18, 2020, Paxton contacted Vassar, asking him to explain how the OAG could retain outside legal counsel. Vassar obliged, explaining that the OAG's approval process for hiring outside counsel requires authorization from no less than 10 different OAG personnel. Various stages throughout the OAG's review process, which is designed in part to prevent the hiring of unqualified, conflicted lawyers to undertake unnecessary work or work that can be provided by current OAG staff, provide that: a contract must be drafted; it must be approved; conflicts must be cleared; and funding must be obligated. Vassar also explained that retaining outside counsel is usually limited to matters in which the OAG does not have the necessary experience (*e.g.*, patent law), license requirements (*e.g.*, patent law or pro hac vice admission), or where an actual or apparent conflict of interest may arise in the matter.

67.     On or about August 26, 2020, Paxton contacted Vassar again and asked if retaining outside counsel to investigate criminal allegations was permissible. Vassar explained that Texas law contemplates two unique scenarios involving the appointment of a special or outside prosecutor. The first scenario involves a situation where a prosecutor may recuse herself to allow the trial court to appoint an attorney pro tem as a prosecuting attorney. Tex. Code Crim. Pro. art. 2.07(a); *see also* Tex. Att'y Gen. Op. KP-0273 (2019). Paxton stated that a court-appointed attorney pro tem was not acceptable. The second scenario involves a situation where a prosecuting attorney may "request the assistance of the attorney general, and the attorney general may offer to the prosecuting attorney the assistance of his office." Tex. Gov't Code §§ 41.102(b); 402.028(a). Vassar cautioned, however, that he would need to defer to Penley on whether engaging outside counsel to conduct a criminal investigation would be appropriate, given Penley's responsibility to

oversee OAG's criminal prosecutions. Paxton then asked Vassar to contact two potential candidates who may be willing to serve as outside legal counsel, to explain the basic retention process.

68.     On or about August 26, 2020, Vassar began contacting the two potential candidates who Paxton said might be willing to serve as outside counsel. During these contacts, Vassar explained the outside counsel process and asked both potential candidates to provide him with their proposed hourly rates and an estimate of the cost for conducting an investigation. One of the candidates was Brandon R. Cammack, a Houston criminal defense attorney who had been licensed only 5 years and never served as a prosecutor. The other candidate was a veteran former state and federal prosecutor with decades of experience.

69.     On or about September 3, 2020, Paxton announced his decision to retain Cammack as outside counsel. Paxton instructed Vassar to draft an outside counsel contract and send it to Cammack that same day. Paxton stated that this needed to be done immediately because the Travis County District Attorney-elect would not be cooperative with this investigation and may rescind the referral to the OAG. Vassar followed Paxton's order, obtained a copy of the criminal referral, for the first time, and prepared a draft contract for Cammack to review. At Paxton's direction, Vassar also sent a copy of the draft agreement to Paxton that same day.

70.     On or about September 4, 2020, Cammack notified Vassar that the contract terms were acceptable. Vassar then forwarded the draft agreement to the General Counsel Division to begin the OAG's internal review and approval process.

71.     On or about September 23, 2020, Cammack contacted Vassar and asked him if Cammack could obtain an email address from the OAG or some other official documentation to identify himself as an attorney working for the OAG, because a certain prosecutor's office was

asking for verification of Cammack's relationship with the OAG. Vassar explained to Cammack that his contract had not been approved yet, but that he would discuss potential ways to document Cammack's involvement in an investigation with relevant OAG personnel. Later that same day, Paxton called Vassar, asking if Cammack could obtain an OAG email address and asking why Cammack's contract had not been approved yet. Vassar explained that the process can take time due to the multiple approvals required. Paxton asked who was currently reviewing the agreement and exclaimed that he was "tired of his people not doing what he had asked."  Upon checking the OAG's contract-approval application, Vassar identified that Penley was currently reviewing the agreement. Paxton then ended the call.

72.    On or about September 24, 2020, Penley refused to sign a memo to approve the hiring of Cammack to take over the investigation of Paul's complaint. Penley believed that the claim alleging that federal law enforcement officers or a federal prosecutor had altered search warrants was unsupported by credible evidence.

73.    On Saturday, September 26, 2020, Paxton asked Penley to meet him in McKinney. Paxton pressured Penley to approve the contract for Cammack. Penley again said he could not in good conscience approve the contract as there was no factual basis for the absurd investigation ordered by Nate Paul of the FBI agents and federal prosecutor involved in obtaining search warrants for Paul's home and offices. Thus, as late as September 26, 2020, Paxton clearly knew that the contract he wanted with Cammack needed Penley's approval and was therefore not authorized under OAG's own policies and procedures.

74.    Plaintiffs would later learn that, on or about September 3, 2020, Paxton had asked Cammack, to begin work as an outside counsel despite not having a contract approved to retain him.

23

75.     The week of September 28, Cammack still did not have a contract that was approved through OAG's policies. He was therefore not authorized to engage in any work for the OAG.  **Exhibit 6** to this pleading is a true and correct copy of the contract OAG now claims OAG made with Cammack to provide legal services for OAG.  This is the contract that was never properly approved; it is the contract Paxton asked Penley to approve on September 24 and again on September 26.

76.     The contract states that Cammack was to provide legal services only as directed by the OAG. (Exhibit 6, Addendum A). The contract states that Cammack would be hired as "Outside Counsel." Importantly, the contract ***does not*** identify Cammack as a prosecutor. It specifically states that Cammack is not to represent OAG in litigation (§1.2.1), and also specifically states that Cammack is not to provide indictment or prosecution legal services (Exhibit 6, Addendum A).

77.     Yet, at Paxton's and OAG's direction, Cammack proceeded to conduct work without a validly approved contract and then, at Ken Paxton's and OAG's direction, falsely represented that he was a "special prosecutor" in order to obtain grand jury subpoenas under false pretenses to investigate, harass, and intimidate Nate Paul's perceived adversaries. Grand jury subpoenas were signed by Cammack as "Special Prosecutor."

78.     The following are screen shots of an actual subpoena that was served on a financial institution by Cammack. Nate Paul's lawyer accompanied Cammack when serving the subpoena.

GRAND JURY SUBPOENA DUCES TECUM

460th GRAND JURY

TRAVIS COUNTY, TEXAS

The State of Texas, to any Peace Officer:

You are commanded to summon:

To appear before the Travis County Grand Jury at the courthouse in said county on the **12th day of October, 2020 at 4:00 o'clock p.m.**, at 700 Lavaca, Multifunction Space B, Room 1.113, Austin, Texas, and thereafter from day to day until he/she shall be released by the foreperson of the Grand Jury, to then and there

...

Please return the requested documents to the attention of Brandon R. Cammack, Special Prosecutor for the Office of the Attorney General, 4265 San Felipe Street, Suite 1100 Houston, TX 77027 or electronically to Mr. Cammack at Brandon@cammacklawfirm.com with an original business records affidavit mailed to the address above.

Herein fail not, and due return make hereof.

Signed on this day of _____.

9/28/2020 | 11:16 AM CDT

KEN PAXTON
Texas Attorney General

By: *Brandon R. Cammack*
—9ARE5EC0C1E5472...
Brandon R. Cammack
Special Prosecutor
Office of the Attorney General

79.     On or before September 29, 2020, at Paxton's and OAG's direction, Cammack obtained 39 grand jury subpoenas from the Travis County Grand Jury by falsely claiming he was a "Special Prosecutor" authorized to represent OAG before the Grand Jury. He did so on the

instructions and with the involvement of Ken Paxton acting in the course and scope of his duties as the Attorney General of the State of Texas. Ken Paxton's actions in directing and coordinating this activity are the actions of the OAG and of an employee of OAG.

80.     Not only were Paxton and OAG directing the OAG "outside counsel" to obtain subpoenas on Paul's enemies based on false representations that Cammack was a prosecutor, they were causing the outside counsel to conduct an investigation outside the scope of what the outside counsel's purported contract even contemplated. Numerous of the subpoenas obtained by Cammack and Paxton were outside the appropriate scope of the June 10 referral from the Travis County District Attorney's office. It would later be learned that Paul had sought an additional investigation, this one asserting a wild conspiracy theory implicating the lawyers for the Mitte Foundation charity, the court-appointed receiver in that litigation, the lawyer for the receiver, and even a federal bankruptcy judge in what Paul called "on ongoing conspiracy" to defraud Nate Paul. A copy of Nate Paul's request is attached to this pleading as **Exhibit 7**. This request to investigate was never the subject of the attempt to appoint Cammack. Thus, not only was Cammack never properly approved under OAG policies to conduct any investigation in the first place and never had the title or powers of a prosecutor, he was now obtaining subpoenas under false pretenses to conduct an investigation that was never in the scope of his asserted contract with OAG. And he was doing all of this at the direction of OAG and Ken Paxton to benefit Nate Paul and Ken Paxton.

81.     On or about September 29, Plaintiffs each learned that Paxton was causing OAG to use the grand jury process and the subpoenas obtained under false pretenses to investigate and intimidate Nate Paul's perceived financial adversaries.  For example, the Whistleblowers learned that one of the subpoenas was served on Independent Financial in Round Rock, a financial

institution that was involved with one of World Class's properties, and that Cammack was accompanied by Nate Paul's attorney, Michael Wynne, when the subpoena was served.

82.     On September 30, each of the Plaintiffs learned of a second grand jury subpoena served on Amplify Credit Union in Austin, a World Class creditor.

83.     On September 29 or 30, each of the Plaintiffs learned that many of the other subpoenas obtained by OAG, Paxton and Cammack under false pretenses were directed to law enforcement agents and federal prosecutors involved in the search warrants executed on Paul's offices and home back in August and in the investigation of Nate Paul. The subpoenas directed to law enforcement agents sought personal information such as their personal cell phone information and were clearly designed only to harass and intimidate the law enforcement officers.

84.     Plaintiffs were shocked at what was transpiring – the Attorney General influencing a criminal investigation that could be referred to the OAG,  improperly hiring an "outside counsel" and directing that individual to obtain grand jury subpoenas on false pretenses, all in an effort to investigate and intimidate the federal law enforcement agents who were investigating Nate Paul and some of Nate Paul's lenders and financial adversaries in the many civil legal and foreclosure proceedings swirling around Nate Paul.

**Plaintiffs' Good Faith Belief that OAG and Paxton Committed Crimes**

85.     During the last week of September 2020, the Plaintiffs talked frequently about what each of them knew about the various actions Paxton and OAG were taking to benefit Nate Paul and Ken Paxton personally. Because Paxton's and OAG's actions to benefit Paul were so sweeping and occurring across numerous divisions of OAG, not every Plaintiff knew the whole picture.

86.     But by the afternoon of September 29, 2020 or the morning of September 30, 2020, each of the Plaintiffs knew -- through direct observation or discussion with others with direct

knowledge or review of documents and reasonable inferences -- every fact described in the paragraphs above that had occurred by that time. And based on what they had observed, what they had been told, and based on their experience, each of the Plaintiffs formed a good faith belief that Paxton and OAG had violated Texas and federal criminal law, including but not limited to laws regarding bribery, tampering with government records, obstruction of justice, harassment, and abuse of office.

87.    By way of example only, Texas Penal Code §39.02, titled Abuse of Official Capacity, makes it a criminal offense for a public servant, with intent to obtain a benefit or with intent to harm or defraud another, intentionally or knowingly misuse government property, services, personnel or any other thing of value belonging to the government. As of September 30, 2020, because of the conduct of OAG and Paxton described above, each Plaintiff had a subjective and reasonable belief that Paxton and OAG misused the funds, services and personnel of his office to personally benefit Nate Paul and to benefit himself. Plaintiffs reasonably concluded that Paxton's bizarre, obsessive use of the power of his office to help Nate Paul was an effort to repay Paul for Paul's help with Paxton's home remodel and/or to silence or repay Paul for helping or paying Paxton's mistress, and/or to encourage Paul not to reveal that Paxton had had an affair and/or to repay Paxton's campaign contribution, and/or to cause Paul to continue giving campaign contributions.

88.    Also by way of example, Texas Penal Code §37.10, titled Tampering With Governmental Record, makes it a criminal offense to knowingly make a false entry in, or false alteration of, a governmental record or to make, present or use any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record, or to make, present or use a governmental record with knowledge of its falsity. By September 30, 2020,

each of the Plaintiffs had formed a good faith and reasonable belief that Paxton and OAG directed and participated in creating, presenting, and using false government records with knowledge of their falsity. For example, Paxton and OAG knew that Cammack's contract was not properly authorized under OAG policy, that Cammack was never even allegedly authorized to investigate the second Nate Paul complaint (Paul's allegation of a conspiracy against him by a charity, a court-appointed receiver, their lawyers, creditors, and a federal bankruptcy judge), that Cammack was not a prosecutor or retained to be a prosecutor. Paxton and OAG directed Cammack to nevertheless file applications for, obtain, and then serve subpoenas obtained on false pretenses, all in an effort to intimidate and harass Nate Paul's perceived adversaries, including his creditors and the law enforcement professionals involved in investigating him.  Each Plaintiff reasonably and in good faith believed that Paxton and OAG engaged in conduct meeting these elements of this crime.

89.     Texas Penal Code §36.02, titled Bribery, makes it a criminal offense to offer, confer, or agree to confer on another, or solicit or accept or agree to accept from another any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter or for the exercise of official discretion in a judicial or administrative proceeding.  By September 30, 2020, each Plaintiff formed a good faith and reasonable belief, based upon the conduct described above, that Paxton and OAG had been bribed. Paxton's decisions, opinions, and exercise of discretion described in detail above were far removed from the bounds of what an ordinary, prudent civil servant would do. They were all ostensibly for the benefit of a single person, a 33 year-old real estate investor under FBI investigation and caught in a maelstrom of business failure and litigation. That real estate investor was also a major donor to Paxton's campaign, was assisting Paxton in the remodel of his personal

residence, and was the employer of Paxton's mistress. Plaintiffs reasonably believed Paxton's bizarre abuse of his office was the result of bribery.

90.      18 U.S.C. §1510(a), titled Obstruction of Criminal Investigations, states:

> Whoever willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator shall be fined under this title, or imprisoned not more than five years, or both.

91.      Under 18 U.S.C. §1512(c)(2), it is a federal crime to obstruct, influence or impede any official proceeding or attempt to do so. Under 18 U.S.C. §1512(d), it is a federal crime to intentionally harass another person and thereby hinder them from attending or testifying in an official proceeding. By September 30, 2020, all of the Plaintiffs knew that Paxton and OAG were orchestrating a campaign to use the levers of power of OAG to investigate, harass and intimidate the federal law enforcement agents who were investigating and would likely testify in official proceedings about the search warrants on Nate Paul's home and offices.  In addition, each Plaintiff reasonably believed that Paxton was being bribed to orchestrate the harassment and witness intimidation.

92.      These are just examples of the specific criminal statutes covering the conduct Plaintiffs reasonably and in good faith believed Ken Paxton and OAG had committed. Plaintiffs also assert that the conduct they in good faith concluded Paxton and OAG had engaged in may violate 18 U.S.C. §1344 (Bank Fraud); 18 U.S.C. §1956 (Money Laundering); and 18 U.S.C. §1961 and 1962 (Racketeer Influenced and Corrupt Organizations).

**Plaintiffs Make a Good Faith Reports about Paxton's Abuse of Power to Law Enforcement**

93.      On September 30, Plaintiffs Brickman, Penley, and Vassar went together to meet with agents for the Federal Bureau of Investigation in Austin, Texas. They were joined at the

meeting by other Whistleblowers. As described below, Plaintiff Maxwell separately reported his good faith belief of crimes committed by Paxton and OAG on, before, and after September 30.

94.     Although Plaintiffs were public employees of OAG and observed criminal conduct by OAG and other OAG employees, Plaintiffs were not acting as prosecutors or law enforcement officers when they went to the FBI to report the criminal conduct of the OAG and Paxton. They were acting as concerned public employees who had a good faith belief that crimes had been committed and went outside OAG to report it to law enforcement.

95.     On September 30, Plaintiffs Brickman, Penley and Vassar, along with several other Whistleblowers reported to the FBI what they collectively knew. Each of the Plaintiffs reported all of what is described in paragraphs 17-92 above to the FBI. Plaintiffs Brickman, Penley, Vassar and the others sat in the same room with at least two FBI agents for several hours. They went around the room telling what they knew, what they'd heard, what they had observed, and the reasonable inferences that could be drawn from known facts. They each answered questions put to them by the FBI. The facts described in paragraphs 17-92 above (those that had occurred by September 30) accurately summarize what Plaintiffs Brickman, Penley and Vassar collectively shared with the FBI on September 30 by way of reporting their good faith belief that Paxton had engaged in criminal conduct.

96.     Specifically, each of the three Plaintiffs who attended the September 30 meeting reported to the FBI how Paxton and OAG intervened in Open Record Requests to help Nate Paul, intervened in civil litigation to help Nate Paul at the expense of a local charity, directed a legal opinion on foreclosure sales to help Nate Paul, and used OAG as a hammer to help Nate Paul  by aiming a campaign of harassment and intimidation at Paul's perceived adversaries, all as described in detail above.  Plaintiffs reported facts to the FBI, not legal conclusions, as would be expected

in an interview with FBI. But the three Plaintiffs who attended that meeting made very clear that they believed Paxton's and OAG's conduct were acts of criminal bribery, harassment, and abuse of office.

97.     David Maxwell could not attend the September 30 meeting with the FBI. But Plaintiff Maxwell complained in good-faith of the acts described in paragraphs 17-92 above in which Ken Paxton abused his office and his employer, the OAG, not just to one, but to three (3) appropriate law-enforcement authorities before his termination by the OAG: the Texas Rangers/Department of Public Safety, the FBI and Department of Justice, and the Travis County District Attorney's Office.

98.     Although Maxwell was a public employee of OAG and observed criminal conduct by OAG and other OAG employees, Maxwell was not acting as a prosecutor or law enforcement officer when he went to the FBI to report the criminal conduct of the OAG and Paxton. He was acting as concerned public employee who had a good faith belief that crimes had been committed and went outside OAG to report it to law enforcement.

99.     Prior to making these good-faith reports to these appropriate law enforcement authorities, Maxwell had communicated his concerns about his good-faith—both objectively and subjectively—reports and complaints about the violations of state and federal laws.  Maxwell has believed and knows from his considerable experience that the authorities to whom he reported the unlawful conduct are authorized to investigate or prosecute violations of criminal law, things of which this Court can—and should—take judicial notice of.

100.    Apart from reporting to proper law enforcement authorities, Maxwell had also communicated to people at the OAG's office including Ken Paxton himself that the conduct Ken Paxton and the OAG had engaged in in connection with Nate Paul was contrary to the law and

violated Texas laws prohibiting tampering with government records, harassment, abuse of office[3] and bribery[4] as well as the federal laws of obstruction of justice.[5]  Maxwell stated that Ken Paxton "was going to get himself indicted" and objected to others at the OAG willing to go along with this unlawful behavior.  Maxwell also communicated that the misuse of grand jury subpoenas could also constitute falsification of official records and tampering with witnesses.[6]

101.    The OAG was implicated in the unlawful conduct as well as Ken Paxton because Ken Paxton committed these acts while acting as the Attorney General and under color of his official capacity.[7]   The OAG is certainly subject to whistleblower claims. *See e.g., Office of Attorney General v. Rodriguez*, 605 S.W.3d 183, 185 (Tex. 2020) ("we decide **whether sufficient evidence** exists to support a finding that a state agency violated the Texas Whistleblower Act when it fired one of its managers.") (emphasis added).

102.    Plaintiff Maxwell reported the unlawful conduct to Randy Prince, Deputy Director Law Enforcement Operations of the Texas Rangers, on September 30, 2020.  Ranger Prince is a person with direct ability to initiate the investigation or prosecution of the laws that Maxwell reported had been violated.  After Maxwell notified people at the OAG about these concerns about violation of law and while on administrative leave but before OAG further retaliated by terminating him on November 2, 2020, Maxwell made the same good-faith reports to the FBI and Department of Justice, and the Travis County District Attorney's Office.

---

[3] Texas Penal Code § 39.02.
[4] Texas Penal Code § 37.10, 36.02.
[5] See e.g., 18 U.S.C. § 1510(a); 1512(c)(2), (d), and (k).
[6] Texas Penal Code § 37.10, 36.05.
[7] To the extent Defendant advances the theoretical argument that any unlawful act is not actionable because it would be ultra vires if committed by a public employee or governmental entity being steered by the person running it in his official capacity, that argument or construction would do violence to, and run directly contrary to, both the purpose and language of the Whistleblower Act.

33

103.     Since at least August of 2020, Maxwell has had a continuous subjective belief that the conduct of Ken Paxton and the OAG that he reported violated the law based on his decades in law enforcement and having been Ken Paxton's hand-picked top law enforcement officer in Texas. Maxwell has been a licensed peace officer since April of 1973 (nearly 48 years).  Maxwell has decades of experience investigating, analyzing, and charging criminal conduct including decades of investigating public corruption.  Maxwell has worked with the public integrity branch of the DPS. In addition to being subjectively made in good faith, his beliefs are also objectively reasonable and in good faith.  These beliefs are not only deeply rooted in his vast law enforcement experience but objectively supported by a plain reading of the laws at issue, as well as by the similar conclusion reached and publicly expressed by seven (7) other high-level employees of the OAG who are all licensed and respected attorneys.

### Paxton's and OAG's Knowledge of Plaintiffs' Reports to Law Enforcement

104.     On October 1, seven of the eight Whistleblowers signed and sent to the OAG's Director of Human Resources a letter notifying OAG that they had reported to an appropriate law enforcement authority a good faith belief of suspected violations of law committed by Paxton and OAG. A true and correct copy of that letter is attached to this pleading as **Exhibit 8**.

105.     Plaintiff Maxwell did not sign the October 1 letter because he was out of state on vacation at the time the letter was drafted, but he was in complete agreement with the letter. He sent a separate written notice to Human Resources regarding his whistleblower complaint to an appropriate law enforcement authority. Plaintiff Maxwell would have signed the letter had he been present to do so.

106.     The OAG's office knew that Maxwell was fully in agreement with the views expressed in the October 1, 2020 letter signed by the lawyers, and that Maxwell would have signed

but for being physically outside of Texas on that day.  Not only was Ken Paxton aware of Maxwell's complaints and reports, but Brent Webster, Ken Paxton's hand-picked successor as First Assistant was also aware at the time the OAG decided to retaliate against Maxwell.

107.    The October 1 letter states:

> This letter is intended to serve as notice to the Office of the Attorney General that on September 30, 2020, we, the undersigned individuals, reported to an appropriate law enforcement authority a potential violation of law committed by Warren K. Paxton, Jr., in his official capacity as the current Attorney General of Texas. We have a good faith belief that the Attorney General is violating federal and/or state law, including prohibitions relating to improper influence, abuse of office, bribery, and other potential criminal offenses. Each signatory below has knowledge of facts relevant to these potential offenses and has provided statements concerning those facts to the appropriate law enforcement authority. Additionally, today, October 1, 2020, the undersigned notified the Attorney General via text message that they have reported the violations to the appropriate law enforcement authority. A copy of the text message is attached hereto.

**Paxton and OAG Take Immediate Adverse Employment Actions**

108.    Ken Paxton swiftly began retaliating against the Whistleblowers both individually and as a group. Paxton's acts were deliberately calculated to try to impugn these public servants, denigrate their legitimate, good-faith complaints about Paxton's corruption, attempt to silence or divide them, and deter others from making such complaints about Paxton's unlawful conduct.

**Friday, October 2 -- Paxton Suspends and Later Terminates Penley and Maxwell**

109.    On October 2, one day after the letter to OAG Human Resources, Plaintiffs Penley and Maxwell were placed on "investigative leave" at the direction of Paxton. Their email accounts and building access badges were disabled. Paxton and the OAG refused to tell Penley or Maxwell what was being investigated or even whether they were accused of wrongdoing of any kind. For the next 2 weeks, the OAG made no attempts to interview Penley or Maxell as part of any alleged investigation. On October 15, newly appointed First Assistant Brent Webster[8] extended Penley's and Maxwell's respective investigative leaves to Monday, November 2, again without giving any

---

[8] Whistleblower Jeff Mateer, the previous First Assistant Attorney General, resigned on October 2, 2020.

explanation for placing them on that status or disclosing the reason for the investigation or the scope of it. Penley made several requests, by phone call and email, seeking that information, but never received a response from Paxton, Webster or anyone else at the OAG.

110.     If Maxwell and Penley had not reported the unlawful conduct, the OAG would not have placed them on investigative leave. No other reason was provided at the time, and the events leading up to it point to that conclusion.

**Saturday, October 3 – Paxton and OAG Smear the Whistleblowers**

111.     On Saturday, October 3, the OAG Communications Department issued the following statement:

> The complaint filed against Attorney General Paxton was done to impede an ongoing investigation into criminal wrongdoing by public officials including employees of this office. Making false claims is a very serious matter and we plan to investigate this to the fullest extent of the law.

112.     This statement was blatantly false in numerous respects and clearly intended to intimidate and retaliate against the Whistleblowers. First, the reports to law enforcement were not made "to impede an ongoing criminal investigation." Rather, the Whistleblowers' reports to law enforcement were made based on their good faith belief that Attorney General Paxton was abusing the Office of Attorney General to benefit a campaign donor and private individual and to benefit himself.

113.     Further, there was no OAG investigation into "employees of this office" as Paxton claimed in his press release. Paxton was trying to mislead the public into believing that the Whistleblowers themselves were under investigation for criminal misconduct when they went to law enforcement with their concerns about Paxton. This false statement was clearly intended to punish the Whistleblowers by smearing and discrediting them.

114.     Paxton also asserted in the October 3 statement that the Whistleblowers made "false claims" to law enforcement. This too was a lie. The Whistleblowers provided only accurate information to law enforcement. Moreover, Paxton did not even know on October 3 what information the Whistleblowers had provided to law enforcement. Paxton was certainly aware of his own corrupt conduct and worried about it being exposed, but he did not know what specifically the Whistleblowers had reported and therefore had no basis upon which to accuse eight of his most senior staff of making false claims to law enforcement. Nor did he seek any transparency, the appointment of any truly neutral or objective special investigator, contact any proper law enforcement agency, or act in any way as a proper steward of the OAG would act.

115.     Paxton punctuated his October 3 statement by threatening the Whistleblowers. The final sentence of his official statement read, "Making false claims is a serious matter and *we plan to investigate this to the fullest extent of the law*." (Emphasis added).

116.     It is hard to imagine a more egregious act of retaliation against a whistleblower than what Paxton began on Saturday morning, October 3. The life's work of each of the Whistleblowers was the law or law enforcement or both. Their credibility and integrity are their essential stock-in-trade. Paxton's statement was a pack of lies intended to hit the Whistleblowers where he thought it would hurt them most: false claims that the Whistleblowers made untrue accusations to law enforcement and had impeded a lawful investigation and a threat of investigation and legal consequences. The potential and certainly-intended effect would be to chill further revelations about Paxton's wrongdoing and try to smear the good name, character, and reputation of these public servants. Paxton's actions were straight out of the playbook he had been running against the enemies of his friend and donor Nate Paul. Now, on a Saturday morning less than 48 hours

after learning of the Whistleblowers' reports to law enforcement, Paxton was running the same play against his own senior deputies, the Plaintiffs here.

### October 5 and 7 -- More Retaliation

117.     Over the weekend of October 3-4, media continued reporting about the relationship and connections between Paxton and Nate Paul and Paxton's personal involvement in the use of his office to investigate and attack Paul's enemies. In response to this more detailed reporting, Paxton again treated the official, taxpayer-funded Communications Department of the OAG as an instrument of retaliation. The OAG Communications Division released this official statement on Monday, October 5 at Paxton's direction (incorrect capitalization in original):

> The Texas attorney general's office was referred a case from Travis county regarding allegations of crimes relating to the FBI, other government agencies and individuals. My obligation as attorney general is to conduct an investigation upon such referral. Because employees from my office impeded the investigation and because I knew Nate Paul I ultimately decided to hire an outside independent prosecutor to make his own independent determination. Despite the effort by rogue employees and their false allegations I will continue to seek justice in Texas and will not be resigning.

118.     The first two sentences of Paxton's October 5 statement were intended to mislead the public into believing that, in conducting the investigations of Nate Paul's enemies, OAG was merely carrying out a legal obligation to investigate a matter referred from the Travis County District Attorney. Of course, this lie by Paxton was calculated to counter the emerging truth that Paxton was personally orchestrating the use of the OAG to attack Paul's enemies.

119.     Two days later, the OAG Communications Division released another official statement at Paxton's direction, reiterating some of the prior statement's untruths and falsely implying that the Cammack contract had been approved through proper OAG procedures:

> Employee, Ryan Vassar, drafted the contract for outside counsel and communicated directly with Independent Counsel Brandon Cammock to assist in the execution of the contract. The Attorney General signed the contract.

Mr. Vassar included the job description in this contract that legally authorized Independent Counsel Brandan Cammock to act. Mr. Vassar also provided this contract directly to Attorney General Paxton for his signature.

120.    This official communication omits the key facts that what Vassar circulated to both Cammack and Paxton was clearly labeled a "draft" contract, prepared at Paxton's direct command; that (as Paxton well knows) Vassar lacks authority to individually authorize retention of outside counsel; and that the required OAG approvals for the Cammack contract were *never* obtained. Vassar demanded correction of the false statement, but his request was ignored.

121.    It was not only the Whistleblowers who were alarmed by Paxton's false October 5 and 7 statements. Margaret Moore, the District Attorney of Travis County, rightly and justly called Paxton out on his misleading statements. In response to Paxton's October 5 and 7 statements, Travis County D.A. Moore wrote to Paxton on October 9:

> On June 10, 2020, my office sent to David Maxwell [the then-current Deputy Director of Law Enforcement Division for the OAG] a letter referring a Request to Investigate (RTI) filed in our office by Nate Paul. You asked my office to hear his complaints. The referral to the OAG was made with your approval. We did not conduct any investigation into the merits of the matters complained of….
>
> The referral cannot and should not be used as any indication of a need for investigation, a desire on the Travis County D.A.'s part for an investigation to take place, or an endorsement of your acceptance of the referral.
>
> My office has closed this file and will take no further action. Furthermore, I have instructed my employees to have no further contact with you or your office regarding this matter.

122.    The District Attorney closed her letter to Paxton by expressing her evident alarm at Paxton's conduct:

Any action you have already taken or will take pursuing this investigation is done solely on your own authority as provided by Texas law. The newly surfaced information raises serious concerns about the integrity of your investigation and the propriety of your conducting it.

Sincerely,

*Margaret Moore*

Margaret Moore

Cc: Brent Webster

123.     On November 11, 2020, Paxton repeated in the *New York Times* the lie that that his investigation of the magistrate judge and state and federal law enforcement officials was initiated by the Travis County District Attorney.

### Monday, October 5 – Wednesday, October 28 – Paxton Removes Duties, Tries to Intimidate Whistleblowers

124.     On Friday October 2, 2020, First Assistant Attorney General Jeff Mateer, who was one of the Whistleblowers, resigned. Paxton quickly hired Brent Webster, who was previously with the Williamson County, Texas D.A.'s office, to replace Mateer as First Assistant Attorney General. October 5 was Webster's first day on the job. At 9:00 a.m., Webster began his first day by dismissing Plaintiff Brickman from a very important legislative meeting with Attorney General Paxton. In an obvious effort to embarrass Brickman, Webster waited until the meeting began and then instructed Brickman, with great ceremony but without explanation, to leave the meeting. As the Deputy Attorney General for Policy and Strategic Initiatives, Brickman had always participated in these meetings with the First Assistant and/or Attorney General Paxton. Removing Brickman from the meeting was clearly intended to diminish Brickman's duties and responsibilities to punish him, to try to intimidate and embarrass or humiliate him, and to send a message to other employees

that Brickman was being punished and stripped of responsibilities and thereby deter similar attempts to complain about or hold Paxton accountable for his official misconduct.

125.    Later that same morning, First Assistant Brent Webster arrived at Brickman's office escorted by an armed peace officer who identified herself as Sergeant Amy Biggs. Mr. Webster repeatedly insisted that he speak alone with Brickman. Brickman politely offered to meet with Mr. Webster in the presence of other deputies but prudently and respectfully declined to meet with Mr. Webster alone or in the presence only of the armed guard accompanying Webster. Confronting Brickman – in needless and unprecedented, banana republic-like, fashion with an armed guard – and insisting on meeting alone for unspecified reasons was clearly an attempt by Webster to intimidate Brickman.

126.    About thirty minutes later, Webster came by Brickman's office, saw him talking on his cell phone, and instructed Brickman to take his cell phone to his car and leave it there. At the time, Brickman was talking on his cell phone with a colleague, Senior Counsel to Attorney General Paxton, Zina Bash. Webster's instruction to take the phone to the car was not consistent with any rule or policy of the office. Other employees also carry and use personal cell phones. In fact, Paxton himself carries multiple personal cell phones, including routinely cycling through "burner" cell phones. This needless instruction to Brickman was not just a bush-league attempt at intimidation; not having his cell phone posed a significant issue for Brickman because his school-age children only have his personal cell phone number. Additionally, Brickman is the guardian for his 96 year-old grandmother who suffered a recent fall and broke her back, and Brickman coordinates her care.

127.    Still on Monday, October 5, Brickman learned that the Scheduler, a position that reported to Brickman, had been replaced without any involvement by Brickman. This was yet

41

another power play by Webster, clearly intended to demote and demean Brickman by removing responsibilities.

128.    After Mateer resigned and Maxwell and Penley were placed on leave, the remaining Whistleblowers and other employees of the OAG watched as their colleagues were systematically retaliated against, mistreated, placed on leave, harassed and fired.

129.    On October 8, 2020, during a regular meeting of the OAG's deputies, directors, and other senior members, Whistleblower McCarty asked Webster and Paxton whether the OAG would continue to make disparaging remarks to the media about the Whistleblowers. Paxton did not respond and Webster expressly refused to answer.

130.    On October 13, Paxton conducted an interview with the Southeast Texas Record in which he once again maligned the Whistleblowers, stating that his deputies and former first assistant engaged in "an effort to cover up the reality of what really happened [with Paul]."

131.    Several of the Whistleblowers had job duties removed, were excluded from regular meetings, and encountered the armed guard that had begun accompanying Webster. Some indicated in formal complaints to the OAG that they believed their OAG issued electronic devices were being monitored and were told that they were "under investigation."  The Whistleblowers also received "litigation hold" letters concerning Paul that instructed them to preserve all correspondence and documents related to his complaints.  Someone even placed empty boxes near the offices of some of the Whistleblowers. All of these actions were overt and intended to dissuade other OAG employees from engaging in protected conduct and to create a hostile work environment to persuade the remaining Whistleblowers to resign. It worked.

132.    On October 19, Ryan Vassar, one of the Whistleblowers, received an email from Webster asking to meet in Webster's office at 1:00. Vassar, who was working remotely at the time,

acknowledged Webster's email and reported to Webster's office. Webster invited Vassar into his office and left the door open while armed guard, Amy Biggs, sat in a chair outside the door. After a meaningless, five-minute conversation, Webster announced that he was placing Vassar on investigative leave for two weeks. Vassar asked multiple times why he was being investigated, but Webster refused to answer. Webster, instead, said that the investigation was "open-ended." At the end of the meeting, Webster directed Vassar to leave his agency-issued laptop and cell phone on Webster's desk. Webster and Sergeant Biggs then escorted Vassar to his office to collect his personal belongings, parading him around the building in front of his colleagues in what could have only been intended to demean Vassar and intimidate him and the other Whistleblowers. After collecting his belongings, Sergeant Biggs then accompanied Vassar in the elevator and escorted him outside the building. Vassar's leave was supposed to end on November 2, 2020, but his earlier request for clarification went unanswered by anyone at the OAG until the next day, November 3, 2020, when the Human Resources Division notified him that his leave had been extended for another 80 hours. Thus, Vassar was, without justification or explanation, completely stripped of his job responsibilities and constructively discharged.

133.    On October 20, Plaintiff Brickman and Whistleblower Lacey Mase were wrongfully terminated by Paxton and Webster for making their whistleblower report.

134.    On October 26, Whistleblower Darren McCarty resigned.

135.    On October 28, Whistleblower Ryan Bangert resigned.

136.    Vassar's second 80-hour investigative leave period was set to expire on November 16. However, on November 13—the day after this lawsuit was filed—Vassar was summoned to the Price Daniel building on four hours' notice. After responding that he was out of town and

unable to make the suddenly scheduled meeting, Vassar was directed to report at 8:00 AM the following Monday, November 16.

137.     Upon his arrival that morning, the retaliation immediately resumed.  Vassar was escorted to the eighth floor of the building, where an armed officer required Vassar to surrender his mobile phone and subjected him to a physical search for recording devices (no word on what OAG was afraid might be recorded).  After a half-hour wait, Vassar was escorted into the office of First Assistant Webster, with the armed officer prominently standing guard outside the door. Webster stated that his investigation of Vassar was 99% complete and then proceeded to interrogate him on various subjects.  When Webster was finished, the armed officer escorted Vassar back down the elevator and outside the building.

138.     Then Vassar was ordered to report back to the Price Daniel Building the next day, November 17, at 10:00 AM.  Vassar arrived promptly at 10:00 AM.. Webster and HR personnel arrived at 10:30 AM.  Webster then fired Vassar for false and pretextual reasons.   And just like that—less than two months after their legally protected, good-faith report to law enforcement authorities, OAG had run off all eight whistle blowers.

**Paxton Uses His Report to the Texas Legislature as a Tool to Further Retaliate Against the Whistleblowers.**

139.     Texas State Representative Jeff Leach is the Republican Chairman of the House Committee on Judiciary and Civil Jurisprudence. Rep. Leach represents parts of Collin County, where Paxton is from. Rep. Leach has been a political ally of Paxton's. On October 9, 2010, Rep. Leach wrote to Paxton, "Texans have good reason to be concerned that the important work of [the Office of the Attorney General] may not be possible under your continued leadership. If there is any truth whatsoever to the factual and legal claims of your own senior staff, I believe you must voluntarily resign your position and urge you to do so."

140.    Rep. Leach expressed that his paramount concern was that the operations of the OAG "continue without interruption and the trust of the people of Texas in their Chief Law Enforcement Officer must be restored." Rep. Leach requested that Paxton provide a written report to all members of the Texas Legislature as to what specific steps are being taken by Paxton and Brent Webster to ensure that the effective operation of the OAG continue in full force and effect. Rep. Leach asked for the report to be provided within seven (7) days.

141.    OAG Director of Legislative Affairs Ryan Fisher emailed various staffers requesting their input into the letter. Although several of the Whistleblowers raised concerns with the operation of the office and the effect of the retaliation on pending matters, none of this criticism made its way into the response to Chairman Leach, which on information and belief was written by Paxton and Webster – not Fisher.

142.    Paxton sent his written report to Chairman Leach and the 181 members of Texas Legislature on October 16, 2020. The report was a barely-two-page, self-aggrandizing letter that failed to respond to Rep. Leach's inquiry in any substantive respect. The letter was a combination of misleading statements, material omissions, and praise for work that mostly began well before First Assistant Webster assumed his new role on October 5, 2020 and that had no bearing on the concern raised by Rep. Leach in his October 9 letter.

143.    Paxton used the report requested by Rep. Leach to again defame and retaliate against the Whistleblowers. Paxton's letter began with a lie and a smear: "Thank you for your October 9 letter asking whether OAG operations continue apace despite the false claims made by some OAG employees." Rep. Leach never said the allegations the Whistleblowers took to law enforcement were "false claims." Paxton was yet again making that allegation to smear and

discredit the Whistleblowers, and he was using a formal, written report requested by a leader in the Texas House of Representatives to amplify his attacks on the Whistleblowers.

144.     Notably, in his response to a request for specific steps he was taking to ensure the office was functioning effectively, Paxton failed to even inform Rep. Leach that at least five of the Whistleblowers had recently filed formal internal grievances alleging that Paxton was harassing and using his office to punish the Whistleblowers. Those complaints from high-ranking deputies were filed in writing and addressed serious concerns about the functioning of the Office of Attorney General. Yet Paxton's report to the Legislature made no mention of the complaints. Paxton's report to the Legislature was to the effect of, "all is well."

### October 9 -- Paxton Claims to Shut Down Cammack Investigation of Nate Paul Enemies

145.     At the end of a busy Friday, October 9, Paxton claimed to be concluding the Cammack investigation of Nate Paul's enemies. OAG issued a statement from Paxton saying, "In this case, we can only investigate in response to a request for assistance from the District Attorney's office. This investigation is now closed." Subsequent events suggest this was yet another effort by Paxton to mislead the public.

### October 19 -- Paxton and Webster Indicate they Will Reopen Investigation of Nate Paul's Enemies

146.     Although Paxton told the public on October 9 that the investigation into Nate Paul's enemies "is now closed," after 9:00 p.m. on October 19, several of the Whistleblowers received an odd email from First Assistant Attorney General Brent Webster. It read in part, "Given your conflicts, you are instructed not to work on any OAG business relating to your allegations against Nate Paul, General Paxton, or any connected cases or OAG matters."

147.     Plaintiffs were puzzled by what matters still pending in the OAG might relate to

Nate Paul or Paxton. One Plaintiff, Blake Brickman, wrote back the next morning seeking

clarification. Brickman wrote to Webster:

Good morning Brent –

I am confused by your email and would like some clarification to ensure that I comply with your directive.

1. I am not aware of any open OAG matters involving Nate Paul. I believe all such matters have been closed. Please advise if that is not the case and please specify exactly what open Nate Paul related matters you reference in your email so I can fully understand and comply with the directive in your email.

2. As many other senior OAG officials have told General Paxton repeatedly over the course of the last several months, General Paxton has a "personal conflict" with respect to any Nate Paul related matter.

> I sincerely hope that your email does not mean that OAG will reopen past matters - or open new matters - that benefit Nate Paul and his business interests under your watch as First Assistant.
>
> Sincerely,
>
> Blake Brickman

148.     Brent Webster responded without answering Brickman's questions. Rather,

Webster wrote, "Let's meet at 1:30 in my office to discuss this." Brickman expressed reluctance

to meet with Webster to speak about Nate Paul related matters. Brickman offered to meet with

Webster at 1:30 with a fellow deputy attorney general present. Brickman also pointed out that,

since the directive to stay away from Nate Paul or "related" matters was made in writing, it was

appropriate that he receive in writing a response identifying those matters. But Webster was

adamant that they meet alone to discuss these unknown Nate Paul related matters that Webster was

instructing Brickman to stay away from.

47

149.     Webster had no intention of telling Brickman about the Nate Paul matters he was referring to in his email from the night before. When Brickman arrived at Webster's office, Webster, an armed guard, and a human resources employee were present. Webster brought Brickman into the office and fired him. Webster said Brickman had been "insubordinate."

### November 2 – OAG and Paxton terminate Maxwell and Penley

150.     On or about October 23, 2020, 3 weeks after Maxwell was put on investigative leave, the OAG collected Maxwell's agency issued laptop and cell phone. On October 28, nearly one month after he was put on investigative leave, the OAG requested Maxwell provide his passwords.

151.     On or about the afternoon of October 28, 2020, nearly one month after Penley was put on investigative leave, Penley received a request to return the following day his agency issued laptop and cell phone, and Penley complied.

152.     On Friday October 30, 2020, Penley and Maxwell were instructed to report to separate buildings at the Austin office of the OAG on November 2, 2020 at 9 a.m. OAG's Human Resources department sent the following email to Maxwell:

> Director Maxwell:
>
> Please be advised that you are directed to report to the William P. Clements Building on Monday , November 2, 2020 at 9:00 a.m. Please proceed to 205J (large training room) on the 2nd floor. Please confirm receipt of this email.
> Thank you for your cooperation.
>
> HR-Help

153.     Penley asked what the purpose of the meeting was and was only told it was "work-related."

154.     Maxwell and Penley appeared as requested at the OAG's Austin office on November 2, 2020, and they both experienced even more irregularities, harassment, and

retaliation. Contrary to Texas law and Paxton's instituted written policy preventing the disarming of licensed peace officers, Brent Webster issued orders to OAG staff to prevent Maxwell from entering if armed, despite Maxwell's status and distinguished career. The OAG violated Maxwell's rights as a licensed peace officer, with a valid License to Carry, to possess a legal weapon at a State Office, contrary to Article 30.06. Penley was escorted up the elevator and into the Executive Conference Room by an armed guard, who remained stationed outside the room throughout the meeting, which lasted from about 9 a.m. to 5 p.m.

155.     Penley and Maxwell were subjected to hostile conditions and conduct throughout the entire day. Webster refused to tell Penley or Maxwell why they had been placed on investigative leave, the reason for the investigation or the scope of it. He also denied Penley's request to have one of the other Whistleblowers attend the meeting as a witness. Instead, Webster proceeded to interrogate Penley and Maxwell in a hostile and aggressive manner. The OAG engaged in a charade under the guise of an administrative investigation interview, but it was apparent that the Whistleblowers' complaints about Paxton's misconduct were the driving force for the events of November 2. Webster pressured both Maxwell and Penley to resign, which they refused to do. At the end of the day, the OAG wrongfully terminated Maxwell's and Penley's employment in retaliation for their protected complaints of illegal conduct by Paxton and the OAG.

**Plaintiffs File Formal Complaints with OAG**

156.     On October 16 and again on October 29, Plaintiff Brickman initiated action under any applicable grievance or appeal procedure of the OAG relating to suspension or termination of employment or adverse personnel action pursuant to TEX. GOV'T CODE §554.006(a). Although the agency had 60 days to investigate his complaint pursuant the Whistleblower Act, OAG HR responded to the October 16 complaint in less than 24 hours stating that there was no complaint

procedure available to Deputy Attorney Generals like Brickman and immediately dismissing the complaint.

157.     On October 12 and again on November 10, 2020, Plaintiff Penley initiated action under any applicable grievance or appeal procedure of the OAG relating to suspension or termination of employment or adverse personnel action pursuant to TEX. GOV'T CODE §554.006(a). OAG HR responded to the Friday, October 12 complaint by letter dated October 16 stating that there was no complaint procedure available to Deputy Attorney Generals like Penley and immediately dismissing the complaint. Penley subsequently inquired whether there was another internal administrative procedure at the OAG by which he could appeal his wrongful termination claim other than the formal complaint process under which he had attempted to initiate a complaint on October 12. By letter dated November 10, the Formal Complaint Officer replied:

> ….This letter is to inform you that there is no other internal administrative procedure at the Office of the Attorney General other than the formal complaint process by which you may appeal your termination….

158.     On November 10, Penley initiated another grievance by submitting a formal complaint about his wrongful termination.

159.     On October 13 and again on November 4, 2020, Plaintiff Maxwell initiated action under any applicable grievance or appeal procedure of the OAG relating to suspension or termination of employment or adverse personnel action pursuant to TEX. GOV'T CODE §554.006(a).

160.     On October 15, 2020, Plaintiff Vassar initiated an action under any applicable grievance or appeal procedure of the OAG relating to suspension or termination of employment or adverse personnel action pursuant to TEX. GOV'T CODE §554.006(a).  His formal complaint detailed a litany of unlawful and retaliatory actions taken against him by Paxton and OAG since

his good-faith report to appropriate law enforcement authorities of legal violations by the OAG

and by the Attorney General Ken Paxton. Although the agency had 60 days to investigate his

complaint pursuant the Whistleblower Act, OAG HR responded to the October 15 complaint the

very next day stating that there was no complaint procedure available to Deputy Attorney Generals

such as Vassar and immediately closing the complaint.

### November 5 – the Smear Campaign Continues

161.　　On November 5, 2020, Paxton's campaign spokesperson, Ian Prior, who is not an

OAG employee and is therefore without knowledge on any OAG personnel matters, referred to

Plaintiffs in a news article as "desperate former employees trying to spin a false narrative".

162.　　On November 11, 2020, the New York Times reported:

> Mr. Paxton told the New York Times in a statement that the latest controversy was created
> by members of his staff who had opposed his decisions without having all the facts and who made
> 'their disagreement noisy and public' in an attempt to undermine the integrity of the office.

### IV. Cause of Action

### Count 1: Violation of Texas Whistleblower Act

163.　　Plaintiffs incorporate and re-allege paragraphs 1-162 above.

164.　　Plaintiffs were all public employees employed by the OAG, which is a state

governmental entity and unit of the State of Texas.

165.　　As described in paragraphs 17-103 above, Plaintiffs all in good faith made reports

to law enforcement authorities of violations of criminal law by the OAG and by the Attorney

General Ken Paxton, who is an employee of OAG and whose criminal actions were taken in the

course of his duties for OAG.

166.　　The OAG and Paxton specifically were aware of Plaintiffs' good faith reports to

law enforcement.

167.     Plaintiffs were subsequently subjected to adverse personnel actions by OAG and Paxton -- including demotion, suspension, removal of work assignments, hostile work environment, constructive termination and termination of employment – because of the reports they made. The adverse employment actions would not have been taken against them had they not made the good-faith reports to law enforcement.

168.     Each of the adverse employment actions was committed within 90 days of the reports to law enforcement, and in some cases within 1 business day of OAG's and Paxton's learning of the reports. Thus, under Texas law, there is a presumption that the adverse employment actions were taken because the employee made the report to law enforcement. TEX. GOV'T CODE §554.004(a). In addition, the circumstances of the actions prove that the adverse actions were taken because of the reports of Attorney General Paxton's criminal conduct to law enforcement.

169.     The adverse employment actions have caused Plaintiffs damages, including but not limited to past lost wages, past and future lost benefits, loss of future earnings and earning capacity, harm to his reputation, emotional pain, mental anguish, and loss of enjoyment of life.

170.     Plaintiffs seek legal and other equitable remedies, reinstatement to their former positions or equivalent positions and to have lost fringe benefits and seniority rights reinstated, including but not limited to the vesting of retirement benefits.

171.     Plaintiffs have all invoked any available grievance or appeal procedure.

172.     All conditions precedent have been met, waived, or otherwise been satisfied to Plaintiffs' filing suit.

### V.     Verified Motion for Temporary Injunction

173.     Plaintiffs Maxwell and Vassar incorporate by reference paragraphs 1 - 172 above and the declarations attached hereto respectively verifying them.

174.     Plaintiffs Maxwell and Vassar file the verified motion for temporary injunction asking the Court to order reinstatement pending trial of this case and other relief as requested herein.

### A.     Temporary Injunction Standards

175.      An applicant for temporary injunction must (a) plead a cause of action; (b) show a probable right to recover on that cause of action; and (c) show a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

176.     As the Texas Supreme Court has stated in *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993):

> The decision to grant or deny a temporary writ of injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion. At the hearing for a temporary writ of injunction, the applicant is not required to establish that she will prevail on final trial; the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits.

177.     In the context of an injunction, the status quo is defined as "the last, actual, peaceable, non-contested status that preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004); *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 892 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

178.     In a Texas Whistleblower Act case in which a plaintiff seeks a temporary injunction, preserving the status quo means restoring the plaintiff to the position the plaintiff held before the allegedly retaliatory act. *City of Galveston v. Humphrey*, 2001 Tex. App. LEXIS 1365 *8 (Tex. App. – Houston [1st Dist.] 2001, no pet.).

### B.     Plaintiffs Have a Probable Right to Recovery.

179.     To establish a claim under the Texas Whistleblower Act, a plaintiff must plead:  (1) that he was a public employee, (2) that he reported what he in good faith believed was a violation

of law committed by his employing governmental entity or another public employee, (3) that the report was made to what the employee in good faith believed was an appropriate law enforcement authority, and (4) that his employing governmental entity took an adverse personnel action against him because of the report. TEX. GOV'T CODE §554.001 *et. seq.*; *Tex. Dep't. of Human Servs. v. Okoli*, 440 S.W.3d 611, 614 (Tex. 2014); *Resendez v. Tex. Comm'n on Envtl. Quality*, 391 S.W.3d 312, 322 (Tex. App. – Austin 2012, reversed on other grounds).

180.    As described in the foregoing verified recitation of the facts and as will be demonstrated in the hearing on this motion, Plaintiffs have a probable right of recovery.

181.    All of the Plaintiffs were public employees employed by the Office of the Attorney General of the State of Texas, which is a state governmental entity and unit of the State of Texas.

182.    Each of the Plaintiffs formed a good faith belief that Paxton in his official duties for OAG, OAG itself, and other employees Paxton enlisted either wittingly or unwittingly, violated laws regarding bribery, tampering with government records, obstruction of justice, harassment, and abuse of office by using OAG's and Paxton's extraordinary influence and power to aid Paxton's close friend and donor and to attack the friend and donor's criminal investigators and civil adversaries as described in detail above.

183.    On September 30, 2020, each of the Plaintiffs in good faith made reports to law enforcement authorities of suspected violations of criminal law by the OAG and by Paxton.

184.    On October 1, 2020, OAG and Paxton learned of Plaintiffs' good faith reports to law enforcement because seven of the eight OAG whistleblowers, including Plaintiffs Brickman, Penley and Vassar, signed and sent to the OAG's Director of Human Resources a letter notifying OAG of their good faith report to an appropriate law enforcement authority of suspected violations of law committed by Paxton and OAG. Plaintiff Maxwell did not sign the October 1 letter but sent

a separate written notice to Human Resources regarding his good faith whistleblower report to an appropriate law enforcement authority.

185.     OAG and Paxton learned of Plaintiffs' good faith reports on October 1, 2020, and took the adverse employment actions with knowledge of them. Each of the acts of retaliation alleged, including the termination of all of the Plaintiffs, occurred within 90 days of their reports to law enforcement. Thus, under Texas law, there is a presumption that the OAG took these adverse employment actions because the Plaintiffs made their reports to law enforcement. TEX. GOV'T CODE §554.004(a).

186.     Even without the applicability of the presumption, Plaintiffs are likely to succeed on the merits of establishing a causal connection between their reports to law enforcement and the termination of their employment and other retaliation by OAG.

187.     Circumstantial evidence can be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. *Tex. Dep't of Criminal Justice v. McElyea*, 239 S.W.3d 842, 855-56 (Tex. App.—Austin 2007, pet. denied).  Such evidence includes (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false. *Id.*  A plaintiff need not present evidence involving all five categories to prove causation. *See Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 452 (Tex. 1996).

188.     The evidence is overwhelming that OAG retaliated against Plaintiffs because of their reports to law enforcement. For example, on October 2, one day after the letter to OAG Human Resources, Plaintiffs Penley and Maxwell were placed on "investigative leave" at the

direction of Paxton. OAG disabled their email accounts and building access badges. Paxton and the OAG refused to tell Penley or Maxwell what was being investigated or whether they were accused of wrongdoing.

189.    On Saturday, October 3 and Monday October 5, the OAG Communications Department issued public statements that were false and misleading and that were intended to intimidate and retaliate against whistleblowers, including the Plaintiffs. For example, in official OAG statements on October 3 and 5, 2020 directly related to Plaintiffs' reports to law enforcement, OAG referred to the Plaintiffs as "rogue employees" and accused Plaintiffs of making "false reports" to law enforcement. OAG also accused Plaintiffs publicly of making their reports to law enforcement "to impede an ongoing investigation into criminal wrongdoing by public officials including employees of this office."  OAG also threatened Plaintiffs by stating publicly in regard to their reports to law enforcement that "making false claims is a very serious matter and we plan to investigate this to the fullest extent of the law."

190.    On Monday, October 5, OAG retaliated further against Plaintiff Brickman by removing responsibilities and authority. For example, on Monday October 5, Plaintiff Brickman was abruptly dismissed from a legislative meeting with Attorney General Paxton. The manner in which Plaintiff Brickman was dismissed from the meeting suggests a motive to intimidate and retaliate and send a message to Brickman and to others that whistleblowing would be punished. Also on October 5, the OAG's new First Assistant, Brent Webster, arrived at Brickman's office escorted by an armed peace officer in a manner calculated to intimidate and retaliate against Plaintiff Brickman.  About thirty minutes later, First Assistant Webster instructed Brickman, contrary to any policy and contrary to normal practice for all other employees, to take his cell phone to his car and leave it there. Still on Monday, October 5, Brickman learned that Paxton's

scheduler, a position that reported to Brickman, had been replaced without any involvement by Brickman.

191.     On October 7, 2020, OAG issued a public statement falsely insinuating that Vassar had approved of the hiring of a so-called "special prosecutor" to investigate a federal magistrate judge, and federal and state prosecutors.

192.     On October 19, Plaintiff Vassar was placed on leave for investigative reasons. Plaintiff Vassar learned of the leave at a meeting OAG First Assistant Webster called and during which Webster posted an armed guard just outside the open door to Webster's office. Webster refused to answer when Plaintiff Vassar asked why he was being investigated. Webster would only say the investigation was "open-ended."  OAG had Plaintiff Vassar escorted from the building by the armed guard in front of his colleagues and coworkers in what was an effort intended to demean and intimidate Vassar and send a message of warning to other actual or would-be whistleblowers.

193.     On October 20, 2020, OAG fired Plaintiff Brickman. That same day, OAG fired Lacey Mase, who was one of the 7 signers of the October 1 whistleblower letter.

194.     On October 26, 2020, Darren McCarty, one of the signers of the October 1 whistleblower letter resigned. On October 28, 2020, another signatory, Ryan Bangert, resigned.

195.     On November 2, 2020, OAG fired Plaintiff Maxwell and Plaintiff Penley.

196.     On November 17, 2020, OAG fired Plaintiff Vassar.

197.     By November 17, 2020, four of the seven signers of the October 1 whistleblower letter had been fired, and the other three had resigned. In addition, Plaintiff Maxwell, who did not sign the October 1 letter but communicated separately that he had made a report to law enforcement, had also been fired – all within seven (7) weeks of their good faith reports to law enforcement.

198.    In addition, OAG's conduct toward Plaintiffs failed to adhere to its established policies and processes regarding employment decisions. For example, an armed guard was used to try to intimidate some of the Plaintiffs. Plaintiff Brickman was instructed, contrary to OAG policy, to take his cell phone to his car and leave it there. Plaintiff Brickman was also stripped of authority and responsibilities.  Some of Plaintiffs were placed on investigative leave without explanation and in contravention OAG policy and practice.

### C.    Plaintiffs Can Show Probable, Imminent, Irreparable Harm.

199.    An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The Texas Whistleblower Act expressly provides for injunctive relief as a remedy. TEX. GOV'T CODE §554.003(a)(1).

200.    An adequate remedy at law is one that is "as complete, practical, and efficient to the ***prompt*** administration of justice as is equitable relief." *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.)(emphasis added). "Thus, if damages do not provide as complete, practical and efficient a remedy as may be had by injunctive relief, the trial court does not err in granting temporary injunction so long as the other elements of injunctive relief are satisfied." *Id.*

201.    Threatened injury to reputation and good will are frequently the basis for temporary injunctive relief. *Id.* (citing *Lifeguard Benefit Servs*. v. *Direct Med. Network Solutions, Inc.,* 308 S.W.3d 102, 118; *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc*., 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc*., 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd); *Townson v. Liming*, No. 06-10-00027-CV, 2010 Tex. App. LEXIS 5459, 2010 WL 2767984, at *2-3 (Tex. App.—

Texarkana July 14, 2010, no pet.)  (mem. op.); *Lionheart Co., Inc. v. PGS Onshore, Inc*., No. 10-06-00303-CV, 2007 Tex. App. LEXIS 4628, 2007 WL 1704906, at *2 (Tex. App.—Waco June 13, 2007, no pet.) (mem. op.); *RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 Tex. App. LEXIS 1689, 2006 WL 504998, at *15-16 (Tex. App.—Austin Mar. 3, 2006, no pet.) (mem. op.).

202.    Also, "[i]f damages cannot compensate for any wrong committed by [the defendant], or if the damages are not measurable by any certain pecuniary standard, then the injury is irreparable and the injunction should issue." *Townson v. Liming*, No. 06-10-00027-CV, 2010 Tex. App. LEXIS 5459, at *8-9 (Tex. App.—Texarkana July 14, 2010, no pet.).  "Certain" means "fixed, settled, and indisputable." *Id*.  The value of "lost business contacts and collaborations" and lost employment opportunities are "anything but fixed, settled, and indisputable."  *Id*.

203.    In addition, the Texas Whistleblower Act expressly provides reinstatement as a remedy for a retaliatory termination. TEX. GOV'T CODE §554.003(a)(1).  The Legislature has therefore acknowledged that money damages alone cannot in some situations remedy a retaliatory discharge of a whistleblower.

204.    Money damages alone cannot adequately remedy the retaliatory discharges and other retaliatory actions in this case. OAG's retaliation consists of firing and publicly accusing Plaintiffs of serious personal and professional misconduct in a manner likely to foreclose other professional opportunities. By way of example, OAG retaliated against Plaintiffs by publicly accusing Plaintiffs, all of whom are either lawyers or law enforcement officials, of making false reports to law enforcement and doing so to interfere with an OAG investigation. The harm to Plaintiffs from losing their jobs in this highly public and disparaging way will be exacerbated by continued unemployment and will be avoided or mitigated in significant respect by reinstatement

to their positions. The kind of harm being inflicted on Plaintiffs by remaining terminated from their positions at OAG under these circumstances is extremely difficult if not impossible to measure by a certain pecuniary standard.

205.    In addition, the retaliation by OAG and Plaintiffs' loss of employment will cause continued harm such as loss of reputation and goodwill in their professions unless a temporary injunction is issued reinstating them to their jobs. Plaintiffs have demonstrated that, without a temporary injunction, they will suffer loss of goodwill and reputation with other lawyers, OAG colleagues, potential clients and others in their industry and that such injury is difficult to calculate or monetize. Plaintiffs, whose careers have consisted largely of public service legal and law enforcement positions, are particularly susceptible to the kind of harm the retaliation by the OAG inflicts on them while they remain terminated. This loss of goodwill and reputation constitutes irreparable injury.

206.    In addition, an injury is irreparable if it cannot be adequately remedied at law – i.e., if the applicant cannot be adequately compensated in damages or if damages are very difficult to measure by any certain pecuniary standard. Many of the kinds of damages Plaintiffs seek in this case will be very difficult to measure by a pecuniary standard.  Plaintiffs, if they prevail, may be awarded, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to their reputation, and loss of future earning capacity associated with being terminated abruptly and with the public smearing of Plaintiffs by OAG. An injunction ordering reinstatement pending trial could lessen many of these kinds of harm, which are very difficult to measure by any certain pecuniary standard.

207.     In addition, reinstating Plaintiffs pending trial will mitigate the chilling effect that OAG's retaliation and public statements have had and will have continue to have on witnesses, including both present and former OAG employees.

208.     In addition, the delay that will be occasioned by OAG's interlocutory appeal or other procedural tactics will prevent a legal remedy or reinstatement upon final judgment from providing an adequate remedy.

209.     All of the harm described above that Plaintiffs would sustain without temporary injunctive relief is imminent. The harm is in fact happening already, and this injunction seeks to avoid further injury in the interim between the issuance of this order and entry of final judgment.

210.     For these reasons, Plaintiffs seek a temporary injunction decreeing that Defendant Office of the Attorney General of the State of Texas, and its officers, agents, servants, employees, and attorneys and those acting in active concert or participation with them who receive actual notice of the order by personal service or otherwise be ORDERED:

1.      To immediately REINSTATE Plaintiff David Maxwell to the position of Director of the Law Enforcement Division in the OAG and to compensate him starting immediately by paying him at the rate of pay and level of benefits, including health care and retirement benefits and all other perquisites of employment as were in effect as of September 30, 2020;

2.      To immediately REINSTATE Plaintiff Ryan M. Vassar to the position of Deputy Attorney General for Legal Counsel at the OAG and to compensate him starting immediately by paying him at the rate of pay and level of benefits, including health care and retirement benefits and all other perquisites of employment as were in effect as of September 30, 2020;

3.      To RETAIN Plaintiffs Maxwell and Vassar in those positions of employment at that rate of pay and benefits, including any pay or benefits increases, but not decreases, that would, in the ordinary course of the affairs of the OAG, be provided to employees in such Plaintiff's position, except that Defendant may terminate a Plaintiff's employment if, and only if, Defendant obtains an order from this Court for good cause found after written motion, notice to Plaintiffs, and a hearing;

4.      To REFRAIN from any retaliation against the reinstated Plaintiffs, and

5.      To PRESERVE and not DESTROY any potentially relevant evidence including any materials pertaining to contacts between the OAG and:

- Nate Paul or any entity in which he holds an interest, and any of his or their attorneys or agents;

- Any federal investigations or inquiries including from the FBI, DOJ, or other law enforcement pertaining to the conduct complained of by Plaintiffs;

- Any investigations or inquiries including from the Travis County DA's office, the Texas Rangers/DPS, or other law enforcement pertaining to the conduct complained of by Plaintiffs;

- Any open records requests relating to any of the issues in the case; and

6.      To grant such other injunctive relief as the Court may deem appropriate.

## VI.      Jury Demand

211.     Having tendered the appropriate fee, Plaintiffs hereby demand a trial by jury.

## VII.     Attorneys' Fees

212.     Plaintiffs have retained the undersigned attorneys to prosecute this case and seek to be awarded their reasonable and necessary attorneys' fees and costs of court.

## VIII.    Civil Penalty

213.     Pursuant to TEX. GOV'T CODE §554.008(a), Plaintiffs hereby request the District Attorney of Travis County, Texas to intervene in this suit and seek the imposition of a civil penalty of $15,000 against any supervisor, including Ken Paxton and Brent Webster, for each adverse personnel action taken against any Plaintiff in violation of the Texas Whistleblower Act.

## IX.      Request for Disclosure

214.     Under Texas Rule of Civil Procedure 194, Plaintiffs previously requested that Defendant disclose, within fifty (50) days of the service of that request, the information and materials described in Rule 194.2(a) through (l). Defendant has failed to comply with this request and with Rule 194.

### X.     Damages, Conclusion and Prayer

Plaintiffs respectfully request that they have judgment against Defendants for:

1.      A temporary injunction as described in Section V. herein;

2.      A permanent injunction ordering reinstatement of Plaintiffs Maxwell and Vassar and all other equitable relief to which Plaintiffs may be entitled;

3.      Actual damages;

4.      Compensation for wages lost during the period of suspension or termination, including back pay and lost benefits;

5.      Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, including injury to Plaintiffs' reputations;

6.      Recovery for future lost earning capacity;

7.      Injunctive relief ordering Plaintiffs reinstated to their former positions or equivalent positions;

8.      Exemplary damages;

9.      Reasonable attorneys' fees for prosecution of this case at trial and on appeal;

10.     All costs of expert witnesses and other costs of litigation;

11.     Pre-judgment interest as required by Chapter 304 of the Texas Finance Code or other applicable laws;

12.      Post-judgment interest at the maximum legal rate; and

13.      All other relief to which Plaintiffs may be entitled at law, or in equity.

Respectfully submitted,

/s/ *Thomas A. Nesbitt*
Thomas A. Nesbitt
  State Bar No. 24007738
  tnesbitt@dnaustin.com
Scott F. DeShazo
  State Bar No. 24011414
  sdeshazo@dnaustin.com
Laura J. Goodson
  State Bar No. 24045959
  lgoodseon@dnaustin.com
**DeShazo & Nesbitt L.L.P.**
809 West Avenue
Austin, Texas  78701
512/617-5560
512/617-5563 (Fax)

/s/ *T.J. Turner*
T.J. Turner
  State Bar No. 24043967
  tturner@cstrial.com
**Cain & Skarnulis PLLC**
400 W. 15th Street, Suite 900
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

**ATTORNEYS FOR PLAINTIFF
JAMES BLAKE BRICKMAN**

/s/ *Don Tittle*
Don Tittle
  State Bar No. 20080200
Roger Topham
  State Bar No. 24100557
  roger@dontittlelaw.com
**Law Offices of Don Tittle**
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
(214) 522-8400
(214) 389-1002 (fax)

**ATTORNEYS FOR PLAINTIFF J.
MARK PENLEY**

/s/ *Carlos R. Soltero*
Carlos R. Soltero
  State Bar No. 00791702
  carlos@ssmlawyers.com
Matthew Murrell
  State Bar No. 24083545
  matthew@ssmlawyers.com
Gregory P. Sapire
  State Bar No. 00791601
  greg@ssmlawyers.com
**Soltero Sapire Murrell PLLC**
7320 N Mopac Suite 309
Austin, Texas 78731
512-422-1559 (phone)
512-359-7996 (fax)

**ATTORNEYS FOR PLAINTIFF
DAVID MAXWELL**

/ s / *Joseph R. Knight*
Joseph R. Knight
  State Bar No. 11601275
  jknight@ebbklaw.com
**Ewell Brown Blanke & Knight LLP**
111 Congress Ave., 28th floor
Austin, TX  78701
Telephone: 512.770.4010
Facsimile: 877.851.6384

**ATTORNEYS FOR PLAINTIFF RYAN
M. VASSAR**

## <u>CERTIFICATE OF SERVICE</u>

I certify the foregoing document has been served on the following counsel of record via email on the 10th day of February, 2021:

William S. Helfand
bill.helfand@lewisbrisbois.com
Sean O'Neal Braun
sean.braun@lewisbrisbois.com
24 Greenway Plaza, Suite 1400
Houston, Texas 77046


/s/ Thomas A. Nesbitt
Thomas A. Nesbitt

CAUSE NO. D-1-GN-20-006861

| | | |
|---|---|---|
| JAMES BLAKE BRICKMAN, | § | IN THE DISTRICT COURT OF |
| DAVID MAXWELL, | § | |
| J. MARK PENLEY, and | § | |
| RYAN M. VASSAR | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| OFFICE OF THE ATTORNEY GENERAL | § | |
| OF THE STATE OF TEXAS | § | |
| | § | |
| | § | |
| Defendant. | | 250th  JUDICIAL DISTRICT |

**Declaration of James Blake Brickman**

1.      My name is James Blake Brickman.  I am over the age of eighteen years, am of sound mind and capable of making this Declaration.  I have personal knowledge of the facts stated in this Declaration, and they are true and correct.

2.      The facts plead in paragraphs 1,2,6,17-19,21-25, 28-32,  81-91, 93-96, 104, 107, 108, 111-119, 121-131, 133, 139-149, 156, 161, 162 of the foregoing Plaintiffs' Second Amended Petition and Verified Motion for Temporary Injunction and Permanent Injunction are within my personal knowledge and are true and correct or, where specifically noted, are based upon published reports.  I hereby attest that the facts plead in paragraphs 42-54  of the foregoing Plaintiffs' First Amended Petition and Verified Motion for Temporary Injunction and Permanent Injunction are true and correct because they were reported to me by individuals I have reason to believe had personal knowledge and based on the documents referred to.

3.      My name is James Blake Brickman, my date of birth is ▮▮▮▮▮, and my address is ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 132.001, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 9th day of February, 2021

/s/ *James Blake Brickman*
James Blake Brickman

CAUSE NO. D-1-GN-20-006861

| | | |
|---|---|---|
| JAMES BLAKE BRICKMAN, | § | IN THE DISTRICT COURT OF |
| DAVID MAXWELL, | § | |
| J. MARK PENLEY, and | § | |
| RYAN M. VASSAR | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| OFFICE OF THE ATTORNEY GENERAL | § | |
| OF THE STATE OF TEXAS | § | |
| | § | |
| | § | |
| Defendant. | § | 250th JUDICIAL DISTRICT |

## **Declaration of David Maxwell**

1.      My name is David Maxwell.  I am over the age of eighteen years, am of sound mind and capable of making this Declaration.  I have personal knowledge of the facts stated in this Declaration, and they are true and correct.

2.      The facts plead in paragraphs 3, 58-62, 64-65, 81-100, 102-106, 108-110, 121, 128, 150, 152, 154-155, 159, 181-186, 188-89, 195, and 197 of the foregoing Plaintiffs' Second Amended Petition and Verified Motion for Temporary Injunction and Permanent Injunction are within my personal knowledge and are true and correct or, where specifically noted, are based upon published reports.

My name is David Maxwell, my date of birth is ███████ , and my address is ████████ ██████████████ .  Pursuant to TEX. CIV. PRAC. & REM. CODE § 132.001, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Matagorda County, State of Texas, on February 9, 2021.

DocuSigned by:

*David Maxwell*

787AE2CA1730425...

David Maxwell

| JAMES BLAKE BRICKMAN, | § | IN THE DISTRICT COURT OF |
| DAVID MAXWELL, | § | |
| J. MARK PENLEY, and | § | |
| RYAN M. VASSAR | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| OFFICE OF THE ATTORNEY GENERAL | § | |
| OF THE STATE OF TEXAS | § | |
| | § | |
| | § | |
| Defendant. | § | 250th JUDICIAL DISTRICT |

## Declaration of Ryan M. Vassar

1.    My name is Ryan M. Vassar. I am over the age of eighteen years, am of sound mind and capable of making this Declaration. I have personal knowledge of the facts stated in this Declaration, and they are true and correct.

2.    The facts plead in paragraphs 5–6, 20, 29, 31–41, 53–54, 66–72, 74–89, 91–96, 104, 111, 114–115, 117, 119–122, 129–145, 160–162 of the foregoing Plaintiffs' First Amended Petition and Verified Motion for Temporary Injunction and Permanent Injunction are within my personal knowledge and are true and correct or, where specifically noted, are based upon published reports.

My name is Ryan M. Vassar, my date of birth is ▇▇▇▇▇ and my address is ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇ Pursuant to TEX. CIV. PRAC. & REM. CODE § 132.001, I

declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 9th day of February, 2021.

Ryan M. Vassar

Office of the Attorney General

| Name (Last,First,Middle)<br>PAXTON, WARREN K JR | User ID | Social Security Number | Effective Date<br>09/01/15 |
|---|---|---|---|

Action
LEGISLATIVE SALARY INCREASE

| FROM | EMPLOYEE INFORMATION | TO |
|---|---|---|
| EXECUTIVE MANAGEMENT<br>725 | Division<br>Budget Org1 Code | EXECUTIVE MANAGEMENT<br>725 |
| 20150132 | Position Number | 20150132 |
| 40 | Weekly Hours | 40 |
| EO1 | Pay Group | 301 |
| 12,500.00 / 150,000.00 | Monthly/Annual<br>Salary | 12,812.50 / 153,750.00 |
| 10656 | PCA | 10656 |
| AO8O | Class Number | AO8O |
| ATTORNEY GENERAL | Job Class Title | ATTORNEY GENERAL |
| 725ADMAM4AM | Organization Code | 725ADMAM4AM |

**EX. 1**

## Office of the Attorney General

| PERSONNEL ACTION FORM | | RN# | | Human Resources Liaison | Phone Number |
|---|---|---|---|---|---|
| FAF Transaction ID:    00006780 | | | | Jessica Herrera | 475-4387 |
| Name (Last, First, Middle) | | User ID | | Social Security Number | Effective Date of Action |
| Paxton Jr., Warren K | | | | | 01/05/2015 |
| Work Address | | | | Mail Code | Work Phone |
| 209 W. 14Th & Lavaca St, 8th Fl, Austin, TX 78701 | | | | 001 | |
| Date of Employment | | Last Evaluation Period | | Last Merit/Promotion Date | Date Entered Into PS |
| 01/05/2015 | | | | | |

| Action | Code | Direct Transfer: State Agency/Institution of Higher Ed.   E |
|---|---|---|
| Hire | 012 - Interagy Xfer-No Chg Cls S | |
| Separation Date | Last Day Physically Worked | Leave Without Pay Period |
| | | to |

| FROM: | EMPLOYEE INFORMATION | TO: |
|---|---|---|
| — | Division/Budget Division Code | 725 - Executive Administration |
| | Position Number | 20150132 |
| | FLSA Indicator (HRD Use) | E |
| 0 | Weekly Hours | 40 |
| | Pay Group | E 01 |
| 0.00  /  0.00 | Monthly/Annual Salary | 12,500.00  /  150,000.00 |
| | Primary PCA/Secondary PCA (Budget Use) | 10656 |
| / | Class Number/EEO Function | A080  /  E |
| | Manager/Supervisor Flag | M |
| | Job Class Title | Attorney General |
| | Organization Code (Budget Use) | 725ADMAM4AM |

Comments

WIT Account ___ Yes  X  No ___ Revoke
Leave Liaison UserID/Position Nbr _____ /

Name/UserID of Employee Being Replaced (if applicable)
Abbott, Greg W /

| REQUSTING DIVISION | | |
|---|---|---|
| Supervisor Name/UserID | Division Chief Signature | Date |
| / | | |
| HUMAN RESOURCES DIVISION | | |
| Posting Approval | Signature | Date |
| [ ] Yes  [ ] No | | |
| Action Approval | Signature | Date |
| [✓] Yes  [ ] No | | 01/05/2015 |
| BUDGET DIVISION | | |
| Funds Certification | Signature | Date |
| [✓] Yes  [ ] No | | 1/5/2015 |
| DEPUTY ASSISTANT ATTORNEY GENERAL/EXECUTIVE DEPUTY | | |
| Action Approval | Signature | Date |
| [ ] Yes  [ ] No | | |
| FIRST ASSISTANT ATTORNEY GENERAL | | |
| Action Approval | Signature | Date |
| [ ] Yes  [ ] No | | |

End of Report

# OUTSIDE COUNSEL CONTRACT

OAG Contract No. _____

**This Agreement,** including all Addenda (the Addenda are incorporated herein by reference), is hereinafter referred to as the "Outside Counsel Contract" or "OCC." This Outside Counsel Contract is made and entered into by and between the Office of the Attorney General of Texas ("Agency," "Attorney General," or "OAG") and Cammack Law Firm, PLLC ("Outside Counsel"). The term "Parties" as used in this OCC refers to Agency and Outside Counsel. This OCC is made and entered into with reference to the following facts:

## INDUCEMENTS

**Whereas,** Agency requires the assistance of outside legal counsel in carrying out its responsibilities; and

**Whereas,** Outside Counsel desires to provide legal services to Agency, subject to the authority of the Texas Attorney General.

## AGREEMENT

**Now, therefore,** in consideration of the inducements, covenants, agreements, and conditions herein contained, the Parties agree as follows:

**Section 1.**  **Purpose.**

**1.1**  **Purpose.** The purpose of this OCC is for Outside Counsel to provide legal services to Agency, as described in Addendum A.

**1.2.1**  **Litigation.** OUTSIDE COUNSEL SHALL NOT REPRESENT AGENCY IN ANY LITIGATION UNLESS ADDENDUM A SPECIFICALLY AUTHORIZES LITIGATION IN A PARTICULAR MATTER.

**1.2.2**  **Appellate Matters.** Irrespective of any authorization to engage in litigation in this OCC, or in a writing outside of this OCC, OUTSIDE COUNSEL IS NOT AUTHORIZED TO PROCEED ON ANY APPEAL, IN ANY CAPACITY, WHETHER INTERLOCUTORY OR OTHERWISE, WHETHER AS APPELLANT, APPELLEE, RESPONDENT, APPLICANT, OR OTHERWISE, WITHOUT FIRST OBTAINING THE WRITTEN PERMISSION OF THE ATTORNEY GENERAL, FIRST ASSISTANT ATTORNEY GENERAL, OR SOLICITOR GENERAL.

**1.2.3**  **OAG Review of Outside Counsel Invoice and Release of Payment.** Outside Counsel invoices will be reviewed and approved by the OAG pursuant to Subsection 402.0212(b) of the Texas Government Code and Title 1, Chapter 57 of the Texas Administrative Code.

**EX. 2**

**Section 2.     OCC Term.**

This OCC shall commence on 9/3/2020, and shall terminate on 8/31/2021 (hereinafter "OCC Term"), unless terminated earlier pursuant to Section 7 of this OCC.  The OCC Term may not be extended except by amendment pursuant to Section 9.12 of this OCC.

**Section 3.     Obligations of Outside Counsel.**

**3.1     Duties.**  Outside Counsel shall provide professional legal services to Agency as described in Addendum A.  Outside Counsel shall represent Agency with due professional care as required by applicable law and disciplinary rules.

**3.2     Staff.**  Outside Counsel is expected to perform valuable services for Agency, and the method and amount or rate of compensation are specified in Section 5 and Addendum B of this OCC.   Outside Counsel staff and employees are expected to perform work of a type commensurate with their professional titles.  Outside Counsel agrees that any person employed or engaged by Outside Counsel and who assists in performing the services agreed to herein shall not be considered employees or agents of Agency or the State of Texas.

**3.3     Public Information and Client Communications.**  Outside Counsel acknowledges that information created or exchanged in the course of representation of a governmental body may be subject to the Texas Public Information Act, Chapter 552 of the Texas Government Code, and may be subject to required disclosure in a publicly accessible format pursuant to Section 2252.907 of the Texas Government Code.  Outside Counsel will exercise professional judgment and care when creating documents or other media intended to be confidential or privileged attorney-client communications that may be subject to disclosure under the Public Information Act (e.g. invoices where incidental notation may tend to reveal litigation strategies or privileged information).  Outside Counsel should mark confidential or privileged attorney-client communications as confidential.  This subsection shall not be interpreted to limit Outside Counsel's duty to provide full disclosure to Agency as necessary in Outside Counsel's judgment to represent Agency with due professional care or as required by applicable law or disciplinary rules.

**3.4     Status.**  Pursuant to the standard of professional care owed to the Agency, Outside Counsel shall endeavor to keep Agency fully informed about all material matters relating to legal services provided under this OCC.

**3.5     Subcontracting Authority.**  In the event Outside Counsel determines it is necessary or expedient to subcontract for any of the performances herein, or in support of any of those performances, Outside Counsel may enter into such subcontract(s) after obtaining express written approval from Agency.  If Outside Counsel purports to enter into a subcontract without express written approval from Agency, the Parties agree that such contract shall be voidable at the option of Agency and that Outside Counsel shall have no recourse against Agency or the State of Texas for any direct or indirect costs, damages, or any other expenses related to the subcontractor.  For all subcontracts entered by Outside Counsel, the Parties agree that all such subcontracts are subject to Section 4 (Liability), Subsection 5.2 (Reimbursement of Expenses),

Subsection 5.3 (Subcontractor Payments), Subsection 6.2 (Subcontractor Invoices), and Subsection 6.5 (Supporting Documents; Right-to-Audit; Inspection of Records) of this OCC. Furthermore, if Outside Counsel elects to enter into a subcontract for any legal services, then the Parties agree that Agency shall not be liable to Outside Counsel for any rates or rate ranges greater than or inconsistent with the highest rate or rate range specified in Addendum B unless prior written approval is obtained from Agency. Any subcontracted legal counsel also must comply with Subsections 5.5 (Administrative Staff/Clerks) and 9.8 (Conflict of Interest) of this OCC.

Outside Counsel agrees to comply with all state and federal laws applicable to any subcontractors, including, but not limited to, laws regarding wages, taxes, insurance, historically underutilized businesses, and workers' compensation.

In no event shall this section or any other provision of this OCC be construed as relieving Outside Counsel of the responsibility for ensuring that all services rendered under this OCC, and any subcontracts thereto, are rendered in compliance with all of the terms of this OCC.

**Section 4.    Liability.**

**4.1    Limitation of Liability.**  The Parties stipulate and agree that the State of Texas and Agency's total liability to Outside Counsel, including consideration for the full, satisfactory, and timely performance of all its duties, responsibilities, and obligations, and for reimbursement of all expenses, if any, as set forth in this OCC or other liability arising out of any performance herein shall not exceed:

**$25,000.00 for this OCC Term.**

Outside Counsel agrees that the State of Texas and its agencies (other than Agency) shall have no liability arising out of this OCC or the services of this OCC to Outside Counsel.

**4.2    Subject to Appropriation.**  The Parties acknowledge and agree that nothing in this OCC will be interpreted to create a future obligation or liability in excess of the funds currently appropriated to Agency.

**Section 5.    Compensation/Expenses.**

**5.1    Fees to Outside Counsel.**    Consistent with Title 1, Chapter 57 of the Texas Administrative Code, Agency agrees to pay Outside Counsel in consideration of full and satisfactory performance of the legal services under this OCC.  Services for non-attorney timekeeper classifications listed on Addendum B, if applicable, such as paralegal, legal assistant, or patent agent, must be of a substantive legal nature in order to be reimbursable.  Outside Counsel agrees to the fee schedule as described in Addendum B.

**5.2    Reimbursement of Expenses.**  Agency will reimburse Outside Counsel for actual expenses incurred in the performance of the legal services described in Addendum A, if such expenses are reasonable and either necessary or advisable.  Outside Counsel must provide copies

of original receipts as evidence of actual expenditures. Limitations on the amount and type of reimbursement include the following, unless otherwise agreed upon by Agency in writing, in advance, and in accordance with Agency policy and relevant law:

**5.2.1   Mileage.**  Agency will reimburse Outside Counsel for reasonable and necessary travel mileage at the per mile rate posted on the Texas Mileage Guide adopted under Section 660.043 of the Texas Government Code.  The Texas Mileage Guide is currently available on the Comptroller of Public Accounts's website, at: https://fmx.cpa.state.tx.us/fm/travel/travelrates.php.

**5.2.2   Meals.**  Agency will reimburse Outside Counsel for reasonable and necessary meal expenses in accordance with the Textravel guide published by the Texas Comptroller of Public Accounts.  Agency will reimburse Outside Counsel at the allowable rate provided by the Textravel guide or actual expenses, whichever is less, for each timekeeper as listed in Addendum B for each day requiring overnight travel and on the return day of travel.  Agency will not reimburse Outside Counsel for the purchase of alcohol.  The Textravel guide is currently available on the Comptroller of Public Accounts's website at: https://fmx.cpa.texas.gov/fmx/travel/textravel/rates/current.php.

**5.2.3   Lodging.**  Agency will reimburse Outside Counsel for reasonable and necessary lodging expenses.   Unless otherwise agreed upon by Agency in writing in advance, Texas lodging or overnight accommodations will be reimbursed at the lesser amount of the actual expense or $200.00 per timekeeper, as listed in Addendum B, per night. Unless otherwise agreed upon by Agency in writing in advance, out-of-Texas lodging or overnight accommodations will be reimbursed at the lesser amount of the actual expense or $250.00 per timekeeper, as listed in Addendum B, per night.

**5.2.4   Airfare.**  Airfare will be reimbursed at the lesser amount of the actual expense or the regular published rates for airfares for commercial airlines.  Agency will not reimburse Outside Counsel for expenses relating to first-class airfare, which includes first- or business-class airfare or any other expense related to premium or preferred airfare benefits.

**5.2.5   Expert Services.**  Subject to Agency's prior approval, Agency will reimburse Outside Counsel for the reasonable and necessary cost of expert services.

**5.2.6   Other Reimbursable Expenses.**  Agency will reimburse the actual cost for other expenses if Outside Counsel provides a reasonable and sufficient explanation of the nature and purpose of the charge and the charge is reasonable and either necessary or advisable.

**5.2.7   Non-Reimbursable Expenses.**  Agency expects Outside Counsel to anticipate and include routine operating expenses and disbursements as part of overhead and, therefore, part of a basic hourly rate or flat rate.  Therefore, Agency will not reimburse Outside Counsel for: routine copying and printing charges; fax charges; routine postage; office supplies; telephone charges unless related to teleconferencing services; local travel (within 20-mile radius of office including mileage, parking, and tolls) not relating to overnight travel; all delivery services

performed by internal staff; electricity or other utilities; software costs or subscription fees; and internet or wireless access charges.

**5.2.8   Gratuity.** Agency will not reimburse Outside Counsel for tips or gratuities.

**5.2.9   Reimbursement for Agency Employee Expenses.** Agency will not reimburse Outside Counsel for the cost of expenses incurred by Agency employees.

**5.2.10   No Mark-up.** Outside Counsel will only be reimbursed for actual expenses. Outside Counsel shall not be reimbursed for any mark-up or other overhead costs.

**5.3   Subcontractor Payments.** Subject to Agency's prior approval, Agency will reimburse Outside Counsel for the actual, reasonable and necessary expenses relating to Outside Counsel's use of subcontractors. Outside Counsel shall be responsible for any payments and other claims due to subcontractors for work performed under this OCC. Outside Counsel, in subcontracting for any performances or in support of any of the performances specified herein (e.g., expert services, local counsel, and other services), expressly understands and agrees that Agency shall not be directly liable in any manner to Outside Counsel's subcontractor(s).

**5.4   Legal Research.** Agency may reimburse Outside Counsel for its reasonable and necessary expenses relating to legal research, including online legal research.

While Agency should be paying Outside Counsel to apply the knowledge and expertise for which it was hired, and not paying Outside Counsel to obtain that knowledge through extensive legal research, Agency understands that situations arise that justify extensive research on how best to proceed in order to achieve a desired result. Therefore, the need for extensive legal research will be addressed on a case-by-case basis by Outside Counsel and Agency.

**5.5   Administrative Staff/Clerks.** Agency will only pay for substantive legal work performed by attorneys or other qualified personnel, regardless of the job title or classification applicable to such individual. For purposes of this agreement, "substantive legal work" has the same meaning as defined by the Texas Paralegal Standards adopted by the Board of Directors of the State Bar of Texas. Agency will not pay for law clerks or interns, however classified, under any circumstances. Agency will not pay for administrative staff, such as secretarial support, librarians, case clerks, and accounting and billing clerks, for activities including but not limited to the following: overtime, file opening, file organization, docketing, and other administrative tasks; and preparation of billing, invoice review, budget preparation, and communications regarding same or any other accounting matter.

**5.6   Training.** Agency will not pay for the education or training of attorneys, paralegals, or other staff of Outside Counsel, including assigning such staff on a transient basis to an Agency matter.

**Section 6.      Invoices for Payment.**

**6.1    General.**  Outside Counsel agrees to abide by the administrative rules adopted by the OAG governing the submission, review, and approval of invoices found at Title 1, Chapter 57 of the Texas Administrative Code.  Outside Counsel understands and agree that no invoice shall seek reimbursement for services performed or expenses incurred in violation of the provisions of this OCC.

**6.1.1    Billing Period**. The billing period is the interval (ex. monthly) which determines the frequency Outside Counsel will submit invoices to the Agency.  The billing period for this OCC is specified in Addendum B. Unless otherwise specified in Addendum B of the Contract, a billing period defined as "monthly" shall begin with the first day of the calendar month and end with the last day of the calendar month.

**6.1.2    Billable Time.** Agency will only pay for the services of individuals covered in Addendum B.  All times must be billed in one-tenth hour or one-quarter hour increments, and must reflect only actual time spent.  Tasks referencing correspondence and filings must describe the document received or authored.  Agency expects to be billed for the actual time it takes to modify standardized forms, filings, and/or correspondence for use on the matter being billed. Agency will not reimburse Outside Counsel for the time it originally took to prepare any such standardized documents.  Agency will not pay for review, execution, and processing of the OCC and submission of invoices.

**6.1.3    Submission of Invoices.** Outside Counsel must submit invoices to Agency for review within one calendar month from the end of the relevant billing period covered by the invoice. Outside Counsel must submit invoices to Agency at:

> general.counsel@oag.texas.gov
>
> OR
>
> Attn.:  General Counsel Division
> Office of the Attorney General
> Mail Code 074
> Post Office Box 12548
> Austin, Texas 78711-2548

**6.2    Subcontractor Invoices.**  Subcontractor(s) shall directly invoice Outside Counsel, and Outside Counsel shall then invoice Agency for the work performed.  The actual work performed by subcontractor shall be specifically identified in the invoice supported by attached documentation.

**6.3    Prompt Payment.** Payments to Outside Counsel by Agency under this OCC shall be in compliance with Chapters 2251 of the Texas Government Code and Title 34, Chapter 20, Subchapter F of the Texas Administrative Code.

**6.4    Supporting Documents; Right-to-Audit; Inspection of Records.**

**6.4.1    Duty to Maintain Records.**  Outside Counsel shall maintain adequate records to support its charges, procedures, and performances to Agency for all work related to this OCC. Outside Counsel shall also maintain such records as are deemed necessary by Agency, the State Auditor's Office, or federal auditors if federal funds are used to pay Outside Counsel, to ensure proper accounting for all costs and performances related to this OCC.

**6.4.2    Records Retention.**  Outside Counsel shall retain, for a period of at least seven (7) years after the later of (1) the expiration or termination of this OCC or (2) the resolution of all issues that arise from any litigation, claim, negotiation, audit, open records request, administrative review, or other action involving this OCC, such records as are necessary to fully disclose the extent of services provided under this OCC, including but not limited to any daily activity reports, time distribution and attendance records, and other records that may show the basis of the charges made or performances delivered.

**6.4.3    Inspection of Records and Right to Audit.**  Outside Counsel shall make available at reasonable times and upon reasonable notice, and for reasonable periods, all information that related to the State of Texas' property, services performed, and charges, such as work papers, reports, books, data, files, software, records, and other supporting documents pertaining to this OCC, for purposes of inspecting, monitoring, auditing, or evaluating by Agency, the State of Texas, or their authorized representatives. Outside Counsel shall cooperate with auditors and other authorized Agency and State of Texas representatives and shall provide them with prompt access to all of such property as requested by Agency or the State of Texas.

**6.4.4    State Auditor.**  In addition to and without limitation on the other audit provisions of this OCC, pursuant to Section 2262.154 of the Texas Government Code, the State Auditor's Office may conduct an audit or investigation of Outside Counsel or any other entity or person receiving funds from the State of Texas directly under this OCC or indirectly through a subcontract under this OCC. The acceptance of funds by Outside Counsel or any other entity or person directly under this OCC or indirectly through a subcontract under this OCC acts as acceptance of the authority of the State Auditor's Office, under the direction of the Legislative Audit Committee, to conduct an audit or investigation in connection with those funds. Under the direction of the Legislative Audit Committee, Outside Counsel or any other entity or person that is the subject of an audit or investigation by the State Auditor's Office must provide the State Auditor's Office with access to any information the State Auditor's Office considers relevant to the investigation or audit. Outside Counsel further agrees to cooperate fully with the State Auditor's Office in the conduct of the audit or investigation, including providing all records requested. Outside Counsel shall ensure that this paragraph concerning the authority to audit funds received indirectly by subcontractors through Outside Counsel and the requirement to cooperate is included in any subcontract it awards. The State Auditor's Office shall at any time have access to and the right to examine, audit, excerpt, and transcribe any pertinent books, documents, working papers, and records of Outside Counsel related to this OCC.

**Section 7.    Termination**

**7.1    Convenience of the State.** Agency has the right to terminate this OCC, in whole or in part, without penalty, by notifying Outside Counsel in writing of such termination prior to the effective date of such termination. Such notification of termination shall state the effective date of termination. In the event of such termination, Outside Counsel shall, unless otherwise mutually agreed upon in writing, cease all services immediately, except such services that are necessary to wind-up, in a cost-effective manner, all services being provided. Subject to Section 4 of this OCC, Agency shall be liable for payments for all services performed under this OCC to the effective date of termination, plus any necessary services to cost effectively wind-up.

**7.2    Cause/Default.** In the event that Outside Counsel commits a material breach of this OCC, Agency may, upon written notice to Outside Counsel, immediately terminate all or any part of this OCC. Termination is not an exclusive remedy but will be in addition to any other rights and remedies provided in equity, by law, or under this OCC.

**7.3    Rights Upon Termination or Expiration.** Upon expiration or termination of this OCC for any reason, Outside Counsel shall, subject to Outside Counsel's professional obligations, immediately transfer to Agency all information and associated work products prepared by Outside Counsel or otherwise prepared for Agency pursuant to this OCC, in whatever form such information and work products may exist, to the extent requested by Agency. At no additional cost to Agency and in any manner Agency deems appropriate in its sole discretion, Agency is granted the unrestricted right to use, copy, modify, prepare derivative works from, publish, and distribute any component of the information, work product, or other deliverable made the subject of this OCC.

**7.4    Remedies.** Notwithstanding any exercise by Agency of its rights of early termination, Outside Counsel shall not be relieved of any liability to Agency for damages due to Agency by virtue of any breach of this OCC by Outside Counsel or for amounts otherwise due Agency by Outside Counsel.

**7.5    Termination by Outside Counsel.** Consistent with applicable rules of professional conduct, Outside Counsel may terminate this OCC upon reasonable notice for material breach by Agency.

**Section 8.    Certifications of Outside Counsel**

By agreeing to and signing this OCC, Outside Counsel hereby makes the following certifications and warranties:

**8.1    Delinquent Child Support Obligations.** Outside Counsel certifies that it is not ineligible to receive any grant, loan, or payment under this OCC pursuant to Section 231.006 of the Texas Family Code and acknowledges that this OCC may be terminated and payment may be withheld if this certification is inaccurate.

**8.2**   **Buy Texas.**  With respect to any services purchased pursuant to this OCC, Outside Counsel represents and warrants that it will buy Texas products and materials for use in providing the services authorized herein when such products and materials are available at a comparable price and within a comparable period of time when compared to non-Texas products and materials.  This subsection does not apply to Outside Counsel providing legal services located outside the State of Texas.

**8.3**   **Gift to Public Servant.**  Outside Counsel warrants that it has not given, nor does it intend to give at any time hereafter, any economic opportunity, future employment, gift, loan, gratuity, special discount, trip, favor, or service to a public servant in connection with the award of this OCC.

**8.4**   **Franchise Tax.**  By signing this OCC, Outside Counsel certifies that its Texas franchise tax payments are current, or that it is exempt from or not subject to such tax, consistent with Chapter 171 of the Texas Tax Code.

**8.5**   **Outside Counsel License/Conduct.**  Outside Counsel certifies that each attorney performing services under this OCC is an attorney in good standing under the laws of the State of Texas or the jurisdiction where the representation occurs.  Outside Counsel will notify Agency in writing within one business day of any lapse in an assigned attorney's licensed status or any final disciplinary action taken against an assigned attorney.  For the Lead Counsel(s) named in Addendum B, Outside Counsel will provide documentation of good standing from the state bar or the licensing authority of the jurisdiction in which the attorney resides and is licensed.  An attorney that is not licensed by the State Bar of Texas may not provide legal services and advice concerning Texas law.

**8.6**   **Debt to State.**  Outside Counsel acknowledges and agrees that, to the extent Outside Counsel owes any debt (child support or other obligation) or delinquent taxes to the State of Texas, any payments Outside Counsel are owed under this OCC may be applied by the Comptroller of Public Accounts toward any such debt or delinquent taxes until such debt or delinquent taxes are paid in full.

**8.7**   **Prohibited Bids and Contracts.**  Under Section 2155.004 of the Texas Government Code, Outside Counsel certifies that it is not ineligible to receive this OCC and acknowledges that this OCC may be terminated and payment withheld if this certification is inaccurate.

**8.8**   **Compliance with State Law Contracting Provisions.**  Agency and Outside Counsel certify that this OCC is compliant, and will remain compliant, with any and all applicable laws governing contracts involving the State of Texas or its agencies, including, but not limited to, Sections 572.054 (Representation by Former Officer or Employee of Regulatory Agency Restricted; Criminal Offense), 572.069 (Certain Employment for Former State Officer or Employee Restricted), 669.003 (Contracting with Executive Head of State Agency), 2252.901 (Contracts with Former or Retired Agency Employees),  2252.908 (Disclosure of Interested Parties),  and 2261.252 (Disclosure of Potential Conflicts of Interest; Certain Contracts Prohibited) of the Texas Government Code.

**8.9    Does not Boycott Israel.**  Pursuant to Section 2270.002 of the Texas Government Code, Outside Counsel certifies, by executing this OCC, that Outside Counsel does not, and will not during the term of this OCC, boycott Israel. Outside Counsel further certifies that no subcontractor of Outside Counsel boycotts Israel or will boycott Israel during the term of this agreement. Outside Counsel agrees to take all necessary steps to ensure this certification remains true during the term of this OCC.

**8.10    Prohibited Companies.**  Outside Counsel certifies, by executing this OCC, that neither Outside Counsel, nor any subcontractor of Outside Counsel, is a company under Texas Government Code section 2252.152 with which Agency may be prohibited from contracting. Outside Counsel agrees to take all necessary steps to ensure this certification remains true during the term of this OCC.

**8.11    Limitation on Abortion Funding.**  Outside Counsel acknowledges and agrees that, under article IX, section 6.25 of the General Appropriations Act, 86th Leg., R.S. (2019), and except as provided by that Act, funds may not be distributed under this OCC to any individual or entity that: (1) performs an abortion procedure that is not reimbursable under the State of Texas' Medicaid program; (2) is commonly owned, managed, or controlled by an entity that performs an abortion procedure that is not reimbursable under the State of Texas' Medicaid program; or (3) is a franchise or affiliate of an entity that performs an abortion procedure that is not reimbursable under the State of Texas' Medicaid program.

## Section 9.    General Terms and Conditions

**9.1    Independent Contractor.**  Outside Counsel agrees and acknowledges that during the OCC Term, Outside Counsel and Outside Counsel's subcontractors are independent contractors of Agency or the State of Texas and are not employees of Agency or the State of Texas.

    **9.1.1**    Outside Counsel will be solely and entirely responsible for its acts and the acts of its agents, employees, subcontractors, and representatives in the performance of this OCC.

    **9.1.2**    Outside Counsel agrees and acknowledges that during the OCC Term, Outside Counsel shall be entirely responsible for the liability and payment for Outside Counsel or Outside Counsel's employees or assistants, of all taxes of whatever kind, arising out of the performances in this OCC.  Other than the payments described in this OCC, Outside Counsel agrees and acknowledges that Outside Counsel or Outside Counsel's employees or assistants shall not be entitled to any State benefit on account of the services provided hereunder. AGENCY SHALL NOT BE LIABLE TO OUTSIDE COUNSEL, ITS EMPLOYEES, AGENTS, OR OTHERS FOR THE PAYMENT OF TAXES OR THE PROVISION OF UNEMPLOYMENT INSURANCE AND/OR WORKERS' COMPENSATION, OR ANY BENEFIT DUE TO A STATE EMPLOYEE.  If Agency or the State of Texas shall nonetheless become liable for such payments or obligations, Outside Counsel shall promptly pay or reimburse Agency or the State of Texas for such liability or obligation.

**9.2    Assignment of OCC.**  Outside Counsel may not assign this OCC, or assign any right or delegate any duty under this OCC, without prior written approval from Agency.

**9.3    Survival.**   The obligations of Outside Counsel under the following sections and subsections shall survive the termination or expiration of this OCC:  3.3, 4, 5, 6.4, 7.1, 7.3, 7.4, 8.8, 9.7, 9.8, 9.11, and 9.13.

**9.4    Copyright/Intellectual Property.**   Outside Counsel shall take reasonable measures to protect Agency from material risks of Agency liability known to Outside Counsel for any copyright or patent infringement or disclosure of trade secrets resulting from the use of any equipment, materials, information, or ideas furnished by Outside Counsel pursuant to this OCC (other than equipment, materials, information, or ideas supplied or required by Agency or its employees or other agents).  Outside Counsel and Agency agree to furnish timely written notice to each other of any claim of copyright, patent, trade secret, or other intellectual property infringement arising out of services under this OCC.

**9.5    Media Releases or Pronouncements.**   Outside Counsel understands that Agency does not endorse any vendor, commodity, or service.  Outside Counsel, its employees, representatives, agents, or subcontractors may not participate in any media event or issue any media release, advertisement, publication, editorial, article, or public pronouncement that pertains to this OCC or the services or project to which this OCC relates or that mentions Agency without the prior written approval of Agency.

**9.6    Written Notice Delivery.**   Any notice required or permitted to be given under this OCC by one party to the other party shall be in writing and shall be given and deemed to have been given immediately if delivered in person to the recipient's address set forth in this subsection, or on the date shown on the certificate of receipt if placed in the United States mail, postage prepaid, by registered or certified mail with return receipt requested, addressed to the receiving party at the address hereinafter specified.

  **9.6.1   Outside Counsel's Address.**   The address for Outside Counsel for all purposes under this OCC and for all notices hereunder shall be:

Brandon Cammack
Cammack Law Firm PLLC
4265 San Felipe St #1100
Houston, Texas 77027
Phone: 713-300-9291
Email: brandon@cammacklawfirm.com

  **9.6.2   OAG's Address.**   The addresses for the OAG for all purposes under this OCC, except as provided by Subsection 6.1.3, and for all notices hereunder shall be:

Office of the Attorney General
General Counsel Division, Mail Code 074
Post Office Box 12548
Austin, Texas 78711-2548

**9.7    Dispute Resolution.**

**9.7.1**   The dispute resolution process provided for in Chapter 2260 of the Texas Government Code shall be used, as further described herein, by Agency and by Outside Counsel to attempt to resolve any claim for breach of this OCC made by Outside Counsel.

**9.7.2** Outside Counsel's claims for breach of this OCC that the Parties cannot resolve in the ordinary course of business shall be submitted to the negotiation process provided in Chapter 2260, Subchapter B, of the Government Code.  To initiate the process, Outside Counsel shall submit written notice, as required by Subchapter B, to the Agency's contact with a copy to the Texas First Assistant Attorney General or his/her designee.  Said notice shall specifically state that the provisions of Chapter 2260, Subchapter B, are being invoked.  A copy of the notice shall also be given to all other representatives of Outside Counsel and Agency otherwise entitled to notice under this OCC.  Compliance by Outside Counsel with Subchapter B is a condition precedent to the filing of a contested case proceeding under Chapter 2260, Subchapter C, of the Government Code.

**9.7.3** The contested case process provided in Chapter 2260, Subchapter C, of the Texas Government Code is Outside Counsel's sole and exclusive process for seeking a remedy for any and all alleged breaches of this OCC by Agency or the State of Texas if the Parties are unable to resolve their disputes under Section 9.7.2 of this OCC.

**9.7.4**  Compliance  with  the  contested  case  process  provided  in  Chapter 2260, Subchapter C, of the Texas Government Code is a condition precedent to seeking consent to sue from the Legislature under Chapter 107 of the Texas Civil Practices and Remedies Code.  Neither the execution of this OCC by Agency nor any other conduct of any representative of Agency relating to this OCC shall be considered a waiver of sovereign immunity.

**9.7.5**   The submission, processing, and resolution of Outside Counsel's claim is governed by Title 1, Chapter 68 of the Texas Administrative Code adopted by the OAG pursuant to Chapter 2260, as currently effective, hereafter enacted, or subsequently amended, shall govern.

**9.8    Conflict of Interest.**

**9.8.1** Neither local funds nor funds appropriated by the General Appropriations Act may be expended to pay the legal fees or expenses of Outside Counsel in representing Agency in any matter if Outside Counsel is representing a plaintiff in a proceeding seeking monetary damages from the State of Texas or any of its agencies.  For these purposes, "proceedings seeking monetary damages" do not include actions for tax refunds, compensation for exercise of eminent domain authority, or reimbursement of costs of litigation and attorney's fees.

**9.8.2** Neither local funds nor funds appropriated by the General Appropriations Act may be used to pay the legal fees or expenses of Outside Counsel under this OCC if Outside Counsel

currently represents, has represented in the six months preceding this OCC, or will represent in the six months following the termination of this OCC, a client before Agency.

**9.8.3** Outside Counsel shall regularly conduct conflicts analyses on its interests and those of its clients and any subcontractor and immediately disclose, in writing, to Agency any actual or potential conflict with respect to Agency or the State of Texas.

**9.8.4** Outside Counsel has a continual and ongoing obligation to immediately notify Agency, in writing, upon discovery of any actual or potential conflict to Agency or the State of Texas.

**9.9    Taxes.** This OCC shall not be construed so as to supersede the laws of the United States or the State of Texas that accord the State of Texas, Agency, and all departments, agencies, and instrumentalities of the State of Texas exemptions from the payment(s) of all taxes of whatever kind.  To the extent allowed by law, Agency will provide, upon the request of Outside Counsel during this OCC Term, all applicable tax exemption documentation.

**9.10   Signatories.**  Having agreed to the terms herein, the undersigned signatories hereby represent and warrant that they have authority to enter into this OCC and are acting in their official capacities.

**9.11   Applicable Law and Venue.**  This OCC is made and entered into in the State of Texas, and this OCC and all disputes arising out of or relating to this OCC shall be governed by the laws of the State of Texas, without regard to any otherwise applicable conflict of law rules or requirements.

Outside Counsel agrees that Agency and the State of Texas do not waive any immunity (including, without limitation, state or federal sovereign immunity).  Outside Counsel further agrees that any properly allowed litigation arising out of or in any way relating to this OCC shall be commenced exclusively in a court of competent jurisdiction in Travis County, Texas.  Outside Counsel thus hereby irrevocably and unconditionally consents to the exclusive jurisdiction of a court of competent jurisdiction in Travis County, Texas for the purpose of prosecuting or defending such litigation.  Outside Counsel hereby waives and agrees not to assert: (a) that Outside Counsel is not personally subject to the jurisdiction of a court of competent jurisdiction in Travis County, Texas, (b) that the suit, action or proceeding is brought in an inconvenient forum, (c) that the venue of the suit, action or proceeding is improper, or (d) any other challenge to jurisdiction or venue.

**9.12   Amendments.**  This OCC, including addenda hereto, may be amended only upon written agreement signed by the Parties.

**9.13   Severability/Interpretation.**  The fact that a particular provision in this OCC is held under any applicable law to be void or unenforceable in no way affects the validity of other provisions, and this OCC will continue to be binding on both Parties.  Any provision that is held to be void or unenforceable will be interpreted by the Parties or the courts to be replaced with language that is as close as possible to the intent of the original provision so as to effectuate the

purpose of this OCC. Any ambiguous or conflicting terms shall be interpreted and construed in such a manner as to accomplish the purpose of this OCC.

**9.14   Insurance Required.** Outside Counsel will undertake reasonable efforts to obtain and maintain during this OCC Term malpractice insurance in an amount not less than $10,000.00 or the amount specified in Section 4.1 of this OCC, whichever is more.

Further, Outside Counsel agrees to give notice to Agency in the event any amount of malpractice insurance is canceled. Outside Counsel also agrees to furnish to Agency certified copies of such insurance policies when requested. Outside Counsel agrees that no claim by Agency and the State of Texas for damages resulting from breach of Outside Counsel's duties to Agency under this OCC shall be limited to the amount of malpractice insurance maintained by Outside Counsel.

**9.15   Additional Terms.** Any additional terms agreed to by Outside Counsel and Agency shall be listed in an optional Addendum C. These terms shall not be inconsistent with or contrary to the Contract terms listed above, and nothing in Addendum C shall remove or modify terms contained in Sections 1–9. In the event of any conflict, ambiguity or inconsistency between the terms of Addendum C and Sections 1–9 of this Outside Counsel Contract, Sections 1–9 shall take precedence and control.

**9.16   Counterparts.** This OCC may be executed in multiple counterparts.

**IN WITNESS THEREOF, THE PARTIES HAVE SIGNED AND EXECUTED THIS OCC.**

**Cammack Law Firm PLLC**                    **Office of the Attorney General of Texas**


By: Brandon Cammack                          Attorney General or designee
4265 San Felipe St #1100
Houston, Texas 77027
Phone: 713-300-9291
Email: brandon@cammacklawfirm.com

Outside Counsel Contract
Page 14 of 16

# OUTSIDE COUNSEL CONTRACT

OAG Contract No. _____

## Addendum A

## Services

The Travis County District Attorney's Office referred a criminal complaint to the OAG. The District Attorney's Office requested that the OAG conduct a review of the allegations, which include complaints of potential criminal violations made by certain state and federal employees.

State law allows the OAG to provide assistance to a prosecutor's office, such as the Travis County District Attorney's Office, in the prosecution of criminal cases. *See* Tex. Gov't Code §§ 402.028(a); 41.102(b).

Outside Counsel will conduct an investigation, under the authority of the OAG, of the criminal allegations contained in the complaint referred to the OAG by the District Attorney's Office and shall prepare a report documenting any potential criminal charges that may be discovered in the course of the investigation. Notwithstanding anything to the contrary contained in this OCC, Outside Counsel shall conduct its investigation only as consistent with the complaint referred to the OAG and only as directed by the OAG. Except for Outside Counsel's duty to provide a post-investigation report, this OCC expressly excludes legal services relating to any other post-investigation activities, including, but not limited to, indictment and prosecution.

# OUTSIDE COUNSEL CONTRACT
## OAG Contract No. _____

## Addendum B
## Rates

Attorneys working on Agency matters, including necessary and appropriate personal appearances before the Court, as requested and authorized by Agency Counsel shall be paid according to the following terms:

**Name(s) of Lead Counsel:   Brandon Cammack**

| Timekeeper classification | Hourly Rate (in United States Dollars) |
|---|---|
| Brandon Cammack | $300.00 |

**Billing Period.**  The billing period for this OCC shall be: **Monthly**

**Travel Rate.**  An attorney's travel rate may not exceed one-half of that attorney's hourly rate listed above. If no hourly rate is identified above or no travel rate(s) listed below, Outside Counsel may not charge Agency for time spent traveling on Agency matters.

1/31/2020 8:38 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-007636**
Gilberto Rios

## CAUSE NO. D-1-GN-18-007636

| | | |
|---|---|---|
| THE ROY F & JOANN COLE MITTE FOUNDATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| WC 1st AND TRINITY, LP, WC 1st AND TRINITY GP, LLC, WC 3rd AND CONGRESS, LP AND WORLD CLASS CAPITAL GROUP, LLC | § § § § | 126th JUDICIAL DISTRICT |

### ATTORNEY GENERAL'S WAIVER

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Ken Paxton, Attorney General for the State of Texas (referred to herein as the "Attorney General"), and files this Waiver in the above-referenced cause of action and respectfully shows the Court as follows:

### I.

Pursuant to §123.002 of the Texas Property Code and the common law, the Attorney General is a proper party and may intervene in a proceeding involving a charitable trust on behalf of the interest of the general public.

### II.

Based upon the pleadings that have been provided to him to date, the Attorney General has determined not to intervene and by this Waiver declines in writing to be a party to the proceeding in its current state, pursuant to §123.004(b)(1) of the Property Code. Accordingly, the Attorney General waives further notice of the proceedings in this case as it is currently constituted.

### III.

If any pleading is filed herein that adds additional parties or causes of action, such pleading would constitute a new or additional proceeding involving a charitable trust, which will require additional notice to the Attorney General pursuant to §123.003 of the Property Code. This Waiver

**EX. 3**

is not intended to constitute a declination in writing to be a party to any such new proceeding.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. McCARTY
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

*/s/ Cathleen M. Day*
Cathleen M. Day
Assistant Attorney General
State Bar No. 24105783
Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-9507 - Direct Line
(512) 477-2348 - Fax
cathleen.day@oag.texas.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Attorney General's Waiver* was served on January 31, 2020, via e-service to the following:

Ray C. Chester                                Edward F. Fernandes
Michael A. Shauness                           Katherine Stein
MCGINNIS LOCHRIDGE, LLP                       KING & SPALDING, LLP
600 Congress Ave., Ste. 2100                  500 W. 2nd St., Ste. 1800
Austin, TX 78701                              Austin, TX 78701
rchester@mcginnislaw.com                      efernandes@kslaw.com
mshaunessy@mcginnislaw.com                    kstein@kslaw.com

*/s/ Cathleen M. Day*
Cathleen M. Day



# KEN PAXTON

ATTORNEY GENERAL OF TEXAS

January 31, 2020

Velva L. Price
Travis County District Clerk
P.O. Box 1748
Austin, TX 78767

Re:   Cause No. D-1-GN-18-007636; *The Roy F. & Joann Cole Mitte Foundation v. WC 1st and Trinity, LP, WC 1st and Trinity GP, LLC, WC 3rd and Congress, LP and World Class Capital Group, LLC*; In the 126th Judicial District Court of Travis County, Texas; ***Attorney General's Waiver***

Dear Ms. Price:

The following pleadings have been received by this office relating to the above-referenced cause:

- *Plaintiff's Original Petition;*
- *Plaintiff's Third Amended Original Petition;*
- *Defendants' Memorandum on Remand for Determination of Adequacy of Supersedeas or Other Order under Tex. R. App. P.24;*
- *Order Appointing Receiver;*
- *Applicant's Notice of Filing of Applicant's Bond;*
- *Bond Securing Appointment of Receiver;*
- *Receiver's Interim Report;* and
- *Receiver's Quarterly Report for the Period December 10, 2019 to December 31, 2019.*

This *Waiver* is a waiver of the right to intervene in this case only as it is currently constituted. If any pleading is filed herein that adds additional parties or causes of action, such pleading will constitute a new or additional proceeding involving a charitable trust, which will require additional notice to the Attorney General pursuant to §123.003 of the Property Code. This Waiver is not intended to constitute a declination in writing to be a party to any such new proceeding.

Sincerely,

*/s/ Kathleen M. Day*
Kathleen M. Day
Assistant Attorney General
State Bar No. 24105783
Financial Litigation and Charitable Trusts Division
P.O. Box 12548

Velva L. Price
Cause No. D-1-GN-18-007636
January 31, 2020
Page **2** of **2**

Austin, Texas 78711-2548
(512) 463-9507 - Direct Line
cathleen.day@oag.texas.gov

CMD/did
Enclosure

  cc:   Ray C. Chester                    Edward F. Fernandes
        Michael A. Shaunessy         Katherine Stein
        MCGINNIS LOCHRIDGE, LLP    KING & SPALDING, LLP
        600 Congress Ave., Ste. 2100    500 W. 2nd St., Ste. 1800
        Austin, TX 78701                Austin, TX 78701
        rchester@mcginnislaw.com     efernandes@kslaw.com
        mshaunessy@mcginnislaw.com  kstein@kslaw.com

Unofficial copy Travis Co. District Clerk Velva L. Price

6/8/2020 4:35 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-007636
Chloe Jimenez

**CAUSE NO. D-1-GN-18-007636**

| | | |
|---|---|---|
| THE ROY F & JOANN COLE MITTE FOUNDATION, | § § § | IN THE DISTRICT COURT OF |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| WC 1st AND TRINITY, LP, WC 1st AND | § | |
| TRINITY GP, LLC, WC 3rd AND | § | |
| CONGRESS, LP AND WORLD CLASS | § | |
| CAPITAL GROUP, LLC | § | 126th JUDICIAL DISTRICT |
| | § | |
|     *Defendants*. | § | |
| | § | |

## ATTORNEY GENERAL'S PETITION IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

    NOW COMES KEN PAXTON, Attorney General of Texas, on behalf of the public interest in charity, ("Attorney General") and files this Petition in Intervention in the above-referenced cause, and would respectfully show the Court the following:

### I.

    Pursuant to §123.002 of the Texas Property Code, the Attorney General is a proper party and may intervene in a "proceeding involving a charitable trust." On December 11, 2019, The Attorney General received notice of the above-captioned case pursuant to §123.003 of the Texas Property Code, and subsequently filed the Attorney General's Waiver of Intervention. The Attorney General recently received notice of a new cause of action filed in this matter. For and on behalf of the interest of the general public of this state in charitable trusts, the Attorney General hereby files this Petition in Intervention in this proceeding, pursuant to §123.002 of the Texas Property Code and Rule 60 of the Texas Rules of Civil Procedure.

### II.

    The Attorney General's presence in this matter is warranted to protect the interests of the public in the event that the public's interest and the parties' interests diverge. In addition, this litigation affects a substantial sum of charitable funds and involves the expenditure of these funds.

**EX. 4**

The Attorney General specifically asserts his right to amend this Petition in Intervention as necessary to assert additional affirmative relief following his review of the complete pleadings and the development of further information.

### III.

The Attorney General has found it necessary to intervene in this proceeding to protect the public interest in charity.  He requests that the Court award reasonable and necessary attorney's fees and costs as are equitable and just for services rendered by the Attorney General in accordance with §123.006(b) of the Texas Property Code.

### PRAYER

WHEREFORE, the Attorney General prays for such relief to which he may be entitled on behalf of the public interest in charity.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

/s/ Cathleen M. Day
Joshua R. Godbey, Division Chief
State Bar No. 24049996
Cathleen M. Day, Assistant Attorney General
State Bar No. 24105783
Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-9507 Phone
(512) 477-2348 Fax
joshua.godbey@oag.texas.gov
cathleen.day@oag.texas.gov

Unofficial copy Travis Co. District Clerk Velva L. Price

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Attorney General's Petition in Intervention* was served by e-service on June 8, 2020, to the following:

Ray C. Chester
Michael A. Shaunessy
MCGINNIS LOCHRIDGE, LLP
600 Congress Ave., Ste. 2100
Austin, TX 78701
rchester@mcginnislaw.com
mshaunessy@mcginnislaw.com

Stephen W. Lemmon
Rhonda B. Mates
STREUSAND, LANDON, OZBURN &
LEMMON, LLP
1801 South Mopac, Ste. 320
Austin, Texas 78746
lemmon@slollp.com
mates@slollp.com

Terry L. Scarborough
V. Blayre Peña
HANCE SCARBOROUGH, LLP
400 W. 15th St., Ste. 950
Austin, TX 78701
tscarborough@hslawmail.com
bpena@hslawmail.com

/s/ Cathleen M. Day
Cathleen M. Day

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sharron Lee on behalf of Cathleen Day
Bar No. 24105783
sharron.lee@oag.texas.gov
Envelope ID: 43565120
Status as of 06/11/2020 16:50:18 PM -05:00

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason Snell | 24013540 | firm@snellfirm.com | 6/8/2020 4:35:03 PM | SENT |
| Katherine Stein | 24083980 | kstein@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Ray Chester | 4189065 | rchester@mcginnislaw.com | 6/8/2020 4:35:03 PM | SENT |
| Michael A. Shaunessy | 18134550 | mshaunessy@mcginnislaw.com | 6/8/2020 4:35:03 PM | SENT |
| Angela Mays | | amays@munsch.com | 6/8/2020 4:35:03 PM | SENT |
| Julie Doss | | jdoss@mcginnislaw.com | 6/8/2020 4:35:03 PM | SENT |
| Dennis Roossien | | droossien@munsch.com | 6/8/2020 4:35:03 PM | SENT |
| Maria AmeliaCalaf | | mac@wittliffcutter.com | 6/8/2020 4:35:03 PM | SENT |
| James Ray | | jray@munsch.com | 6/8/2020 4:35:03 PM | SENT |
| Jack Simms | | jack@wittliffcutter.com | 6/8/2020 4:35:03 PM | SENT |
| Jason Augustine | | jason@reeveaugustine.com | 6/8/2020 4:35:03 PM | SENT |
| Annette Bittick | | abittick@mcginnislaw.com | 6/8/2020 4:35:03 PM | SENT |
| Kim McBride | | kmcbride@mcginnislaw.com | 6/8/2020 4:35:03 PM | SENT |
| Lisa Garrett | | lgarrett@munsch.com | 6/8/2020 4:35:03 PM | SENT |
| John Saba | | john@wittliffcutter.com | 6/8/2020 4:35:03 PM | SENT |

Associated Case Party: GregoryS.Milligan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rhonda Bear Mates | 24040491 | Mates@slollp.com | 6/8/2020 4:35:03 PM | SENT |
| Stephen W. Lemmon | | lemmon@slollp.com | 6/8/2020 4:35:03 PM | SENT |

Associated Case Party: WC 1st and Trinity, LP

| Name |
|------|

Unofficial copy Travis Co. District Clerk Velva L. Price

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sharron Lee on behalf of Cathleen Day
Bar No. 24105783
sharron.lee@oag.texas.gov
Envelope ID: 43565120
Status as of 06/11/2020 16:50:18 PM -05:00

Associated Case Party: WC 1st and Trinity, LP

| Viola Pena | 24050372 | bpena@hslawmail.com | 6/5/2020 4:35:03 PM | SENT |
| Nicholas Bacarisse | 24073872 | nbacarisse@adjtlaw.com | 6/6/2020 4:35:03 PM | SENT |
| Adam Gray | 24087616 | agray@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Wallace Jefferson | 19 | wjefferson@adjtlaw.com | 6/8/2020 4:35:03 PM | SENT |
| Terry Lane Scarborough | 17716000 | tscarborough@hslawmail.com | 6/8/2020 4:35:03 PM | SENT |
| Edward FFernandes | | efernandes@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Kate Stein | | kstein@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Kevin Orellana | | paralegal@hslawmail.com | 6/8/2020 4:35:03 PM | SENT |

Associated Case Party: Ken Paxton on behalf of the Public Interest in Charity

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Cathleen Day | 24105783 | cathleen.day@oag.texas.gov | 6/8/2020 4:35:03 PM | SENT |

Associated Case Party: WC 1st and Trinity GP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Edward FFernandes | | efernandes@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Kate Stein | | kstein@kslaw.com | 6/8/2020 4:35:03 PM | SENT |

Associated Case Party: WC 3rd and Congress, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Edward FFernandes | | efernandes@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Kate Stein | | kstein@kslaw.com | 6/8/2020 4:35:03 PM | SENT |

Associated Case Party: World Class Capital Group, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sharron Lee on behalf of Cathleen Day
Bar No. 24105783
sharron.lee@oag.texas.gov
Envelope ID: 43565120
Status as of 06/11/2020 16:50:18 PM -05:00

Associated Case Party: World Class Capital Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Edward FFernandes | | efernandes@kslaw.com | 6/8/2020 4:35:03 PM | SENT |
| Kate Stein | | kstein@kslaw.com | 6/8/2020 4:35:03 PM | SENT |

9/30/2020 12:08 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-007636
Alexus Rodriguez

## CAUSE NO. D-1-GN-18-007636

| | | |
|---|---|---|
| THE ROY F. & JOANN COLE MITTE FOUNDATION, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| WC 1st AND TRINITY, LP, WC 1st AND TRINITY GP, LLC, WC 3rd AND CONGRESS, LP AND WORLD CLASS CAPITAL GROUP, LLC | § | |
| *Defendants*. | § | IN THE 126TH JUDICIAL DISTRICT |

### ATTORNEY GENERAL OF TEXAS'S NOTICE OF NONSUIT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES KEN PAXTON, Attorney General of Texas, and in accordance with Texas Rule of Civil Procedure 162, files this Notice of Nonsuit of his Petition in Intervention in the above-referenced cause.

The Attorney General hereby gives notice to this Court that he is taking a nonsuit without prejudice of his Petition in Intervention which was brought for and on behalf of the interest of the general public of this state in charity, pursuant to Section 123.002 of the Texas Property Code. The Attorney General hereby notifies this Court and the parties that his nonsuit shall be effective immediately on its filing date.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. McCARTY
Deputy Attorney General for Civil Litigation

_/s/ Joshua R. Godbey_
Joshua R. Godbey, Division Chief
Assistant Attorney General
State Bar No. 24049996
Financial Litigation and Charitable Trusts Division
Office of the Attorney General
P.O. Box 12548/Mail Stop 017
Austin, Texas 78711-2548
Telephone: (512) 475-4203
Facsimile: (512) 477-2348
joshua.godbey@oag.texas.gov

*On behalf of the Public Interest in Charity*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2020, the foregoing *Attorney General's Notice of Nonsuit* was filed with the Clerk of this Court and served on all parties of record via EFileTexas.gov efiling service:

Ray C. Chester/Michael A. Shaunessy
McGinnis Lochridge, LLP
rchester@mcginnislaw.com
mshaunessy@mcginnislaw.com

*Counsel for Plaintiff Mitte Foundation*

Stephen Lemmon/Rhonda B. Mates
Streusand, Landon, Ozburn & Lemmon, LLP
lemmon@slollp.com
mates@slollp.com

*Counsel for Receiver*

Terry L. Scarborough/V. Blayre Peña
Hance Scarborough, LLP
tscarborough@hslawmail.com
bpena@hslawmail.com

Wallace B. Jefferson/ Nicholas Bacarisse
Alexander Dubose & Jefferson LLP
wjefferson@adjtlaw.com
nbacarisse@adjtlaw.com

*Counsel for Defendants*

Michael J. Wynne/Heather Martinez
Gregor Wynne Arney, PLLC
mwynne@gcfirm.com
hmartinez@gcfirm.com

*Counsel for Super Majority Parties*

_/s/ Joshua R. Godbey_
Joshua R. Godbey, Division Chief
Assistant Attorney General

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Laura Edwards on behalf of Joshua Godbey
Bar No. 24049996
laura.edwards@oag.texas.gov
Envelope ID: 46708034
Status as of 10/1/2020 8:58 AM CST

Associated Case Party: WC 1st and Trinity, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Viola Pena | 24050372 | bpena@hslawmail.com | 9/30/2020 12:08:30 PM | SENT |
| Wallace Jefferson | 19 | wjefferson@adjtlaw.com | 9/30/2020 12:08:30 PM | SENT |
| Nicholas Bacarisse | 24073872 | nbacarisse@adjtlaw.com | 9/30/2020 12:08:30 PM | SENT |
| Terry Lane Scarborough | 17716000 | tscarborough@hslawmail.com | 9/30/2020 12:08:30 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael A. Shaunessy | 18134550 | mshaunessy@mcginnislaw.com | 9/30/2020 12:08:30 PM | SENT |
| Joshua Godbey | 24049996 | Joshua.Godbey@oag.texas.gov | 9/30/2020 12:08:30 PM | SENT |
| Ray Chester | 4189065 | rchester@mcginnislaw.com | 9/30/2020 12:08:30 PM | SENT |
| Heather Martinez | | hmartinez@gcfirm.com | 9/30/2020 12:08:30 PM | SENT |

Associated Case Party: GregoryS.Milligan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rhonda Bear Mates | 24040491 | Mates@slollp.com | 9/30/2020 12:08:30 PM | SENT |
| Stephen W. Lemmon | | lemmon@slollp.com | 9/30/2020 12:08:30 PM | SENT |

Associated Case Party: World Class Interests, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael JohnWynne | | mwynne@gcfirm.com | 9/30/2020 12:08:30 PM | SENT |

Associated Case Party: Ken Paxton on Behalf of the Public Interest in Charity

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Edwards on behalf of Joshua Godbey
Bar No. 24049996
laura.edwards@oag.texas.gov
Envelope ID: 46708034
Status as of 10/1/2020 8:58 AM CST

Associated Case Party: Ken Paxton on Behalf of the Public Interest in Charity

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cathleen Day | 24105783 | cathleen.day@oag.texas.gov | 9/30/2020 12:08:30 PM | SENT |

## OUTSIDE COUNSEL CONTRACT

OAG Contract No. _____

**This Agreement,** including all Addenda (the Addenda are incorporated herein by reference), is hereinafter referred to as the "Outside Counsel Contract" or "OCC." This Outside Counsel Contract is made and entered into by and between the Office of the Attorney General of Texas ("Agency," "Attorney General," or "OAG") and Cammack Law Firm, PLLC ("Outside Counsel"). The term "Parties" as used in this OCC refers to Agency and Outside Counsel. This OCC is made and entered into with reference to the following facts:

### INDUCEMENTS

**Whereas**, Agency requires the assistance of outside legal counsel in carrying out its responsibilities; and

**Whereas**, Outside Counsel desires to provide legal services to Agency, subject to the authority of the Texas Attorney General.

### AGREEMENT

**Now, therefore,** in consideration of the inducements, covenants, agreements, and conditions herein contained, the Parties agree as follows:

**Section 1.    Purpose.**

**1.1    Purpose.** The purpose of this OCC is for Outside Counsel to provide legal services to Agency, as described in Addendum A.

**1.2.1    Litigation.** OUTSIDE COUNSEL SHALL NOT REPRESENT AGENCY IN ANY LITIGATION UNLESS ADDENDUM A SPECIFICALLY AUTHORIZES LITIGATION IN A PARTICULAR MATTER.

**1.2.2    Appellate Matters.** Irrespective of any authorization to engage in litigation in this OCC, or in a writing outside of this OCC, OUTSIDE COUNSEL IS NOT AUTHORIZED TO PROCEED ON ANY APPEAL, IN ANY CAPACITY, WHETHER INTERLOCUTORY OR OTHERWISE, WHETHER AS APPELLANT, APPELLEE, RESPONDENT, APPLICANT, OR OTHERWISE, WITHOUT FIRST OBTAINING THE WRITTEN PERMISSION OF THE ATTORNEY GENERAL, FIRST ASSISTANT ATTORNEY GENERAL, OR SOLICITOR GENERAL.

**1.2.3    OAG Review of Outside Counsel Invoice and Release of Payment.** Outside Counsel invoices will be reviewed and approved by the OAG pursuant to Subsection 402.0212(b) of the Texas Government Code and Title 1, Chapter 57 of the Texas Administrative Code.

**EX. 6**

**Section 2.      OCC Term.**

This OCC shall commence on 9/3/2020, and shall terminate on 8/31/2021 (hereinafter "OCC Term"), unless terminated earlier pursuant to Section 7 of this OCC.  The OCC Term may not be extended except by amendment pursuant to Section 9.12 of this OCC.

**Section 3.      Obligations of Outside Counsel.**

**3.1      Duties.**  Outside Counsel shall provide professional legal services to Agency as described in Addendum A.  Outside Counsel shall represent Agency with due professional care as required by applicable law and disciplinary rules.

**3.2      Staff.**  Outside Counsel is expected to perform valuable services for Agency, and the method and amount or rate of compensation are specified in Section 5 and Addendum B of this OCC.   Outside Counsel staff and employees are expected to perform work of a type commensurate with their professional titles.  Outside Counsel agrees that any person employed or engaged by Outside Counsel and who assists in performing the services agreed to herein shall not be considered employees or agents of Agency or the State of Texas.

**3.3      Public Information and Client Communications.**  Outside Counsel acknowledges that information created or exchanged in the course of representation of a governmental body may be subject to the Texas Public Information Act, Chapter 552 of the Texas Government Code, and may be subject to required disclosure in a publicly accessible format pursuant to Section 2252.907 of the Texas Government Code.  Outside Counsel will exercise professional judgment and care when creating documents or other media intended to be confidential or privileged attorney-client communications that may be subject to disclosure under the Public Information Act (e.g. invoices where incidental notation may tend to reveal litigation strategies or privileged information).  Outside Counsel should mark confidential or privileged attorney-client communications as confidential.  This subsection shall not be interpreted to limit Outside Counsel's duty to provide full disclosure to Agency as necessary in Outside Counsel's judgment to represent Agency with due professional care or as required by applicable law or disciplinary rules.

**3.4      Status.**  Pursuant to the standard of professional care owed to the Agency, Outside Counsel shall endeavor to keep Agency fully informed about all material matters relating to legal services provided under this OCC.

**3.5      Subcontracting Authority.**  In the event Outside Counsel determines it is necessary or expedient to subcontract for any of the performances herein, or in support of any of those performances, Outside Counsel may enter into such subcontract(s) after obtaining express written approval from Agency.  If Outside Counsel purports to enter into a subcontract without express written approval from Agency, the Parties agree that such contract shall be voidable at the option of Agency and that Outside Counsel shall have no recourse against Agency or the State of Texas for any direct or indirect costs, damages, or any other expenses related to the subcontractor.  For all subcontracts entered by Outside Counsel, the Parties agree that all such subcontracts are subject to Section 4 (Liability), Subsection 5.2 (Reimbursement of Expenses),

Subsection 5.3 (Subcontractor Payments), Subsection 6.2 (Subcontractor Invoices), and Subsection 6.5 (Supporting Documents; Right-to-Audit; Inspection of Records) of this OCC. Furthermore, if Outside Counsel elects to enter into a subcontract for any legal services, then the Parties agree that Agency shall not be liable to Outside Counsel for any rates or rate ranges greater than or inconsistent with the highest rate or rate range specified in Addendum B unless prior written approval is obtained from Agency.   Any subcontracted legal counsel also must comply with Subsections 5.5 (Administrative Staff/Clerks) and 9.8 (Conflict of Interest) of this OCC.

Outside Counsel agrees to comply with all state and federal laws applicable to any subcontractors, including, but not limited to, laws regarding wages, taxes, insurance, historically underutilized businesses, and workers' compensation.

In no event shall this section or any other provision of this OCC be construed as relieving Outside Counsel of the responsibility for ensuring that all services rendered under this OCC, and any subcontracts thereto, are rendered in compliance with all of the terms of this OCC.

**Section 4.      Liability.**

**4.1      Limitation of Liability.**  The Parties stipulate and agree that the State of Texas and Agency's total liability to Outside Counsel, including consideration for the full, satisfactory, and timely performance of all its duties, responsibilities, and obligations, and for reimbursement of all expenses, if any, as set forth in this OCC or other liability arising out of any performance herein shall not exceed:

**$25,000.00 for this OCC Term.**

Outside Counsel agrees that the State of Texas and its agencies (other than Agency) shall have no liability arising out of this OCC or the services of this OCC to Outside Counsel.

**4.2      Subject to Appropriation.**  The Parties acknowledge and agree that nothing in this OCC will be interpreted to create a future obligation or liability in excess of the funds currently appropriated to Agency.

**Section 5.      Compensation/Expenses.**

**5.1      Fees to Outside Counsel.**    Consistent with Title 1, Chapter 57 of the Texas Administrative Code, Agency agrees to pay Outside Counsel in consideration of full and satisfactory performance of the legal services under this OCC.   Services for non-attorney timekeeper classifications listed on Addendum B, if applicable, such as paralegal, legal assistant, or patent agent, must be of a substantive legal nature in order to be reimbursable.   Outside Counsel agrees to the fee schedule as described in Addendum B.

**5.2      Reimbursement of Expenses.**  Agency will reimburse Outside Counsel for actual expenses incurred in the performance of the legal services described in Addendum A, if such expenses are reasonable and either necessary or advisable.  Outside Counsel must provide copies

of original receipts as evidence of actual expenditures. Limitations on the amount and type of reimbursement include the following, unless otherwise agreed upon by Agency in writing, in advance, and in accordance with Agency policy and relevant law:

**5.2.1   Mileage.**  Agency will reimburse Outside Counsel for reasonable and necessary travel mileage at the per mile rate posted on the Texas Mileage Guide adopted under Section 660.043 of the Texas Government Code.  The Texas Mileage Guide is currently available on the Comptroller of Public Accounts's website, at: https://fmx.cpa.state.tx.us/fm/travel/travelrates.php.

**5.2.2   Meals.**  Agency will reimburse Outside Counsel for reasonable and necessary meal expenses in accordance with the Textravel guide published by the Texas Comptroller of Public Accounts.  Agency will reimburse Outside Counsel at the allowable rate provided by the Textravel guide or actual expenses, whichever is less, for each timekeeper as listed in Addendum B for each day requiring overnight travel and on the return day of travel.  Agency will not reimburse Outside Counsel for the purchase of alcohol.  The Textravel guide is currently available on the Comptroller of Public Accounts's website at: https://fmx.cpa.texas.gov/fmx/travel/textravel/rates/current.php.

**5.2.3   Lodging.**  Agency will reimburse Outside Counsel for reasonable and necessary lodging expenses.  Unless otherwise agreed upon by Agency in writing in advance, Texas lodging or overnight accommodations will be reimbursed at the lesser amount of the actual expense or $200.00 per timekeeper, as listed in Addendum B, per night. Unless otherwise agreed upon by Agency in writing in advance, out-of-Texas lodging or overnight accommodations will be reimbursed at the lesser amount of the actual expense or $250.00 per timekeeper, as listed in Addendum B, per night.

**5.2.4   Airfare.**  Airfare will be reimbursed at the lesser amount of the actual expense or the regular published rates for airfares for commercial airlines.  Agency will not reimburse Outside Counsel for expenses relating to first-class airfare, which includes first- or business-class airfare or any other expense related to premium or preferred airfare benefits.

**5.2.5   Expert Services.**  Subject to Agency's prior approval, Agency will reimburse Outside Counsel for the reasonable and necessary cost of expert services.

**5.2.6   Other Reimbursable Expenses.**  Agency will reimburse the actual cost for other expenses if Outside Counsel provides a reasonable and sufficient explanation of the nature and purpose of the charge and the charge is reasonable and either necessary or advisable.

**5.2.7   Non-Reimbursable Expenses.**  Agency expects Outside Counsel to anticipate and include routine operating expenses and disbursements as part of overhead and, therefore, part of a basic hourly rate or flat rate.  Therefore, Agency will not reimburse Outside Counsel for: routine copying and printing charges; fax charges; routine postage; office supplies; telephone charges unless related to teleconferencing services; local travel (within 20-mile radius of office including mileage, parking, and tolls) not relating to overnight travel; all delivery services

performed by internal staff; electricity or other utilities; software costs or subscription fees; and internet or wireless access charges.

    **5.2.8   Gratuity.**  Agency will not reimburse Outside Counsel for tips or gratuities.

    **5.2.9   Reimbursement for Agency Employee Expenses.**  Agency will not reimburse Outside Counsel for the cost of expenses incurred by Agency employees.

    **5.2.10  No Mark-up.**  Outside Counsel will only be reimbursed for actual expenses. Outside Counsel shall not be reimbursed for any mark-up or other overhead costs.

**5.3   Subcontractor Payments.**  Subject to Agency's prior approval, Agency will reimburse Outside Counsel for the actual, reasonable and necessary expenses relating to Outside Counsel's use of subcontractors.  Outside Counsel shall be responsible for any payments and other claims due to subcontractors for work performed under this OCC.  Outside Counsel, in subcontracting for any performances or in support of any of the performances specified herein (e.g., expert services, local counsel, and other services), expressly understands and agrees that Agency shall not be directly liable in any manner to Outside Counsel's subcontractor(s).

**5.4   Legal Research.**  Agency may reimburse Outside Counsel for its reasonable and necessary expenses relating to legal research, including online legal research.

While Agency should be paying Outside Counsel to apply the knowledge and expertise for which it was hired, and not paying Outside Counsel to obtain that knowledge through extensive legal research, Agency understands that situations arise that justify extensive research on how best to proceed in order to achieve a desired result.  Therefore, the need for extensive legal research will be addressed on a case-by-case basis by Outside Counsel and Agency.

**5.5   Administrative Staff/Clerks.**  Agency will only pay for substantive legal work performed by attorneys or other qualified personnel, regardless of the job title or classification applicable to such individual.  For purposes of this agreement, "substantive legal work" has the same meaning as defined by the Texas Paralegal Standards adopted by the Board of Directors of the State Bar of Texas.  Agency will not pay for law clerks or interns, however classified, under any circumstances. Agency will not pay for administrative staff, such as secretarial support, librarians, case clerks, and accounting and billing clerks, for activities including but not limited to the following:  overtime, file opening, file organization, docketing, and other administrative tasks; and preparation of billing, invoice review, budget preparation, and communications regarding same or any other accounting matter.

**5.6   Training.**  Agency will not pay for the education or training of attorneys, paralegals, or other staff of Outside Counsel, including assigning such staff on a transient basis to an Agency matter.

**Section 6.   Invoices for Payment.**

**6.1    General.**  Outside Counsel agrees to abide by the administrative rules adopted by the OAG governing the submission, review, and approval of invoices found at Title 1, Chapter 57 of the Texas Administrative Code.  Outside Counsel understands and agree that no invoice shall seek reimbursement for services performed or expenses incurred in violation of the provisions of this OCC.

   **6.1.1    Billing Period**. The billing period is the interval (ex. monthly) which determines the frequency Outside Counsel will submit invoices to the Agency.  The billing period for this OCC is specified in Addendum B. Unless otherwise specified in Addendum B of the Contract, a billing period defined as "monthly" shall begin with the first day of the calendar month and end with the last day of the calendar month.

   **6.1.2    Billable Time.** Agency will only pay for the services of individuals covered in Addendum B.  All times must be billed in one-tenth hour or one-quarter hour increments, and must reflect only actual time spent.  Tasks referencing correspondence and filings must describe the document received or authored.  Agency expects to be billed for the actual time it takes to modify standardized forms, filings, and/or correspondence for use on the matter being billed.  Agency will not reimburse Outside Counsel for the time it originally took to prepare any such standardized documents.  Agency will not pay for review, execution, and processing of the OCC and submission of invoices.

   **6.1.3    Submission of Invoices.** Outside Counsel must submit invoices to Agency for review within one calendar month from the end of the relevant billing period covered by the invoice. Outside Counsel must submit invoices to Agency at:

> general.counsel@oag.texas.gov
>
> OR
>
> Attn.:  General Counsel Division
> Office of the Attorney General
> Mail Code 074
> Post Office Box 12548
> Austin, Texas 78711-2548

**6.2    Subcontractor Invoices.**  Subcontractor(s) shall directly invoice Outside Counsel, and Outside Counsel shall then invoice Agency for the work performed.  The actual work performed by subcontractor shall be specifically identified in the invoice supported by attached documentation.

**6.3    Prompt Payment.**  Payments to Outside Counsel by Agency under this OCC shall be in compliance with Chapters 2251 of the Texas Government Code and Title 34, Chapter 20, Subchapter F of the Texas Administrative Code.

**6.4     Supporting Documents; Right-to-Audit; Inspection of Records.**

     **6.4.1     Duty to Maintain Records.**  Outside Counsel shall maintain adequate records to support its charges, procedures, and performances to Agency for all work related to this OCC. Outside Counsel shall also maintain such records as are deemed necessary by Agency, the State Auditor's Office, or federal auditors if federal funds are used to pay Outside Counsel, to ensure proper accounting for all costs and performances related to this OCC.

     **6.4.2     Records Retention.**  Outside Counsel shall retain, for a period of at least seven (7) years after the later of (1) the expiration or termination of this OCC or (2) the resolution of all issues that arise from any litigation, claim, negotiation, audit, open records request, administrative review, or other action involving this OCC, such records as are necessary to fully disclose the extent of services provided under this OCC, including but not limited to any daily activity reports, time distribution and attendance records, and other records that may show the basis of the charges made or performances delivered.

     **6.4.3     Inspection of Records and Right to Audit.**  Outside Counsel shall make available at reasonable times and upon reasonable notice, and for reasonable periods, all information related to the State of Texas' property, services performed, and charges, such as work papers, reports, books, data, files, software, records, and other supporting documents pertaining to this OCC, for purposes of inspecting, monitoring, auditing, or evaluating by Agency, the State of Texas, or their authorized representatives. Outside Counsel shall cooperate with auditors and other authorized Agency and State of Texas representatives and shall provide them with prompt access to all of such property as requested by Agency or the State of Texas.

     **6.4.4     State Auditor.**  In addition to and without limitation on the other audit provisions of this OCC, pursuant to Section 2262.154 of the Texas Government Code, the State Auditor's Office may conduct an audit or investigation of Outside Counsel or any other entity or person receiving funds from the State of Texas directly under this OCC or indirectly through a subcontract under this OCC. The acceptance of funds by Outside Counsel or any other entity or person directly under this OCC or indirectly through a subcontract under this OCC acts as acceptance of the authority of the State Auditor's Office, under the direction of the Legislative Audit Committee, to conduct an audit or investigation in connection with those funds. Under the direction of the Legislative Audit Committee, Outside Counsel or any other entity or person that is the subject of an audit or investigation by the State Auditor's Office must provide the State Auditor's Office with access to any information the State Auditor's Office considers relevant to the investigation or audit. Outside Counsel further agrees to cooperate fully with the State Auditor's Office in the conduct of the audit or investigation, including providing all records requested. Outside Counsel shall ensure that this paragraph concerning the authority to audit funds received indirectly by subcontractors through Outside Counsel and the requirement to cooperate is included in any subcontract it awards. The State Auditor's Office shall at any time have access to and the right to examine, audit, excerpt, and transcribe any pertinent books, documents, working papers, and records of Outside Counsel related to this OCC.

## Section 7.    Termination

**7.1    Convenience of the State.**  Agency has the right to terminate this OCC, in whole or in part, without penalty, by notifying Outside Counsel in writing of such termination prior to the effective date of such termination.  Such notification of termination shall state the effective date of termination.  In the event of such termination, Outside Counsel shall, unless otherwise mutually agreed upon in writing, cease all services immediately, except such services that are necessary to wind-up, in a cost-effective manner, all services being provided.  Subject to Section 4 of this OCC, Agency shall be liable for payments for all services performed under this OCC to the effective date of termination, plus any necessary services to cost effectively wind-up.

**7.2    Cause/Default.**  In the event that Outside Counsel commits a material breach of this OCC, Agency may, upon written notice to Outside Counsel, immediately terminate all or any part of this OCC.  Termination is not an exclusive remedy but will be in addition to any other rights and remedies provided in equity, by law, or under this OCC.

**7.3    Rights Upon Termination or Expiration.**  Upon expiration or termination of this OCC for any reason, Outside Counsel shall, subject to Outside Counsel's professional obligations, immediately transfer to Agency all information and associated work products prepared by Outside Counsel or otherwise prepared for Agency pursuant to this OCC, in whatever form such information and work products may exist, to the extent requested by Agency.  At no additional cost to Agency and in any manner Agency deems appropriate in its sole discretion, Agency is granted the unrestricted right to use, copy, modify, prepare derivative works from, publish, and distribute any component of the information, work product, or other deliverable made the subject of this OCC.

**7.4    Remedies.**  Notwithstanding any exercise by Agency of its rights of early termination, Outside Counsel shall not be relieved of any liability to Agency for damages due to Agency by virtue of any breach of this OCC by Outside Counsel or for amounts otherwise due Agency by Outside Counsel.

**7.5    Termination by Outside Counsel.**  Consistent with applicable rules of professional conduct, Outside Counsel may terminate this OCC upon reasonable notice for material breach by Agency.

## Section 8.    Certifications of Outside Counsel

By agreeing to and signing this OCC, Outside Counsel hereby makes the following certifications and warranties:

**8.1    Delinquent Child Support Obligations.**  Outside Counsel certifies that it is not ineligible to receive any grant, loan, or payment under this OCC pursuant to Section 231.006 of the Texas Family Code and acknowledges that this OCC may be terminated and payment may be withheld if this certification is inaccurate.

**8.2    Buy Texas.**  With respect to any services purchased pursuant to this OCC, Outside Counsel represents and warrants that it will buy Texas products and materials for use in providing the services authorized herein when such products and materials are available at a comparable price and within a comparable period of time when compared to non-Texas products and materials.  This subsection does not apply to Outside Counsel providing legal services located outside the State of Texas.

**8.3    Gift to Public Servant.**  Outside Counsel warrants that it has not given, nor does it intend to give at any time hereafter, any economic opportunity, future employment, gift, loan, gratuity, special discount, trip, favor, or service to a public servant in connection with the award of this OCC.

**8.4    Franchise Tax.**  By signing this OCC, Outside Counsel certifies that its Texas franchise tax payments are current, or that it is exempt from or not subject to such tax, consistent with Chapter 171 of the Texas Tax Code.

**8.5    Outside Counsel License/Conduct.**  Outside Counsel certifies that each attorney performing services under this OCC is an attorney in good standing under the laws of the State of Texas or the jurisdiction where the representation occurs.  Outside Counsel will notify Agency in writing within one business day of any lapse in an assigned attorney's licensed status or any final disciplinary action taken against an assigned attorney.  For the Lead Counsel(s) named in Addendum B, Outside Counsel will provide documentation of good standing from the state bar or the licensing authority of the jurisdiction in which the attorney resides and is licensed.  An attorney that is not licensed by the State Bar of Texas may not provide legal services and advice concerning Texas law.

**8.6    Debt to State.**  Outside Counsel acknowledges and agrees that, to the extent Outside Counsel owes any debt (child support or other obligation) or delinquent taxes to the State of Texas, any payments Outside Counsel are owed under this OCC may be applied by the Comptroller of Public Accounts toward any such debt or delinquent taxes until such debt or delinquent taxes are paid in full.

**8.7    Prohibited Bids and Contracts.**  Under Section 2155.004 of the Texas Government Code, Outside Counsel certifies that it is not ineligible to receive this OCC and acknowledges that this OCC may be terminated and payment withheld if this certification is inaccurate.

**8.8    Compliance with State Law Contracting Provisions.**  Agency and Outside Counsel certify that this OCC is compliant, and will remain compliant, with any and all applicable laws governing contracts involving the State of Texas or its agencies, including, but not limited to, Sections 572.054 (Representation by Former Officer or Employee of Regulatory Agency Restricted; Criminal Offense), 572.069 (Certain Employment for Former State Officer or Employee Restricted), 669.003 (Contracting with Executive Head of State Agency), 2252.901 (Contracts with Former or Retired Agency Employees), 2252.908 (Disclosure of Interested Parties), and 2261.252 (Disclosure of Potential Conflicts of Interest; Certain Contracts Prohibited) of the Texas Government Code.

**8.9   Does not Boycott Israel.**  Pursuant to Section 2270.002 of the Texas Government Code, Outside Counsel certifies, by executing this OCC, that Outside Counsel does not, and will not during the term of this OCC, boycott Israel. Outside Counsel further certifies that no subcontractor of Outside Counsel boycotts Israel or will boycott Israel during the term of this agreement. Outside Counsel agrees to take all necessary steps to ensure this certification remains true during the term of this OCC.

**8.10   Prohibited Companies.**  Outside Counsel certifies, by executing this OCC, that neither Outside Counsel, nor any subcontractor of Outside Counsel, is a company under Texas Government Code section 2252.152 with which Agency may be prohibited from contracting. Outside Counsel agrees to take all necessary steps to ensure this certification remains true during the term of this OCC.

**8.11   Limitation on Abortion Funding.**  Outside Counsel acknowledges and agrees that, under article IX, section 6.25 of the General Appropriations Act, 86th Leg., R.S. (2019), and except as provided by that Act, funds may not be distributed under this OCC to any individual or entity that: (1) performs an abortion procedure that is not reimbursable under the State of Texas' Medicaid program; (2) is commonly owned, managed, or controlled by an entity that performs an abortion procedure that is not reimbursable under the State of Texas' Medicaid program; or (3) is a franchise or affiliate of an entity that performs an abortion procedure that is not reimbursable under the State of Texas' Medicaid program.

**Section 9.   General Terms and Conditions**

**9.1   Independent Contractor.**  Outside Counsel agrees and acknowledges that during the OCC Term, Outside Counsel and Outside Counsel's subcontractors are independent contractors of Agency or the State of Texas and are not employees of Agency or the State of Texas.

**9.1.1**   Outside Counsel will be solely and entirely responsible for its acts and the acts of its agents, employees, subcontractors, and representatives in the performance of this OCC.

**9.1.2**   Outside Counsel agrees and acknowledges that during the OCC Term, Outside Counsel shall be entirely responsible for the liability and payment for Outside Counsel or Outside Counsel's employees or assistants, of all taxes of whatever kind, arising out of the performances in this OCC.  Other than the payments described in this OCC, Outside Counsel agrees and acknowledges that Outside Counsel or Outside Counsel's employees or assistants shall not be entitled to any State benefit on account of the services provided hereunder. AGENCY SHALL NOT BE LIABLE TO OUTSIDE COUNSEL, ITS EMPLOYEES, AGENTS, OR OTHERS FOR THE PAYMENT OF TAXES OR THE PROVISION OF UNEMPLOYMENT INSURANCE AND/OR WORKERS' COMPENSATION, OR ANY BENEFIT DUE TO A STATE EMPLOYEE.  If Agency or the State of Texas shall nonetheless become liable for such payments or obligations, Outside Counsel shall promptly pay or reimburse Agency or the State of Texas for such liability or obligation.

**9.2   Assignment of OCC.**  Outside Counsel may not assign this OCC, or assign any right or delegate any duty under this OCC, without prior written approval from Agency.

**9.3    Survival.**    The obligations of Outside Counsel under the following sections and subsections shall survive the termination or expiration of this OCC:  3.3, 4, 5, 6.4, 7.1, 7.3, 7.4, 8.8, 9.7, 9.8, 9.11, and 9.13.

**9.4    Copyright/Intellectual Property.**    Outside Counsel shall take reasonable measures to protect Agency from material risks of Agency liability known to Outside Counsel for any copyright or patent infringement or disclosure of trade secrets resulting from the use of any equipment, materials, information, or ideas furnished by Outside Counsel pursuant to this OCC (other than equipment, materials, information, or ideas supplied or required by Agency or its employees or other agents).  Outside Counsel and Agency agree to furnish timely written notice to each other of any claim of copyright, patent, trade secret, or other intellectual property infringement arising out of services under this OCC.

**9.5    Media Releases or Pronouncements.**    Outside Counsel understands that Agency does not endorse any vendor, commodity, or service.  Outside Counsel, its employees, representatives, agents, or subcontractors may not participate in any media event or issue any media release, advertisement, publication, editorial, article, or public pronouncement that pertains to this OCC or the services or project to which this OCC relates or that mentions Agency without the prior written approval of Agency.

**9.6    Written Notice Delivery.**    Any notice required or permitted to be given under this OCC by one party to the other party shall be in writing and shall be given and deemed to have been given immediately if delivered in person to the recipient's address set forth in this subsection, or on the date shown on the certificate of receipt if placed in the United States mail, postage prepaid, by registered or certified mail with return receipt requested, addressed to the receiving party at the address hereinafter specified.

   **9.6.1    Outside Counsel's Address.**    The address for Outside Counsel for all purposes under this OCC and for all notices hereunder shall be:

Brandon Cammack
Cammack Law Firm PLLC
4265 San Felipe St #1100
Houston, Texas 77027
Phone: 713-300-9291
Email: brandon@cammacklawfirm.com

   **9.6.2    OAG's Address.**    The addresses for the OAG for all purposes under this OCC, except as provided by Subsection 6.1.3, and for all notices hereunder shall be:

Office of the Attorney General
General Counsel Division, Mail Code 074
Post Office Box 12548
Austin, Texas 78711-2548

**9.7     Dispute Resolution.**

**9.7.1**   The dispute resolution process provided for in Chapter 2260 of the Texas Government Code shall be used, as further described herein, by Agency and by Outside Counsel to attempt to resolve any claim for breach of this OCC made by Outside Counsel.

**9.7.2** Outside Counsel's claims for breach of this OCC that the Parties cannot resolve in the ordinary course of business shall be submitted to the negotiation process provided in Chapter 2260, Subchapter B, of the Government Code.  To initiate the process, Outside Counsel shall submit written notice, as required by Subchapter B, to the Agency's contact with a copy to the Texas First Assistant Attorney General or his/her designee.  Said notice shall specifically state that the provisions of Chapter 2260, Subchapter B, are being invoked.  A copy of the notice shall also be given to all other representatives of Outside Counsel and Agency otherwise entitled to notice under this OCC.  Compliance by Outside Counsel with Subchapter B is a condition precedent to the filing of a contested case proceeding under Chapter 2260, Subchapter C, of the Government Code.

**9.7.3** The contested case process provided in Chapter 2260, Subchapter C, of the Texas Government Code is Outside Counsel's sole and exclusive process for seeking a remedy for any and all alleged breaches of this OCC by Agency or the State of Texas if the Parties are unable to resolve their disputes under Section 9.7.2 of this OCC.

**9.7.4** Compliance with the contested case process provided in Chapter 2260, Subchapter C, of the Texas Government Code is a condition precedent to seeking consent to sue from the Legislature under Chapter 107 of the Texas Civil Practices and Remedies Code. Neither the execution of this OCC by Agency nor any other conduct of any representative of Agency relating to this OCC shall be considered a waiver of sovereign immunity.

**9.7.5**   The submission, processing, and resolution of Outside Counsel's claim is governed by Title 1, Chapter 68 of the Texas Administrative Code adopted by the OAG pursuant to Chapter 2260, as currently effective, hereafter enacted, or subsequently amended, shall govern.

**9.8     Conflict of Interest.**

**9.8.1** Neither local funds nor funds appropriated by the General Appropriations Act may be expended to pay the legal fees or expenses of Outside Counsel in representing Agency in any matter if Outside Counsel is representing a plaintiff in a proceeding seeking monetary damages from the State of Texas or any of its agencies.  For these purposes, "proceedings seeking monetary damages" do not include actions for tax refunds, compensation for exercise of eminent domain authority, or reimbursement of costs of litigation and attorney's fees.

**9.8.2** Neither local funds nor funds appropriated by the General Appropriations Act may be used to pay the legal fees or expenses of Outside Counsel under this OCC if Outside Counsel

currently represents, has represented in the six months preceding this OCC, or will represent in the six months following the termination of this OCC, a client before Agency.

**9.8.3** Outside Counsel shall regularly conduct conflicts analyses on its interests and those of its clients and any subcontractor and immediately disclose, in writing, to Agency any actual or potential conflict with respect to Agency or the State of Texas.

**9.8.4** Outside Counsel has a continual and ongoing obligation to immediately notify Agency, in writing, upon discovery of any actual or potential conflict to Agency or the State of Texas.

**9.9     Taxes.** This OCC shall not be construed so as to supersede the laws of the United States or the State of Texas that accord the State of Texas, Agency, and all departments, agencies, and instrumentalities of the State of Texas exemptions from the payment(s) of all taxes of whatever kind. To the extent allowed by law, Agency will provide, upon the request of Outside Counsel during this OCC Term, all applicable tax exemption documentation.

**9.10    Signatories.** Having agreed to the terms herein, the undersigned signatories hereby represent and warrant that they have authority to enter into this OCC and are acting in their official capacities.

**9.11    Applicable Law and Venue.** This OCC is made and entered into in the State of Texas, and this OCC and all disputes arising out of or relating to this OCC shall be governed by the laws of the State of Texas, without regard to any otherwise applicable conflict of law rules or requirements.

Outside Counsel agrees that Agency and the State of Texas do not waive any immunity (including, without limitation, state or federal sovereign immunity). Outside Counsel further agrees that any properly allowed litigation arising out of or in any way relating to this OCC shall be commenced exclusively in a court of competent jurisdiction in Travis County, Texas. Outside Counsel thus hereby irrevocably and unconditionally consents to the exclusive jurisdiction of a court of competent jurisdiction in Travis County, Texas for the purpose of prosecuting or defending such litigation. Outside Counsel hereby waives and agrees not to assert: (a) that Outside Counsel is not personally subject to the jurisdiction of a court of competent jurisdiction in Travis County, Texas, (b) that the suit, action or proceeding is brought in an inconvenient forum, (c) that the venue of the suit, action or proceeding is improper, or (d) any other challenge to jurisdiction or venue.

**9.12    Amendments.** This OCC, including addenda hereto, may be amended only upon written agreement signed by the Parties.

**9.13    Severability/Interpretation.** The fact that a particular provision in this OCC is held under any applicable law to be void or unenforceable in no way affects the validity of other provisions, and this OCC will continue to be binding on both Parties. Any provision that is held to be void or unenforceable will be interpreted by the Parties or the courts to be replaced with language that is as close as possible to the intent of the original provision so as to effectuate the

purpose of this OCC.  Any ambiguous or conflicting terms shall be interpreted and construed in such a manner as to accomplish the purpose of this OCC.

**9.14    Insurance Required.**  Outside Counsel will undertake reasonable efforts to obtain and maintain during this OCC Term malpractice insurance in an amount not less than $10,000.00 or the amount specified in Section 4.1 of this OCC, whichever is more.

Further, Outside Counsel agrees to give notice to Agency in the event any amount of malpractice insurance is canceled.  Outside Counsel also agrees to furnish to Agency certified copies of such insurance policies when requested.  Outside Counsel agrees that no claim by Agency and the State of Texas for damages resulting from breach of Outside Counsel's duties to Agency under this OCC shall be limited to the amount of malpractice insurance maintained by Outside Counsel.

**9.15    Additional Terms.**  Any additional terms agreed to by Outside Counsel and Agency shall be listed in an optional Addendum C.  These terms shall not be inconsistent with or contrary to the Contract terms listed above, and nothing in Addendum C shall remove or modify terms contained in Sections 1–9.  In the event of any conflict, ambiguity or inconsistency between the terms of Addendum C and Sections 1–9 of this Outside Counsel Contract, Sections 1–9 shall take precedence and control.

**9.16    Counterparts.**  This OCC may be executed in multiple counterparts.

**IN WITNESS THEREOF, THE PARTIES HAVE SIGNED AND EXECUTED THIS OCC.**

**Cammack Law Firm PLLC**                                    **Office of the Attorney General of Texas**


By: Brandon Cammack                                          Attorney General or designee
4265 San Felipe St #1100
Houston, Texas 77027
Phone: 713-300-9291
Email: brandon@cammacklawfirm.com

# OUTSIDE COUNSEL CONTRACT

OAG Contract No. _____

## Addendum A

## Services

The Travis County District Attorney's Office referred a criminal complaint to the OAG. The District Attorney's Office requested that the OAG conduct a review of the allegations, which include complaints of potential criminal violations made by certain state and federal employees.

State law allows the OAG to provide assistance to a prosecutor's office, such as the Travis County District Attorney's Office, in the prosecution of criminal cases. *See* Tex. Gov't Code §§ 402.028(a); 41.102(b).

Outside Counsel will conduct an investigation, under the authority of the OAG, of the criminal allegations contained in the complaint referred to the OAG by the District Attorney's Office and shall prepare a report documenting any potential criminal charges that may be discovered in the course of the investigation. Notwithstanding anything to the contrary contained in this OCC, Outside Counsel shall conduct its investigation only as consistent with the complaint referred to the OAG and only as directed by the OAG. Except for Outside Counsel's duty to provide a post-investigation report, this OCC expressly excludes legal services relating to any other post-investigation activities, including, but not limited to, indictment and prosecution.

# OUTSIDE COUNSEL CONTRACT
## OAG Contract No. _____

## Addendum B
## Rates

Attorneys working on Agency matters, including necessary and appropriate personal appearances before the Court, as requested and authorized by Agency Counsel shall be paid according to the following terms:

**Name(s) of Lead Counsel:   Brandon Cammack**

| Timekeeper classification | Hourly Rate (in United States Dollars) |
|---|---|
| Brandon Cammack | $300.00 |

**Billing Period.** The billing period for this OCC shall be: **Monthly**

**Travel Rate.** An attorney's travel rate may not exceed one-half of that attorney's hourly rate listed above. If no hourly rate is identified above or no travel rate(s) listed below, Outside Counsel may not charge Agency for time spent traveling on Agency matters.

**Return to:**
Travis County District Attorney's Office
Special Prosecution Unit
416 W. 11th Street, Suite 200
Austin, Texas  78701

Austin Police Department
Travis County Sheriff's Office
**Travis County District Attorney's Office**
(512) 854-9530
FAX: 854-4810

# REQUEST TO INVESTIGATE

This complaint form is provided to you with the understanding that this office may conduct investigations to determine if a firm or person is in violation of Penal Laws of the State of Texas.  We strongly recommend that you consult with your own private attorney to determine your legal rights and civil remedies in this matter.

(PLEASE TYPE OR PRINT)
## I.  INFORMATION ABOUT THE PARTY OR FIRM COMPLAINED OF:
**See attached.**

*Full Name*

*Address (Street, City, State, Zip)*                                                   *Telephone*

*Race*     *Sex*     *Height*     *Weight*     *Hair*     *Eyes*     *D.O.B*   *or Approximate Age*

*Driver's License #*     *D.L. State*                                 *Social Security Number*

## II. COMPLAINING PARTY AND WITNESS:
**See attached.**

*Your Full Name (and Company Name, if applicable)*

*Address (Street, City, State, Zip)*

*Telephone Numbers (Office & Home)*                   *D.O.B.*         *Driver's License #*     *D.L. State*

*WITNESS – Name*

*Address and Telephone*

*WITNESS – Name*

*Address and Telephone*

## III. INFORMATION ABOUT ALLEGED OFFENSE:
**See attached.**

Date of alleged offense: _____

Where did the offense occur: _____

**EX. 7**

What property was taken: _____

Total value of property taken: _____

What, if any, property have you recovered: _____

_____

What is the business and/or personal relationship between you and the party or firm complained of:

_____

_____

Have you discussed this matter with the person or firm: _____ Their reply: _____

_____

_____

Did you sign a contract: _____ If so, enclose a copy.

What other agencies have you reported this matter to: _____

(PLEASE TYPE OR PRINT)

**IV. FACT DESCRIPTION:** *(attach additional pages as needed)*

      Describe the exact nature of your complaint below and on additional sheets, if necessary.  Please be complete.  Include the name of the individual that you dealt with and dates.  If possible, recite facts in the order in which they occurred.  You must provide copies of all relevant documents (see attached list).  **Keep all originals in a safe place in the event they are needed for court purposes**.  **See attached.**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I certify that the information that I have furnished the District Attorney in this complaint is true and correct to the best of my knowledge and belief, and is furnished for the sole purpose of instituting a criminal prosecution where the investigation indicates criminal activity and not for the purpose of recovering personal property or any other thing of value. I authorize the District Attorney to use the information given in any manner that he deems necessary and proper. I further certify that I understand that the District Attorney's Office cannot give me legal advice or act as my attorney.  I also understand that the completion of this form will not constitute the filing of criminal charges. I have not withheld any information pertinent to this complaint.

_____
SIGNATURE OF COMPLAINTANT

_____
Natin Paul
PRINTED NAME OF COMPLAINTANT

SUBSCRIBED AND SWORN TO before me this the _____ day of _____, A.D., 20____.

_____
(Seal)                              Notary Public in and for the State of Texas
                                    My Commission Expires: _____

**Information needed from you to begin an investigation may include the following, please send as many of these documents as you have available:**

1) In the fact description, be very detailed about what specifically you are alleging (attach additional sheets as necessary.)

2) If checks, drafts or other bank items were used in the commission of the alleged offense include:

   a) Copies of bank statements

   b) Copies of the front and back of checks

   c) Copies of wire orders

   d) Checkbook registers, check stubs, accounting ledgers, and/or complete backup copies of QuickBooks or Peachtree accounting software (include version number).  If you use another type of software, check with the assigned investigator prior to sending a backup file.

   e) Identification of all of the victim's bank accounts.

3) If the victim is a business or association:

   a) Copies of documents used for the legal formation of the business (partnership agreements, articles of incorporation, etc.)

   b) Description of business, including type of operation, names of owners or partners, names of directors and contact information (include on a separate sheet).

   c) The affiant's position within the business

4) If the party about which you are complaining is/was an employee:

   a) Complete personnel file, including application, resume, IRS Forms W2 and W4, direct deposit information, copies of paychecks, list of all direct deposits, copies of reimbursements, time sheets, and relevant correspondence.

5) Promissory notes, security agreements, or loan agreements

6) All civil pleadings and orders related to the actions about which you are complaining.

7) Copies of any receipts or invoices involved

8) Copies of all contracts or written agreements between involved parties

9) Copies of any pertinent written or email correspondence between parties

10) A forensic audit

## I. INFORMATION ABOUT THE PARTY OR FIRM COMPLAINED OF:

**Dorsey Bryan ("Bryan") Hardeman**

██████████████

**William Bryan ("Will") Hardeman**

██████████████

**Christopher L. Dodson**

██████████████

**Stephen Benesh**

██████████████

**Jason Cohen**

██████████████

**Mark Riley**

██████████████

**Justin Bayne**

██████████████

**Tony M. Davis**
[REDACTED]

**Ray Chester**

██████████████

**Gregory Milligan**

██████████████



**Dilum Chandrasoma**

## II. COMPLAINING PARTY AND WITNESS:

**Natin "Nate" Paul**

Witness

Jeremy Stoler

## III. INFORMATION ABOUT ALLEGED OFFENSE:

Date of Alleged Offense:          January 2020 – Ongoing

Where did the offense occur:     Austin, Travis County, Texas

## IV. FACT DESCRIPTION: *(attach additional pages as needed)*

      Describe the exact nature of your complaint below and on additional sheets, if necessary.  Please be complete. Include the name of the individual that you dealt with and dates.  If possible, recite facts in the order in which they occurred.  You must provide copies of all relevant documents (see attached list).  **Keep all originals in a safe place in the event they are needed for court purposes**.

    This complaint is regarding a fraudulent financial scheme to defraud mortgage borrowers that is currently an ongoing conspiracy orchestrated by Bryan Hardeman, Will Hardeman, Justin Bayne, Mark Riley, Christopher Dodson, Steve Benesh, Jason Cohen, Gregory Milligan, Ray Chester, Dilum Chandrasoma, and Judge Tony Davis. The mortgage borrowers that are being defrauded are single-purposes LLC's owning properties that are owned/controlled by myself, Natin "Nate" Paul and/or my company, World Class Holdings.

    Starting with the first loan purchase that occurred in May 2020, the conspirator group led by Bryan and Will Hardeman of the Hardeman Family Joint Venture have acquired mortgage loans from banks that were the mortgage holders on 8 different properties in Austin, San Antonio, and Plano, Texas.

    These individual loan purchases all shared very concerning characteristics from an "anonymous LLC loan purchaser". The loans were all at very low loan-to-value ratios and it became very clear the new "anonymous lender" was moving in an aggressive manner to call loans in to default and pursue remedies.

These remedies include trying to push for foreclosure on the commercial properties when such legal action was prohibited by orders of the City of Austin, Travis County, and the state of Texas.

Our team conducted extensive investigation to unearth the circumstances behind these loan purchases and the principals behind the anonymous LLC but were unable to find the details we sought through the legal process while the anonymous lender LLC continued an aggressive litigation strategy against the borrowers.

However, that changed when I received a phone call from our lender on one of our properties in downtown Austin. That lender is Alan Nalle.

Alan Nalle called me on Wednesday, September 16th, to let me know of a phone call he received the week prior from Bryan Hardeman. Bryan Hardeman disclosed to Alan Nalle that he had purchased 8 other loans on properties I owned, and that he wanted to acquire Alan Nalle's loan on another one of our properties. Alan told him he would only ever consider selling his loan if a buyer were to pay a large premium, which would not make economic sense for a buyer since they would take a loss when we pay off the loan if the buyer of the loan paid a premium. Bryan Hardeman proceeded to tell Mr. Nalle that he would be willing to pay a premium because the property was worth so much more than the loan balance, and if he bought the loan and proceeded to auction at foreclosure, that all proceeds would go to him as the new loan owner.

Mr. Nalle corrected Mr. Hardeman that he would technically only be allowed to collect on the loan principal balance and unpaid interest in a scenario as he outlined, to which Mr. Hardeman disagreed. He reiterated to Mr. Nalle that when he auctioned the property that he would retain all the proceeds – essentially stating he believed he was buying "ownership" of these properties by solely buying the loans. This raised a red flag to Mr. Nalle. Bryan Hardeman was very confident that he was correct in this assertion and informed Alan Nalle that he was proceeding with this same strategy with the other loans he had purchased.

On this initial call, Bryan Hardeman continued to use the word "we" as he described the actions taken to buy loans and pursue the strategy. Alan Nalle asked Bryan who is "we", and his response was "my family". He told Alan Nalle that his son, Will Hardeman, was "running the deal" and that the capital behind these loan purchases were "his family's money".

Bryan Hardeman told Alan Nalle that he was "using a law firm out of Houston" to pursue these loan purchases, which matched up with the lawyers that were representing the anonymous LLC Lenders: lawyers from Bracewell's Houston office and Mark Riley out of Houston. These anonymous LLC's have only ever presented Justin Bayne as the sole "business person" representing the LLC's as Justin Bayne is named as the sole Manager of the entities. The lawyers have gone to extreme efforts to conceal the identity of the partners behind these anonymous LLC's.

Bryan Hardeman claimed to Alan Nalle on this call many times with pride that he had already purchased approximately $43 million in loans. This amount is consistent with the total loan balances of the 8 loans purchased by anonymous lender LLC's,

Bryan Hardeman made many additional disparaging comments about me that were all false to Alan Nalle on this call to dissuade him from continuing to be my lender and as a motivation for him to sell his loan to him. This is the same strategy he and his co-conspirators did in calling my other lenders where they have purchased and/or attempted to purchase loans. Hardeman claimed to Alan Nalle that he learned of some of these issues from Robert F. Smith, which we believe to be a false statement. He knowingly

made false statements to banks to induce them in to sell him loans on properties for him to undertake this complex fraudulent scheme to steal the properties.

Bryan Hardeman insinuated on this call with Alan Nalle that he was working on this loan purchase strategy with Dilum Chandrasoma, the former President of the Mitte Foundation. On a call to Dani Tristan, Bryan Hardeman stated he has been working with Ray Chester, the lawyer for the Mitte Foundation.

Bryan Hardeman said he was hoping that he would be happy to own the properties at the loan purchase amounts or if someone bid it up to a high amount since he would make all the money someone would pay in an auction – which is incorrect. Bryan Hardeman was steadfast that all the proceeds from the sale of a property would go to him as the loan holder.

I have a very strong relationship with Alan Nalle and he is a well-respected businessman in Austin. Bryan Hardeman was unaware that Alan Nalle and I have a very good relationship of many years and that Alan Nalle has been very pleased with us as a borrower. Alan Nalle called me after receiving this call from Bryan Hardeman because he said the call was very strange and concerning. After he informed me of the details of the call, he let me know that he would call me if he heard from Bryan Hardeman again. By way of background, Alan Nalle has known Bryan Hardeman for over 50 years.

On Friday, September 18th, I received another call from Alan Nalle. He called to let me know he received another call from Bryan Hardeman that was very shocking.

Bryan Hardeman called Alan Nalle as a follow up to their initial call and proceeded to tell him of his real plan and his intentions in making these loan purchases and the details of his complex scheme. On this call, Bryan Hardeman outlined the complex fraudulent scheme that he and his co-conspirators are actively pursuing to take these properties involving all of the named subjects of this complaint.

Bryan Hardeman called to let him know that in the Bankruptcy Court for the Western District of Texas that the Bankruptcy Judge had dismissed the bankruptcy cases on 2 properties. These 2 properties are 2 where the Mitte Foundation is a small limited partner and Gregory Milligan has been involved as a receiver at Mitte's direction.

Bryan then told Alan Nalle that the bankruptcy judge for the US Courts system of the Western District, Tony Davis, lives in Austin but has an apartment in Houston because his wife is undergoing a lung transplant. Bryan told Alan that his lawyers in Houston are good friends with Judge Tony Davis and that they have cut a "deal" with Judge Davis and have him on board with this elaborate scheme.

According to Bryan Hardeman, his lawyers are going to move to consolidate the loans that he has purchased in to a single bankruptcy case in Judge Davis' court in the "coming week or two". They will then file a motion to appoint Gregory Milligan as a receiver/trustee over these properties to act at his direction. According to Bryan Hardeman, this conspiracy and collusion between Hardeman, his lawyers, and Milligan was proposed to Judge Tony Davis and that Judge Davis has told them that if they file such actions, he would approve the motion and go along with their plan. This "side agreement" allegedly took place in a meeting between his lawyers and Judge Davis in Houston.

This "move", as Bryan Hardeman calls it, is Hardeman's grand plan to remove me from control of my own properties by having Judge Tony Davis approve the insertion of Gregory Milligan. He then states that Milligan is on board with his plan to let him move to auction the assets and steal the equity in the properties in this orchestrated scheme. Bryan Hardeman stated to Alan Nalle that he and Gregory Milligan have a coordinated effort for this plan.

We have seen the anonymous lender LLC in one of the loans he has purchased (4th and Colorado) make a motion to attempt to appoint Gregory Milligan as receiver over control of the property. However, we put that property in to Chapter 11 bankruptcy to ward off the predatory lender. Hardeman's scheme he outlined to Nalle would entail him bringing Milligan in to the bankruptcy to work at his direction to disadvantage and steal from the borrower.

Bryan Hardeman then told Alan Nalle another shocking statement. Hardeman told Nalle that he has previously foreclosed on loans to take back properties against other property owners where third-party bidders showed up to purchase the properties. Hardeman said he had his lawyers present at the auctions to talk to the third-party bidders and tell them to stop bidding on the loans because the Hardeman entities were going to bid the loan amount to take ownership of the property at the loan balance and they would then turn around and sell the property to the third party bidder at a price slightly lower than they would pay in the legal foreclosure auction bid process. This highly illegal "rigged auction" process, coordinated by Hardeman and his lawyers, is the reason he stated to Nalle on the previous call that he expects to be the beneficiary of all sale proceeds when he auctions properties as a remedy. This is the strategy Bryan Hardeman is pursuing in this fraudulent scheme to steal the properties.

Alan Nalle then told Bryan Hardeman, "Why would a bidder agree to this on the courthouse steps and act on a verbal agreement. This sounds like a conspiracy to defraud the landowner of what his part of the deal." Bryan Hardeman responded, "I have done this before. It works."

Alan Nalle stated he believed Bryan Hardeman told him what he was doing because they have a 50-year relationship. Alan Nalle stated he believed Bryan also told him this because he expects Bryan's next call will be to Alan to ask if he wants to partner with him on these loan purchases he made. Alan Nalle stated he would have no interest if such an offer is made. Alan Nalle stated on the call that Bryan Hardeman's scheme is a "clear conspiracy to defraud the landowners" and is "illegal". Even more alarming is that this a scheme he has completed before and gotten away with it.

Mark Riley, one of Hardeman's Houston lawyers, serves as General Counsel to the anonymous LLCs that own the loans. He has been named as the "substitute trustee" to handle the auctions in the event of a foreclosure auction and will be the party that is running the rigged bidding auctions.

Alan Nalle stated Bryan Hardeman was "braggadocious" in explaining his concocted scheme to defraud me and was bragging about having done this to other landowners before.

Bryan Hardeman reiterated on this call to Alan Nalle that he owns $43 million in loans on properties I own and that he is actively working to acquire another loan on a shopping center I own in San Antonio and that he fully expects to close on that loan purchase.

I informed Alan Nalle that the properties I own that have the $43 million in loans are valued at approximately $200 million. Therefore, my equity in the properties is approximately $157 million.

Bryan Hardeman's complex fraudulent scheme is to steal this $150+ million in equity in these properties because he and his lawyers have struck an illegal deal with the bankruptcy Judge to consolidate loans in to a single bankruptcy and to appoint Gregory Milligan to be in charge prior to any of this ever actually occurring in the judicial process. Hardeman's plan is to then take ownership of the properties by moving to "auction" the properties in the "rigged bidding" scheme with his lawyers which will give him the opportunity to credit bid and take fee simple ownership of $200 million in properties for the $43 million loan balance which is approximately what he paid for the loans. Alan Nalle stated that Bryan

Hardeman's intention is clearly to "take the difference between the value of the properties and the loans – he is playing to take your equity"

Bryan Hardeman clearly stated he purchased these loans with the intention of completing this fraudulent scheme as he outlined. He has already taken actions in these separate legal disputes on the respective properties which show that this plan is well underway. His intention with purchasing these loans is to defraud the borrower by colluding with his lawyers, the Judge, the proposed receiver/trustee, and potential bidders to take ownership of all of the properties and to deprive me of my legal and constitutional rights.

This fraudulent financial scheme has been orchestrated by Bryan and Will Hardeman on behalf of the Hardeman Family Joint Venture. The lawyers that Hardeman claims have struck the illegal side deal with Judge Davis, and that will be handling the illegal rigged bidding to steal the properties are: Christopher Dodson, Steve Benesh, Jason Cohen, and Mark Riley. Hardeman's partners in these LLC's are Justin Bayne and Mark Riley. The bankruptcy Judge that, according to Hardeman, has agreed to this scheme is Judge Tony M. Davis. Gregory Milligan has conspired with the Hardeman group by agreeing to go along with the scheme by serving as a proposed "neutral" receiver/trustee that will be appointed by Judge Davis. Dilum Chandrasoma and Ray Chester are co-conspirators with the Hardeman group and provide the link between the Hardemans and Milligan through their prior relationship with Milligan. According to Bryan Hardeman statements, all of these parties are aware of his plan and are playing their respective roles in this fraudulent scheme.



October 1, 2020

Dear Mr. Simpson:

This letter is intended to serve as notice to the Office of the Attorney General that on September 30, 2020, we, the undersigned individuals, reported to an appropriate law enforcement authority a potential violation of law committed by Warren K. Paxton, Jr., in his official capacity as the current Attorney General of Texas. We have a good faith belief that the Attorney General is violating federal and/or state law, including prohibitions relating to improper influence, abuse of office, bribery, and other potential criminal offenses. Each signatory below has knowledge of facts relevant to these potential offenses and has provided statements concerning those facts to the appropriate law enforcement authority. Additionally, today, October 1, 2020, the undersigned notified the Attorney General via text message that they have reported the violations to the appropriate law enforcement authority. A copy of the text message is attached hereto.

Sincerely,

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant Attorney General

James Blake Brickman
Deputy Attorney General for Policy
& Strategy Initiatives

Lacey E. Mase
Deputy Attorney General for Administration

Darren L. McCarty
Deputy Attorney General for
Civil Litigation

J. Mark Penley
Deputy Attorney General for
Criminal Justice

Ryan M. Vassar
Deputy Attorney General for Legal Counsel

EX. 8

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marianne Ross on behalf of Thomas Nesbitt
Bar No. 24007738
mross@dnaustin.com
Envelope ID: 50518494
Status as of 2/11/2021 3:59 PM CST

Associated Case Party: JamesBlakeBrickman

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Thomas ANesbitt | | tnesbitt@dnaustin.com | 2/10/2021 8:49:24 AM | SENT |
| Marianne Ross | | mross@dnaustin.com | 2/10/2021 8:49:24 AM | SENT |
| Thomas John Turner | 24043967 | tturner@cstrial.com | 2/10/2021 8:49:24 AM | SENT |
| Kiara Dial | | kdial@cstrial.com | 2/10/2021 8:49:24 AM | SENT |

Associated Case Party: David Maxwell

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Gregory Sapire | 791601 | greg@ssmlawyers.com | 2/10/2021 8:49:24 AM | SENT |
| Carlos Ramon Soltero | 791702 | carlos@ssmlawyers.com | 2/10/2021 8:49:24 AM | SENT |
| Matthew Murrell | | matthew@ssmlawyers.com | 2/10/2021 8:49:24 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| William Helfand | | bill.helfand@lewisbrisbois.com | 2/10/2021 8:49:24 AM | SENT |
| Dawn Garrard | | Dawn.Garrard@lewisbrisbois.com | 2/10/2021 8:49:24 AM | SENT |
| LeGia Russell | | legia.russell@lewisbrisbois.com | 2/10/2021 8:49:24 AM | SENT |
| Sean Braun | | Sean.Braun@lewisbrisbois.com | 2/10/2021 8:49:24 AM | SENT |

Associated Case Party: J.MarkPenley

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Don A. Tittle | 20080200 | don@dontittlelaw.com | 2/10/2021 8:49:24 AM | SENT |
| Roger Topham | 24100557 | roger@dontittlelaw.com | 2/10/2021 8:49:24 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marianne Ross on behalf of Thomas Nesbitt
Bar No. 24007738
mross@dnaustin.com
Envelope ID: 50518494
Status as of 2/11/2021 3:59 PM CST

Associated Case Party: RyanM.Vassar

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph R. Knight | 11601275 | jknight@ebbklaw.com | 2/10/2021 8:49:24 AM | SENT |